**PLANNED PARENTHOOD FEDERATION OF AMERICA, et al., Plaintiffs,**

v.

**John ASHCROFT, Attorney General of the United States, in his official capacity, Defendant.**

**City and County of San Francisco, Plaintiff Intervenor,**

v.

**John Ashcroft, Attorney General of the United States, in his official capacity, Defendant.**

**No. C 03–4872 PJH.**

United States District Court, N.D. California.

June 1, 2004.

Beth H. Parker, Giselle Fahimian, Teresa L. Federer, Deborah A. Adler, Esq., Bingham McCutchen LLP, San Francisco, CA, Eve C. Gartner, Roger K. Evans, Planned Parenthood Federation of America, New York, NY, Helene T. Krasnoff, Planned Parenthood Federation of America, Washington, DC, for Plaintiffs.

Aleeta Marie Van Runkle, Kathleen Suzanne Morris, Therese M. Stewart, Office of the City Attorney, San Francisco, CA, Intervenor Plaintiff.

Andrew Irving Warden, Anthony Joseph Coppolino, James J. Gilligan, Kaija Marie Clark, Terry Marcus Henry, Mark Thomas Quinlivan, Preeya Myrtle Noronha, U.S. Department of Justice, Washington, DC, W. Scott Simpson, U.S. Department of Justice, Washington, VA, for Defendant.

## ORDER GRANTING PERMANENT INJUNCTION; FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT THEREOF

HAMILTON, District Judge.

## TABLE OF CONTENTS

BACKGROUND ................................................. 959

 I. FACTUAL BACKGROUND ................................. 960
 A. Established Abortion Procedure ...................... 960
 B. Contested Abortion Procedure ....................... 963

 II. LEGAL FRAMEWORK .................................... 966

 III. PROCEDURAL HISTORY ................................. 966
ISSUES ...................................................... 967
DISCUSSION ................................................. 967

 I. STANDARD OF REVIEW ................................. 967

 II. UNDUE BURDEN ....................................... 968
 A. Introduction ......................................... 968
 B. Parties' Positions .................................... 968
 C. Legal Background .................................... 969
 D. *Stenberg:* Comparison of Act's Language to Nebraska Statute ......... 970
 E. Findings of Fact ..................................... 971
 F. Conclusions of Law .................................. 973

 III. CONSTITUTIONAL VAGUENESS ......................... 975
 A. Parties' Positions .................................... 975
 B. Legal Standard ...................................... 976
 C. Findings of Fact and Conclusions of Law ............. 976

 IV. HEALTH EXCEPTION ................................... 978
 A. Parties' Arguments .................................. 979
 B. Trial Evidence ....................................... 979
 C. Findings of Fact ..................................... 998
 D. Congressional Findings .............................. 1002
 E. Conclusions of Law .................................. 1032
CONCLUSION ................................................. 1034

## INTRODUCTION

Before this court is the constitutionality of the Partial–Birth Abortion Ban Act of 2003 ("Act"). With the Act, Congress seeks to ban an abortion procedure it refers to as "partial-birth abortion." The

Act is very similar to a prior Nebraska statute banning so-called "partial-birth abortions," which the United States Supreme Court held unconstitutional. *See Stenberg v. Carhart*, 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000). Plaintiffs in this case seek an injunction permanently enjoining enforcement of the Act.

For the reasons that follow, this court concludes that the Act is unconstitutional, and PERMANENTLY ENJOINS enforcement of the Act.[1]

## BACKGROUND

### I. *FACTUAL BACKGROUND*

The Act at issue in this case imposes criminal and civil penalties on "[a]ny physician who, in or affecting interstate or foreign commerce, knowingly performs a partial-birth abortion." 18 U.S.C. § 1531(a). A brief summary of the various abortion procedures is set forth below to aid in an understanding of the Act's scope and the procedure or procedures that it prohibits.[2]

#### A. Established Abortion Procedure

A full-term pregnancy lasts for approximately 40 weeks, measured from the date of the woman's last menstrual period ("lmp").[3] Traditionally, pregnancy is divided into three trimesters, with the first trimester lasting until about the 13th or 14th week of pregnancy, the second lasting until about the 27th week, and the third lasting until birth. *See, e.g.*, Trial Transcript ("Tr.") Vol. 1 at 14:2–20 (Paul). A fetus is considered viable, meaning that it has a realistic chance of long-term survival outside the uterus, at approximately 24 weeks lmp. Tr. Vol. 1 at 14:21–15:5 (Paul); Tr. Vol. 7 at 1119:23–1120:3 (Sprang), Tr. Vol. 9 at 1355:18–22 (Cook, finding viability at 23 weeks).

If a woman chooses to terminate her pregnancy, a doctor will use different medical techniques depending on the gestational age of the fetus. Second trimester abortions, the main subject of this litigation, generally involve one of two procedures: dilation and evacuation ("D & E," or surgical abortion) or induction (which is also known as a medical abortion, meaning that drugs are administered to abort the pregnancy).[4] Other methods that are used much more rarely are hysterotomy (the caesarean removal of the fetus from the uterus) and hysterectomy. Tr. Vol. 1 at 44:7–47:2, 46:8–46:22 (Paul); Exh. 7 (table 16).

#### 1. D & E

A D & E abortion is a surgical procedure, which is performed in two steps: dilation of the cervix and surgical removal

1. The court would like to take this opportunity to express its appreciation for the high quality of advocacy and the degree of professionalism and courtesy exhibited by all counsel.

2. In discussing the background regarding abortion procedures generally, the court relies in part on the testimony of the parties' experts. The background and qualifications of those experts is set forth in this court's findings of fact regarding the necessity of a medical exception. *See* fn 16 below.

3. All gestational ages in this order are dated from lmp unless otherwise indicated. Some doctors date gestational age by the date of conception, which is approximately two weeks after a woman's last menstrual period. *See* Tr. Vol. 10 at 1614:14–23 (Anand).

4. As of 2000, first trimester abortions make up approximately 85% of the 1.3 million abortions performed per year in the United States. Exh. 7 at 31 ("Abortion Surveillance—United States 2000," compiled by the Centers for Disease Control; table 16); *see also* Tr. Vol. 1 at 38:6–42:24 (Paul). For first trimester abortions, the doctor will either perform an early medical abortion (up to 9 weeks) or a vacuum aspiration abortion (which is also known as dilation and curettage, or D & C). Tr. Vol. 1 at 43:18–44:6 (Paul). These procedures are not at issue here.

of the fetus. *See, e.g.,* Tr. Vol. 1 at 50:10–15 (Paul). About 85–95% of all second trimester abortions performed in the United States are D & Es. Tr. Vol. 1 at 48:24–49:17 (Paul); Trial Exhibit ("Exh.") 7 (table 18) (noting that D & Es make up 95% of all abortions taking place between 16 and 20 weeks of pregnancy, and 85% of all abortions taking place after 20 weeks); Tr. Vol. 5 at 804:2–3 (Westhoff).[5]

To begin the D & E process, the woman's cervix is first dilated with osmotic dilators used either alone or in conjunction with drugs known as prostaglandins (or misoprostyl).[6] This encourages the cervix to expand in width and shorten in length, as if in preparation for labor, and will permit the doctor to introduce surgical instruments into the woman's uterus. Tr. Vol. 1 at 50:25–62:6 (Paul); Tr. Vol. 1 at 167:5–10 (Sheehan); Tr. Vol. 3 at 400:18–402:22(Doe); Tr. Vol. 4 at 509:4–511:19 (Broekhuizen); Tr. Vol. 4 at 657:13–662:25 (Creinin); Tr. Vol. 5 at 811:18–812:20 (Westhoff), Tr. Vol. 11 at 1718:4–1720:10 (Chasen). Doctors need more dilation as gestational age increases, and generally try to achieve a minimum of one millimeter of dilation for each week of gestation (for example, a doctor would try to achieve 20 millimeters, or 2 centimeters, of dilation for a 20 week fetus). Tr. Vol. 2 at 182:6–14 (Sheehan); Tr. Vol. 3 at 402:3–5(Doe); Tr. Vol. 4 at 661:22–662:1 (Creinin).[7]

However, the amount of cervical dilation that can be achieved is individual to each woman and cannot necessarily be controlled. Tr. Vol. 1 at 55:8–14 (Paul); Tr. Vol. 2 at 14–15 (Sheehan); Tr. Vol. 3 at 402:10–18(Doe); Tr. Vol. 8 at 1283:3–8 (Shadigian); Tr. Vol. 4 at 661:19–21 (Creinin). For instance, women who have previously undergone childbirth often will achieve greater dilation in a shorter period of time than women who have not. Tr. Vol. 1 at 62:2–5 (Paul); Tr. Vol. 2 at 182:20–183:1 (Sheehan); Tr. Vol. 4 at 662:2–9 (Creinin); Tr. Vol. 5 at 812:12–13 (Westhoff); Tr. Vol. 11 at 1723:17–1724:6 (Chasen).

Dilation can take place over a period of time ranging from 90 minutes up to one or two days, depending on the practice of the physician. The process can be accelerated if drugs to induce dilation are administered along with the placement of laminaria in the cervix. Tr. Vol. 1 at 55:4–7, 59:9–11 (Paul, using a half to one-day dilation procedure); Tr. Vol. 1 at 180:21–183:10 (Sheehan, using a two-day dilation procedure); Tr. Vol. 3 at 401:7–402:22 (Doe, using a one-day dilation procedure); Tr. Vol. 4 at 659:23–24 (Creinin, using a one-day dilation procedure); Tr. Vol. 5 at 812:6–812:20 (Westhoff, using a two day-dilation procedure); Tr. Vol. 11 at 1719:10–25 (Chasen, using a two-day dilation procedure). If the doctor opts to perform dilation over an

**5.** Doctors report that women appear to strongly prefer D & E abortions to inductions for a variety of reasons, including the fact that a D & E is significantly quicker than an induction, does not require a hospital stay, and does not require that the woman go through labor to end the pregnancy. *See, e.g.,* Tr. Vol. 1 at 91:17–92:1 (Paul), Tr. Vol. 3 at 457:1–458:10(Doe); Tr. Vol. 4 at 503:22–504:3 (Broekhuizen); Tr. Vol. 5 at 804:2–5 (Westhoff); Tr. Vol. 11 at 1773:23–1776:10 (Chasen); Tr. Vol. 6 at 946:24–947:3 (Bowes).

**6.** Sometimes the misoprostyl will result in uterine contractions, which may result in ei-

ther the partial or complete delivery of the fetus before any surgery takes place. *See, e.g.,* Tr. Vol. 1 at 59:16–60:17 (Paul); Tr. Vol. 3 at 405:4–6(Doe); Tr. Vol. 4 at 511:23–512:25 (Broekhuizen).

**7.** By comparison, the vaginal delivery of a full-term fetus requires 10 centimeters of dilation. No doctor would dilate a woman's cervix to that extent for the purpose of performing a surgical abortion. *See* Tr. Vol. 4 at 544:17–545:4 (Broekhuizen stating the maximum dilation he would seek is 6–7 centimeters for an induction abortion, which requires more dilation than a D & E).

extended period of time, the procedure often takes place in an outpatient setting, so the woman can participate in her usual daily activities and spend the night at home. *See, e.g.,* Tr. Vol. 1 at 45:15–19, 60:1–6 (Paul); Tr. Vol. 2 at 181:11–14 (Sheehan); Tr. Vol. 3 at 402:21–22(Doe); Tr. Vol. 4 at 659:25–660:5 (Creinin).

The woman then returns to the clinic or hospital the next day, and, if sufficient dilation has been achieved, she is then placed under some form of sedation, and the cervix is prepared for surgery.[8] The doctor will then place forceps in the uterus, and, usually under ultrasound guidance, grasp the fetus with the forceps and then remove the fetus by pulling it through the cervix and vagina. This process usually causes the fetus to disarticulate. It usually takes about 10–15 "passes" through the uterus to remove the entire fetus. When the entire fetus has been removed, the doctor then uses a suction tube, or cannula, to remove the placenta from the uterus and to ensure that no fetal parts have been left behind. Tr. Vol. 1 at 62:7–68:21, 69:9–21 (Paul); Tr. Vol. 2 at 183:15–186:13 (Sheehan); Tr. Vol. 3 at 402:23–404:12(Doe); Tr. Vol. 4 at 514:20–526:17 (Broekhuizen); Tr. Vol. 4 at 663:1–668:4 (Creinin); Tr. Vol. 5 at 812:21–818:7 (Westhoff). All the testifying experts who perform this procedure use ultrasound to provide visual guidance for second trimester abortions. Tr. Vol. 1 at 67:6–7 (Paul); Tr. Vol. 1 at 168:6–13 (Sheehan); Tr. Vol. 3 at 403:16–19(Doe); Tr. Vol. 4 at 515:15–24 (Broekhuizen); Tr. Vol. 4 at 668:13–17 (Creinin); Tr. Vol. 11 at 1721:11–15 (Chasen).

This process takes between 10–15 minutes on average, and can take place either in an outpatient setting or in a hospital.

Tr. Vol. 1 at 62:8–9, 73:2–4 (Paul); Tr. Vol. 2 at 186:12–13 (Sheehan); Tr. Vol. 3 at 407:24–408:1(Doe); Tr. Vol. 4 at 524:11–14 (Broekhuizen, averaging 10–15 minutes, but noting range of 5 to 40 minutes); Tr. Vol. 5 at 741:5–742:2 (Creinin, averaging 10–15 minutes, but noting range of up to 40 minutes).

Some doctors, but not all, also give an injection of either digoxin or potassium chloride ("KCl") either directly into the fetus' heart or in the amniotic fluid surrounding the fetus to effect fetal demise before the procedure is commenced. *Compare* Tr. Vol. 2 at 16–196:6 (Sheehan, who routinely offers digoxin); Tr. Vol. 4 at 561:15–562:22 (Broekhuizen) *with* Tr. Vol. 2 at 328:24–329:18 (Drey, who only offers digoxin when specifically requested to do so), Tr. Vol. 3 408:7–13, 416:14–419:19 (Doe, who does not routinely effect fetal demise before procedure); Tr. Vol. 5 at 819:20–820:5 (Westhoff); Tr. Vol. 11 at 1780:20–1782:21 (Chasen).

## 2. Induction

The second-most common method of second trimester abortion is induction. About 5% of all second trimester abortions from 14–20 weeks are by induction; after 20 weeks, that percentage increases to 15%. Tr. Vol. 1 at 48:24–49:17 (Paul); Exh. 7 (table 18).

Since the uterus in the second trimester of pregnancy is not inclined to expel the fetus, contractions must instead be artificially induced through the use of chemical agents. In an induction, the woman is given medication to induce labor to expel the fetus. Inductions were previously triggered by saline injections into the uterus, but the most current medical tech-

---

8. If the doctor believes the cervix has not sufficiently dilated for the procedure to be performed, the doctor may place more dilators in the cervix and wait another day before beginning the surgical portion of the abortion. *See, e.g.,* Tr. Vol. 4 at 518:23–519:2 (Broekhuizen); Tr. Vol. 4 at 660:23–661:14 (Creinin).

niques now call for the administration of misoprostyl or oxytocin to induce contractions and labor. Tr. Vol. 3 at 409:4–409:21(Doe); Tr. Vol. 4 at 527:6–529:20 (Broekhuizen, noting that "We are kind of overriding nature because ... there are usually signals at this time that suppress uterine activity"); Tr. Vol. 5 at 15:20 (Creinin, "We have to give very high doses of medicines, much higher than you would give at term, just because we are trying to override the fact that the uterus doesn't want to do this process. So you have to make the uterus contract so strongly that it can break apart"); Tr. Vol. 11 at 1777:12–1778:9 (Chasen); *see also* Tr. Vol. 6 at 948:3–9, 950:5–15 (Bowes). *But see* Tr. Vol. 7 at 1093:1–7 (Sprang, testifying induction is more natural); Tr. Vol. 9 at 1391:21–1392:19 (Cook).

An induction abortion takes anywhere from 6 to 48 hours to complete, and in ten percent of inductions, the woman must also undergo a D & E to remove unexpelled matter from the uterus (usually the placenta). Tr. Vol. 3 at 409:18–410:9, 414:3–7 (Doe, stating that most inductions occur within 24 hours and noting complications); Tr. Vol. 4 at 527:6–532:13 (Broekhuizen, giving range of time as 8 to 72 hours, and discussing possible complications requiring subsequent D & E); Tr. Vol. 5 at 715:8–24 (Creinin); Tr. Vol. 8 at 1268:18–21, 1287:19–1289:5 (Shadigian) (stating that most inductions take place between 4 and 24 hours but can take up to 2 and a half days). Because an induction requires around-the-clock monitoring for at least 24 hours, these abortions can take place only in a hospital setting. Tr. Vol. 1 at 45:20–46:7 (Paul); Tr. Vol. 4 at 526:8–527:2 (Broekhuizen).

An induction is more likely to result in the delivery of an intact fetus, so when a fetal autopsy might be needed, doctors will recommend this procedure. Tr. Vol. 3 at 408:14–409:3(Doe); Tr. Vol. 9 at 1399:11–1400:4 (Cook). However, if the induction takes too long to complete, the fetal tissue breaks down and becomes unuseable for medical study. Tr. Vol. 11 at 1758:7–19 (Chasen).

### 3. Hysterotomy and Hysterectomy

Two other methods of second trimester abortion are also available, but are very rarely used. A hysterotomy, like a caesarean delivery, involves the surgical removal of the fetus through an incision in the uterus, and a hysterectomy involves the removal of the woman's entire uterus. Tr. Vol. 1 at 46:8–47:2 (Paul); Exh. 7 (table 18, indicating these procedures make up .01% of all abortions and .07% of all second trimester abortions).

Both of these procedures are considered major surgery and are not recommended except in the case of extreme emergency. *See also, e.g.,* Tr. Vol. 1 at 82:9–12 (Paul, noting that hysterotomy and hysterectomy are not really options because of their high rate of mortality and morbidity); Tr. Vol. 11 at 1767:6–1768:4 (Chasen, stating that hysterotomy and hysterectomy should only be used when fetus must be delivered immediately to save the life or health of the woman); Tr. Vol. 6 at 972:6–8 (Bowes).

### B. Contested Abortion Procedure

The government argues that none of these previously-described procedures (1st trimester abortion procedures, D & E, induction, hysterotomy, or hysterectomy) are banned by the Act. Rather, the Act prohibits a specific second trimester abortion technique, which the Act refers to as "partial-birth abortion."

### 1. The Act

The Act defines "partial-birth abortion" as:

an abortion in which a physician deliberately and intentionally vaginally delivers

a living, unborn child until either the entire baby's head is outside the body of the mother, or any part of the baby's trunk past the navel is outside the body of the mother and only the head remains inside the womb, for the purpose of performing an overt act (usually the puncturing of the back of the child's skull and removing the baby's brains) that the person knows will kill the partially delivered infant, performs this act, and then completes delivery of the dead infant. Act § 2(1); *see also* 18 U.S.C. § 1531(b) (statutory definition). The term "partial-birth abortion," however, is neither recognized in the medical literature nor used by physicians who routinely perform second trimester abortions. *See, e.g.,* Tr. Vol. 2 at 200:23–201:4 (Sheehan); Tr. Vol. 3 at 420:23–421:2(Doe); *but see* Tr. Vol. 6 at 901:5–19 (Bowes); Tr. Vol. 8 at 1219:23–1220:8 (Shadigian); Tr. Vol. 9 at 1386:7–1387:7 (Cook) (arguing "partial-birth abortion" is a medically recognized term). The language of the Act obviously omits any reference to D & X, D & E, or "intact" extraction.

### 2. Dr. Haskell and ACOG

The debate over this procedure appears to have been initiated by a presentation given by Dr. Marvin Haskell in 1992 before the National Abortion Federation ("NAF"). *See* Partial–Birth Abortion Ban Act of 2002: Hearing on H.R. 4965 before the Subcomm. on the Constitution of the House Comm. on the Judiciary, 107th Cong. 2nd Sess at 127–34 (2002) ("Record Exh. C") (copy of article).[9] In that presentation, Dr. Haskell outlined a variant on D & E abortions in which the fetus was removed either intact or nearly intact rather than through disarticulation.[10] To distinguish this variant from the standard D & E by disarticulation, Dr. Haskell coined the term "D & X," or "dilation and extraction." *Id.* at 127.

Dr. Haskell described a procedure in which 1) the woman's cervix is dilated through the use of up to 20–30 osmotic dilators over a two-day period; 2) the physician inserts forceps into the woman's uterus and, if the fetus is not presented in a breech position (feet first), the physician performs an "internal podalic version" of the fetus and inverts the fetus so that it is presenting in a breech position; 3) the fetus is extracted intact through the cervix and vagina until its head, or calvarium, is lodged at the cervical opening, or os; and 4) the physician inserts scissors and a suction cannula into the fetus' skull and drains brain tissue from the calvarium, which causes the calvarium to collapse to the point at which it can be extracted from the uterus. Record Exh. C at 129–131; *see also, e.g.,* Tr. Vol. 8 at 1219:12–1220:4 (Shadigian), Tr. Vol. 9 at 1386:7–1387:7 (Cook).

In response to the subsequent debate over this procedure, the American College of Obstetricians and Gynecologists ("ACOG") subsequently coined the term "intact D & X," which was defined as: 1) deliberate dilation of the cervix, usually over a sequence of days, 2) internal podalic version of the fetus to a breech position; 3) breech extraction of the fetus up to the calvarium, and 4) the extraction of the fetal cranial contents to permit vaginal delivery of a dead, intact fetus. Cain Depo. 164:8–166:17; Exh. 3; *see also, e.g.,* Tr. Vol. 5 at 735:8–736:2 (Creinin).

9. The court takes judicial notice of this article's inclusion in the Congressional Record, but notes also that the article itself was not introduced into evidence at trial.

10. While Dr. Haskell first outlined this procedure in 1992, other physicians testified that they have practiced some version of intact extraction since the 1970s. Tr. Vol. 2 at 187:15–19 (Sheehan); Tr. Vol. 4 at 584:16–585:3 (Broekhuizen).

### 3. Trial Testimony

At trial, plaintiffs presented the testimony of a number of physicians who perform D & E abortions by procedures which they believe might violate the Act. Several physicians report that occasionally while performing a D & E, they encounter a situation where they believe it will be possible to remove the fetus either intact or largely intact. This occurs when the woman's cervix is dilated to such a degree that the fetus can be extracted up to the head, in either one or two "passes" with the forceps. The potential for a largely intact removal cannot be ascertained until the surgical procedure has already begun, and depends primarily on how the cervix presents at the commencement of the procedure. Tr. Vol. 1 at 67:24–68:1, 71:17–24 (Paul); Tr. Vol. 2 at 205:16–24, 206:5–13 (Sheehan); Tr. Vol. 3 at 406:24–407:11(Doe); Tr. Vol. 5 at 784:–786:23 (Creinin); Tr. Vol. 5 at 815:3–816:22, 818:18–21(Westhoff).

The number of times this occurs varied per doctor, but ranged from between 5% to 33% of all D & Es performed, with most doctors reporting occurrences of around 5–15% of the time.[11] Tr. Vol. 1 at 71:8–19 (Paul, estimating 5–10%); Tr. Vol. 2 at 188:13–12 (Sheehan, reporting approximately 20% the week before); Tr. Vol. 3 at 406:10–16 (Doe, estimating 15–20%).

Notably, since Dr. Haskell's paper and presentation, the process has evolved. While some physicians perform abortions in this circumstance using the four steps outlined by ACOG or Dr. Haskell, many others do not.

Some physicians insert up to 25 osmotic dilators over a two day period (known as "serial dilation") to increase the likelihood of an intact D & E, while others simply proceed as they do for a standard D & E by disarticulation. Some physicians perform podalic version, while others do not. Some physicians puncture the calvarium and suction out the cranial contents, others disarticulate the calvarium and crush it with forceps before extraction, while yet others use forceps to collapse the calvarium while it is still attached. *See, e.g.,* Tr. Vol. 1 69:22–70:6, 78:25–79:7 (Paul, who collapses the attached skull with forceps or disarticulates at the neck); Tr. Vol. 2 at 184:15–17, 193:22–24 (Sheehan, who does same, and does not perform podalic version); Tr. Vol. 3 at 405:19–406:9 (Doe, who disarticulates calvarium and crushes with forceps, and sometimes performs podalic version); Tr. Vol. 4 at 516:8–24, 523:1–524:10, 589:23–590:1, 615:7–13 (Broekhuizen, who sometimes practices serial dilation, sometimes performs podalic version when grasping for fetal part, and punctures calvarium); Tr. Vol. 4 at 668:18–669:19, 680:11–681:1 (Creinin, who performs podalic version and punctures or disarticulates calvarium); Tr. Vol. 5 at 801:22–802:3 (Westhoff, who punctures calvarium); Tr. Vol. 11 at 1718:4–1725:10 (Chasen, who uses up to 25 dilators, performs podalic version, and punctures calvarium).

Furthermore, although Dr. Haskell inserted scissors or trocars by touch, all of the physicians who testified stated that they could see the insertion point, either directly or through ultrasound, before any insertions were made. Tr. Vol. 1 at 67:6–7 (Paul); Tr. Vol. 1 at 168:6–13 (Sheehan); Tr. Vol. 3 at 403:16–19(Doe); Tr. Vol. 4 at 632:2–8, 638:18–640:7 (Broekhuizen); Tr. Vol. 4 at 682:14–19 (Creinin); Tr. Vol. 5 at 801:25–802:5, 818:8–11 (Westhoff); Tr. Vol. 11 at 1722:10–13 (Chasen).

---

**11.** Dr. Sheehan and Dr. Creinin reported that an intact D & E occurred less than 1% of the time, but they were reporting incidents where the entire fetus, including the head, was removed intact. Tr. Vol. 2 at 271:20–272:8 (Sheehan); Tr. Vol. 4 at 784:19–786:19 (Creinin).

Most significantly, all of the testifying physicians who have performed intact extractions refer to this procedure as a variant of D & E, and not as an entirely separate procedure. *See, e.g.,* Tr. Vol. 1 at 44:14–45:14 (Paul); Tr. Vol. 2 at 188:20–189:2, 205:16–13 (Sheehan); Tr. Vol. 3 at 406:17–23(Doe); Tr. Vol. 11 at 1721:16–23, 1723:4–1724:21 (Chasen). The only physicians who referred to it as a separate procedure were witnesses who had never performed the procedure. Tr. Vol. 6 at 959:10–960:3 (Bowes); Tr. Vol. 7 at 1034:8–1035:21, 1094:5–8 (Sprang); Tr. Vol. 8 at 1214:3–1215:3, 1232:14–1233:7 (Shadigian); Tr. Vol. 9 at 1374:4–9, 1380:7–18, 1389:8–13 (Cook). Accordingly, the court will refer to the procedure throughout this order as "intact D & E."

## II. *LEGAL FRAMEWORK*

As noted, this case involves an issue similar to that confronted by the Supreme Court in *Stenberg.* In 1997, Dr. Leroy Carhart, a medical doctor who provides late-term abortions, sought a preliminary injunction enjoining Nebraska's "partial-birth abortion" law. Carhart argued that the state's ban subjected women seeking abortions to a significantly greater risk of injury or death than would be the case if he were permitted to perform the banned procedure. The United States District Court for the District of Nebraska granted Carhart's request for a permanent injunction, and the Eighth Circuit affirmed.

The United States Supreme Court subsequently granted certiorari in 2000. *Stenberg,* 530 U.S. at 914, 120 S.Ct. 2597. Before evaluating the Nebraska statute, the Court reiterated the standards for evaluating abortion regulations and restrictions set forth by the Court previously in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), as follows:

(1) Prior to viability, a woman has a constitutional right to choose to terminate her pregnancy. *Id.* at 921, 112 S.Ct. 2791. And, while the state has interests in protecting the health of the mother and the potentiality of human life, *see id.,* "[t]he State's interest in regulating abortion previability is considerably weaker than postviability." *Id.* at 930, 112 S.Ct. 2791. Prior to viability, a law that places an "undue burden" on a woman's decision to terminate her pregnancy is unconstitutional. *Id.* at 921, 112 S.Ct. 2791.

(2) Subsequent to viability, the state may regulate and even proscribe abortion "except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Id.* (citations omitted).

The *Stenberg* Court subsequently held that the Nebraska statute violated the Fourteenth Amendment on two different bases. First, it concluded that the Nebraska statute was unconstitutional because it lacked any exception for the preservation of the health of the mother. *See id.* at 930–32, 120 S.Ct. 2597. Second, it concluded that the state law placed an undue burden on a woman seeking a previability abortion. *See id.* at 945, 120 S.Ct. 2597.

## III. *PROCEDURAL HISTORY*

Approximately three years after the Supreme Court decided *Stenberg,* the 108th Congress passed the final version of the Act, which President George W. Bush signed into law on November 5, 2003. Plaintiffs filed the instant lawsuit, claiming that the Act violates their Fifth Amendment due process rights. At or around the same time that plaintiffs filed their lawsuit with this court, plaintiffs National Abortion Federation, et al., and Dr. Leroy Carhart, plaintiff in the *Stenberg* case, and

other physicians, filed similar lawsuits challenging the Act in the United States District Courts for the Southern District of New York ("New York court") and the District of Nebraska ("Nebraska court"), respectively. *See National Abortion Federation v. Ashcroft*, No. 03–8695 RCC (S.D.N.Y.); *Carhart v. Ashcroft*, No. 4:03CV3385 (D.Neb.).

On November 6, 2003, one day after the President signed the Act into law, this court issued an injunction temporarily enjoining enforcement of the Act. The New York and Nebraska courts also temporarily enjoined enforcement of the Act.

At the request of the Attorney General ("the government"), the hearing on the plaintiffs' motion for a preliminary injunction was merged with the trial on the merits, and with the government's consent, the matter was continued for approximately 120 days during which the parties engaged in expedited discovery and trial preparation. On March 19, 2004, the court extended the temporary restraining order to a reasonable time after trial on the merits, for preparation of the instant findings of fact and conclusions of law. Subsequently, on March 29, 2004, the bench trial in this case commenced, lasting approximately three weeks.

In addition to the sizeable Congressional Record submitted by both parties, this court heard testimony from a total of thirteen expert witnesses, and reviewed the deposition testimony of an additional six expert witnesses.

### ISSUES

Plaintiffs contend that the Act is unconstitutional, for the following reasons:

(1) the Act places an undue burden on a woman's right to choose;

(2) the Act is impermissibly vague because it fails to clearly define the prohibited medical procedures, thereby depriving physicians of fair notice and encouraging arbitrary enforcement;

(3) the Act's failure to provide an exception for the health of the mother violates a woman's Fifth Amendment due process rights as set forth by the Supreme Court in *Casey* and *Stenberg;* and

(4) the Act violates a woman's due process right to bodily integrity.[12]

### DISCUSSION

### I. *STANDARD OF REVIEW*

The 108th Congress made numerous findings in support of the Act. The government argues that this court must afford those findings substantial deference, while the plaintiffs, on the other hand, contend that this court need not accord the findings any deference. However, the congressional findings, the deference afforded them, and their interplay with the trial evidence in this case, are relevant primarily with respect to the issue regarding the necessity of a health exception, and are therefore discussed in the context of this court's findings and conclusions in that section below.

■ The other issues involving the construction and validity of the Act: whether the Act places an undue burden on a woman's right to choose, and the alleged vagueness of the Act, are issues of law, which this court reviews *de novo*. *See, e.g., Taylor v. Delatoore*, 281 F.3d 844, 847 (9th Cir.2002); *Free Speech Coalition v. Reno*, 198 F.3d 1083, 1090 (9th Cir.1999) (construction and constitutionality of statute are issues of law reviewed *de novo* ). Accordingly, both plaintiffs and the govern-

---

**12.** Because the court finds the Act unconstitutional on the three preceding grounds, it declines to reach this issue.

ment agree that this court "is tasked with independently determining ... the [constitutional] validity of the [A]ct." *See* Government's January 30, 2004 reply brief at 10; *see also* March 1, 2004 amicus brief at 8 ("this Court must make an independent legal judgment regarding whether the applicable law unduly burdens [a woman's right to terminate her pregnancy]").

The court, therefore, discusses first the issues of undue burden and vagueness, setting forth its findings and conclusions on the issues, and subsequently, turns to the necessity of a health exception. In the section regarding the health exception, the court sets forth its findings of fact based on the trial evidence, and then discusses the legislative history of the Act and the record before Congress supporting the congressional findings. The court then provides its conclusion regarding the deference to be afforded the congressional findings, and its conclusions of law, based on the congressional findings and the evidence before this court, regarding the necessity of a health exception.

## II. *UNDUE BURDEN*

### A. Introduction

In *Stenberg*, one of the two bases for the Supreme Court's holding that the Nebraska statute was unconstitutional was that the statute " 'impose[d] an undue burden on a woman's ability to choose a D & E abortion, thereby unduly burdening the right to choose abortion itself." *Stenberg*, 530 U.S. at 930, 120 S.Ct. 2597 (citing *Casey*, 505 U.S. at 874, 112 S.Ct. 2791).

The Court noted that an undue burden is created by a law that "has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 921, 120 S.Ct. 2597. It subsequently held that Nebraska's partial-birth abortion ban posed an unconstitutional undue burden on a woman's decision because the language of the

statute was broad enough that it could be interpreted to include a ban on previability D & Es, the most common second trimester abortion procedure, thereby unconstitutionally placing an obstacle in the path of a woman seeking a previability second trimester abortion. *Id.* at 945, 120 S.Ct. 2597.

### B. Parties' Positions

Plaintiffs claim that, similar to the Nebraska statute in *Stenberg*, the Act here poses an undue burden on a woman's decision to have an abortion prior to viability. Plaintiffs contend that the Act likewise bans other safe second trimester procedures, including D & E and induction abortions. They argue that the definition of "partial-birth abortion" in the Act is so broad that any abortion performed by the two safest, most common abortion procedures used in the second trimester of pregnancy, prior to fetal viability—D & E and induction—could proceed so as to violate the Act. Accordingly, plaintiffs assert that the Act is unconstitutional as a matter of law.

Moreover, plaintiffs contend that regardless of any interpretation that the government may advance regarding the procedures banned by the Act, the court must follow the language of the definition of "partial-birth abortion" in the Act. *Stenberg*, 530 U.S. at 942, 120 S.Ct. 2597 (rejecting Nebraska Attorney General's suggestion that the term "partial-birth abortion" is "ordinarily associated with the [intact D & E] procedure" because "[w]hen a statute includes an explicit definition, we must follow that definition even if it varies from that term's ordinary meaning"); *see also Reno v. ACLU*, 521 U.S. 844, 884 n. 49, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (federal courts lack the authority to rewrite a statute to conform it to constitutional requirements).

The government, on the other hand, devoted very little attention to the undue burden issue at trial and in its pre-trial and post-trial submissions to the court. That was in spite of this court's conclusion in its order temporarily enjoining the Act that "the scope of the Act may impermissibly encompass [all] D & E procedures and thus impose an undue burden on a woman's right to choose." *See* November 7, 2003 Order.

Instead, as it did in its papers in opposition to the temporary restraining order, the government continues to mistakenly conflate plaintiffs' undue burden challenge with the issue of vagueness. The government's position is simply that Congress intended to ban only intact D & Es, and that the Act is not vague and should be interpreted to apply only to intact D & E abortions—not to D & Es by disarticulation, inductions, or other abortion procedures. Therefore, according to the government, there can be no undue burden.

The government's approach, however, ignores the fact that the two issues, while somewhat related, are nevertheless distinct. The Act may be unduly burdensome under *Casey*, yet not unconstitutionally vague. For example, this court could find that the Act was sufficiently specific regarding the description of the conduct that violates the Act; however, at the same time, the court could conclude that the prohibited conduct may be interpreted to encompass other safe second trimester abortion procedures besides intact D & E. Accordingly, the court rejects the government's framework for analyzing the undue burden issue.

### C. Legal Background

The government misconstrues the test regarding undue burden, narrowing the inquiry to whether the regulation poses a "*significant threat* to the ... health of a woman." However, as the Supreme Court

noted in *Stenberg*, "[a]n 'undue burden is ... shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.'" 530 U.S. at 921, 120 S.Ct. 2597 (quoting *Casey*, 505 U.S. at 877, 112 S.Ct. 2791).

The Nebraska statute at issue in *Stenberg* proscribed:

> deliberately and intentionally delivering into the vagina a living unborn child, or a substantial portion thereof, for the purpose of performing a procedure that the person performing such procedure knows will kill the unborn child.

530 U.S. at 938, 120 S.Ct. 2597 (quoting Neb.Rev.Stat. Ann. § 28–326(9) (Supp. 1999)).

The state of Nebraska agreed that the statute would impose an undue burden if it applied to the more commonly used D & E procedure as well as to the intact D & E procedure. *Id.* at 938, 120 S.Ct. 2597. However, the state argued that the statute's aim was to ban intact D & E and that the statute differentiated between D & E and intact D & E.

The Supreme Court, however, rejected the state's arguments. The Court held that regardless of the statute's "aim," "its language makes clear that [in addition to intact D & E], it also covers a much broader category of procedures." *Id.* at 939, 120 S.Ct. 2597. It noted that "[t]he language [of the statute] does not track the medical differences between D & E and [intact D & E]—though it would have been a simple matter ... to provide an exception for the performance of D & E and other abortion procedures." *Id.*

Moreover, that the state of Nebraska "generally intended to bar intact D & E" could be correct, but according to the Supreme Court was "irrelevant." *Id.* at 939.

970

Instead, the relevant inquiry was "whether the law was intended to apply *only* to [intact D & E]." *Id.* The Court noted that "even were we to grant the [Nebraska] Attorney General's views [regarding the aim of the statute] substantial weight, [the Court] would still have to reject his interpretation [because] it conflicts with the statutory language." *Id.* at 942, 120 S.Ct. 2597.

In holding that the statute constituted an undue burden, the Court further concluded that:

[U]sing this law some . . . prosecutors. . . may choose to pursue physicians who use D & E procedures, the most commonly used method for performing previability second trimester abortions. All those who perform abortion procedures using that method must fear prosecution, conviction, and imprisonment. The result is an undue burden upon a woman's right to make an abortion decision.

*Id.* at 945–46, 120 S.Ct. 2597.

### D. *Stenberg:* Comparison of Act's Language to Nebraska Statute

In contrast to the Nebraska statute in *Stenberg,* the Act here forbids:

deliberately and intentionally vaginally deliver[ing] a living fetus until, in the case of a head-first presentation, the entire fetal head is outside the body of the mother, or, in the case of breech presentation, any part of the fetal trunk past the navel is outside the body of the mother, for the purpose of performing an overt act that the person knows will kill the partially delivered living fetus.

18 U.S.C. § 1531(b)(1)(A).

The government correctly notes that the language of the Act differs from the statute in *Stenberg* in three respects: 1) the Act requires delivery of the fetus outside of the mother; 2) the Act specifies the required protruding fetal parts; and 3) the

Act proscribes an overt act distinct from the completion of the delivery itself.

#### i. *Location of Delivered Fetus*

While the Nebraska statute applied where the living fetus or a substantial portion thereof was delivered "into the vagina," the Act here specifies vaginal delivery "outside the body of the mother." Neb.Rev.Stat. § 28–326(9); 18 U.S.C. § 1531(b)(1)(A). The government contends that the constitutional infirmities of the Nebraska statute are avoided because D & Es by disarticulation, as compared to intact D & Es, are generally internal dismemberment procedures, and, as the Act here does not apply to procedures performed internally, it does not encompass D & Es by disarticulation.

#### ii. *Fetal Parts*

In *Stenberg,* the Nebraska statute required the delivery into the vagina of "a living unborn child or *substantial portion thereof.*" Neb.Rev.Stat. § 28–326(9). The Supreme Court took issue with this language, noting that it could

not understand how one could distinguish, using this language, between D & E (where a foot or arm is drawn through the cervix) and [intact D & E] (where the body up to the head is drawn through the cervix). Evidence before the trial court makes clear that D & E will often involve a physician pulling a "substantial portion" of a living fetus, say, an arm or leg, into the vagina prior to the death of the fetus.

*Stenberg,* 530 U.S. at 938–939, 120 S.Ct. 2597.

The Act, on the other hand, specifies vaginal delivery of "a living fetus until, in the case of a head-first presentation, *the entire fetal head* is outside the body of the mother *or* in the case of a breech presentation, *any part of the fetal trunk past the*

*navel* is outside the body of the mother." 18 U.S.C. § 1531(b)(1)(A). The government likewise argues that inclusion of this language avoids the constitutional infirmities in *Stenberg* because the Act provides "a specific anatomic landmark."

### iii. *Overt Act*

The language of the Act regarding completion of the abortion also varies somewhat from the Nebraska statute in *Stenberg*. In addition to defining the prohibited procedure, the Act provides that the physician "perform[ ] the overt act, other than completion of delivery, that kills the partially delivered living fetus." 18 U.S.C. § 1531(b)(1)(B). In comparison, the Nebraska statute defined the prohibited abortion procedure, and with respect to completion of the abortion, provided that the procedure "does kill the unborn child." Neb.Rev.Stat. § 28–326(9).

The government argues that this further distinguishes the Act from the statute in *Stenberg*. It argues that the language distinguishes intact D & Es from other procedures because the specific act to kill the fetus must happen at a particular point and place in time. According to the government, "the fact that during the course of a D & E [by disarticulation] or induction, some 'overt act' is taken to kill a living fetus ... does not render D & E or induction unlawful" because the overt acts characteristic of the other procedures do not occur under the other requirements specified by the Act.

### E. Findings of Fact

This court concludes, however, based on the findings set forth below, that despite linguistic differences between the Nebraska statute in *Stenberg* and the Act, the Act

nevertheless poses an undue burden on a woman's right to choose an abortion because the Act encompasses not only intact D & E procedures, but other previability D & E procedures and possibly inductions as well, in violation of the Supreme Court's holding.

Specifically, this court finds, based on the evidence before it, that:[13]

1. Like the Nebraska statute in *Stenberg*, the Act bans abortions performed at any time during a pregnancy, regardless of gestational age or fetal viability. In fact, Congress rejected alternatives and amendments to the Act that would have limited its applicability to viable fetuses. *See* 149 Cong. Rec. S3600 (daily ed. March 12, 2003) (statement of Sen. Feinstein); 149 Cong. Rec. H4939 (daily ed. June 4, 2003) (statement of Rep. Greenwood); 149 Cong. Rec. H4948 (daily ed. June 4, 2003) (statement of Rep. Baldwin).

2. In performing all D & Es, including D & Es by disarticulation, and inductions, physicians "deliberately and intentionally" extract the fetus from the woman's uterus and through her vagina. Tr. Vol. 1 at 76:19–21 (Paul); Tr. Vol. 2 at 200:23–201:4 (Sheehan); Tr. Vol. 3 at 422:3–12(Doe); Tr. Vol. 5 at 822:0–823:12 (Westhoff). Extraction of the fetus from the uterus, if brought through the cervix and vagina (as opposed to through an incision in the woman's abdomen), is called a "vaginal delivery." Tr. Vol. 1 at 75:20–76:5 (Paul); Tr. Vol. 3 at 421:6–11(Doe); Tr. Vol. 5 at 822:20–823:12 (Westhoff).

3. The fetus may still have a detectable heartbeat or pulsating umbilical cord when the uterine evacuation begins in any D & E or induction, and may be considered a "living fetus." Tr. Vol. 1 at 67:3–11; 76:6–

---

**13.** As noted previously, the background and qualifications of the experts relied on by the court for the findings that follow are set forth

in this court's findings of fact regarding the necessity of health exception.

18 (Paul); Tr. Vol. 2 at 201:5–8 (Sheehan); Tr. Vol. 3 at 421:12–18(Doe); Tr. Vol. 5 at 822:20–823:12 (Westhoff); Tr. Vol. 11 at 1783:15–1786:3 (Chasen).

4. Plaintiffs' and the government's experts agree that in any D & E or induction, a living fetus may be extracted in a breech presentation until some "part of the fetal trunk past the navel is outside the body of the mother." Tr. Vol. 6 at 945:17–21 (Bowes); Tr. Vol. 8 at 1283:17–20 (Shadigian); Lockwood Depo 235:16–24; Tr. Vol. 1 at 77:9–78:13 (Paul); Tr. Vol. 1 at 99:16–2; 201:9–16 (Sheehan); Tr. Vol. 2 at 281:22–282:3 (Drey); Tr. Vol. 3 at 405:4–12; 422:3–19(Doe); Tr. Vol. 4 at 521:2–15; 551:19–552:4 (Broekhuizen); Tr. Vols. 4 & 5 at 678:23–679:14; 784:3–786:18 (Creinin); Tr. Vol. 5 at 822:20–823:12 (Westhoff); Tr. Vol. 11 at 1783:15–1786:3 (Chasen).

5. In a D & E, this may occur under a variety of scenarios, including when:

(A) on an initial pass into the uterus with forceps, the physician disarticulates a small fetal part, which does not cause immediate demise, and then on a subsequent pass, the fetus is brought out of the cervix past the fetal navel;

(B) on an initial pass into the uterus with forceps, the physician brings out a fetal part—either attached to the rest of the fetus, or not—that is "part of the fetal trunk past the navel," but the extraction does not cause immediate demise;

(C) the physician extracts the fetus intact until the calvarium lodges at the internal cervical opening; or

(D) the physician extracts the fetus intact until "part of the fetal trunk past the navel is outside the woman's body," but it is not extracted so far that the calvarium lodges at the cervical opening. Tr. Vol. 1 at 77:9–78:13 (Paul); Tr. Vol. 2 at 201:9–202:1; 272:18–22 (Sheehan); Tr. Vol. 4 at 521:2–15; 551:1–18 (Broekhuiz-

en); Tr. Vols. 4 & 5 at 681:8–16; 784:3–786:18 (Creinin); Tr. Vol. 5 at 822:20–824:2 (Westhoff); Tr. Vol. 11 at 1783:15–1784:20 (Chasen).

6. In an induction, this may occur because fetal demise may not have occurred by the time the fetus passes through the woman's cervix and vagina, and is outside the body of the woman past the fetal navel. Tr. Vol. 4 at 530:15–533:6 (Broekhuizen); Tr. Vol. 11 at 1784:21–1786:3 (Chasen).

7. In any D & E or induction, if the fetus has been brought to the point "where any part of the fetal trunk past the navel is outside the body of the mother" or "the entire fetal head is outside the body of the mother," a physician may then, in order to complete the abortion in the safest manner, need to perform an "overt act," short of completing delivery, that the physician knows the fetus cannot survive, if it is still living, and that "kills" the fetus. Lockwood Depo. 235:17–236:2; Tr. Vol. 1 at 79:8–16; 60:13–61:6; 69:22–25 (Paul); Tr. Vol. 3 at 422:3–19(Doe); Tr. Vol. 4 at 551:19–552:9 (Broekhuizen); Tr. Vol. 4 at 638:10–684:10 (Creinin); Tr. Vol. 11 at 1783:15–1786:3 (Chasen). This "overt act" may include disarticulation, cutting the umbilical cord, or compressing or decompressing the skull or abdomen or other fetal part that is obstructing completion of the uterine evacuation. Tr. Vol. 1 at 61:7–15; 70:1–6; 78:25–79:5 (Paul); Tr. Vol. 2 at 193:5–24; 205:8–15 (Sheehan); Tr. Vol. 3 at 405:13–22(Doe); Tr. Vol. 4 at 523:1–524:1 (Broekhuizen); Tr. Vol. 5 at 783:15 (Creinin).

8. The procedures described above are performed by the testifying physicians only on previable fetuses. Tr. Vol. 1 at 74:14–80:20 (Paul); Tr. Vol. 2 at 281:15–21 (Drey); Tr. Vol. 3 at 420:9–22(Doe); Tr. Vol. 4 at 550:18–552:9 (Broekhuizen); Tr. Vol. 4 at 657:3–8 (Creinin); Tr. Vol. 5 at

822:9–824:2 (Westhoff); Tr. Vol. 11 at 1783:15–1786:3 (Chasen).

9. For these reasons, any abortion performed using the D & E or induction method could proceed so as to violate the Act when performed in the safest manner. Tr. Vol. 1 at 92:2–93:4 (Paul); Tr. Vol. 1 at 165:11–21 (Sheehan); Tr. Vol. 2 at 282:20–283:3 (Drey); Tr. Vol. 11 at 1784:15–1786:3 (Chasen).

10. For the same reasons, the Act could also ban the steps that a physician takes when treating a woman who presents in the midst of a spontaneous second trimester miscarriage. Tr. Vol. 4 at 555:7–556:11 (Broekhuizen); Tr. Vol. 4 at 684:11–685:5 (Creinin); Tr. Vol. 5 at 824:4–24 (Westhoff); Tr. Vol. 11 at 1786:4–1787:9 (Chasen).

11. As part of their routine practice, eleven of the experts who testified before this court, including Drs. Paul, Sheehan, Doe, Drey, Broekhuizen, Creinin, Westhoff, Chasen, Hammond, Grunebaum, and Fredriksen, sometimes perform previability abortions, as described above, which would violate the act. Tr. Vol. 1 at 74:14–80:20 (Paul); Tr. Vol. 1 at 165:7–21 (Sheehan); Tr. Vol. 2 at 281:15–21 (Drey); Tr. Vol. 3 at 420:9–22(Doe); Tr. Vol. 4 at 550:18–552:9 (Broekhuizen); Tr. Vol. 4 at 657:3–8 (Creinin); Tr. Vol. 5 at 822:9–824:2 (Westhoff); Tr. Vol. 11 at 1783:15–1786:3 (Chasen); Exh. 36, Exh. 37, Exh. 38.

12. When beginning a D & E or induction procedure, a physician cannot predict if the procedure will proceed in such a manner that it violates the Act, but the physician knows that is a possibility. Tr. Vol. 1 at 71:17–24 (Paul); Tr. Vol. 2 at 206:1–13 (Sheehan); Tr. Vol. 3 at 420:18–22; 426:5–7(Doe); Tr. Vol. 4 at 522:4–17 (Broekhuizen); Tr. Vol. 5 at 786:11–23 (Creinin).

13. Accordingly, because physicians may face criminal prosecution under the Act for violative procedures, the nature of which they cannot always predict, the Act would have a significantly negative impact on their practice and their relationships with their patients, and in some circumstances, already has. See, e.g., Tr. Vol. 1 at 74:21–23 (Paul) ("my overriding concern is that if I continue to practice ... second trimester abortions in the way I believe is the safest for women, that I could be in prison"); id. at 92:8–13 ("I think [the Act] would have a tremendous impact on my practice. I would be forced with a decision I would have never faced before in medicine and that is as to whether to continue to do procedures in a way that I think are safest for women because if I did so, I would risk imprisonment"); id. at 93:5–12 (Act would undermine fundamental trust that physician has with patient because it would prevent them from giving best possible care); Tr. Vol. 4 at 563:3–16 (Broekhuizen) (the Act would "make it significantly more difficult to provide ... medically necessary services" and would force him to utilize fetocidal injections more frequently which "may not really be in the best interests of the patients"); Tr. Vol. 11 at 1787:10–23 (Chasen) (fear of committing a criminal act may prevent physicians from giving their full attention while providing care); Tr. Vol. 5 at 820:6–20 (Westhoff) (describing complication that occurred as a result of a D & E performed utilizing fetocidal injection in attempt to avoid Act's coverage); Tr. Vol. 2 at 204:14–205:3 (Sheehan) (the Act "would really cause a significant disruption between [me and] the patient"); Lockwood Depo. 68:2–68:16 (criminal penalties included in Act "further unravel physicians' social contract with patients").

**F. Conclusions of Law**

 Accordingly, the court concludes that the definition of "partial-birth abortion" contained in the Act encompasses several second trimester abortion proce-

dures *in addition* to intact D & E. Physicians may perform each element contained in the Act's definition in any D & E procedure, and in the course of certain induction abortions and treatment of spontaneous miscarriages as well. And, because D & E procedures comprise nearly 85–95% of all second trimester abortions, the Act creates a risk of criminal liability during virtually all abortions performed after the first trimester, and "has the effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Stenberg,* 530 U.S. at 921, 120 S.Ct. 2597 (quoting *Casey,* 505 U.S. at 877, 112 S.Ct. 2791). A majority of the physicians who testified noted that because they "fear prosecution, conviction, and imprisonment," the wide net cast by the Act could have and has already had the effect of impacting all previability second trimester abortion services that they provide to their patients. *See id.* at 945–46, 112 S.Ct. 2791.

The government's argument that Congress intended to ban only the intact D & E procedure is not convincing. First, as the Supreme Court noted in *Stenberg* in rejecting a nearly identical argument by the state of Nebraska, if Congress did not intend to prohibit procedures other than intact D & Es, it would have been simple for it to exclude other procedures. *See Stenberg,* 530 U.S. at 939, 120 S.Ct. 2597 ("it would have been a simple matter, for example, to provide an exception for the performance of D & E and other abortion procedures"); *see also Planned Parenthood of Central New Jersey v. Farmer,* 220 F.3d 127, 140 (3rd Cir.2000) (holding New Jersey partial-birth abortion ban unconstitutional, and noting that "[i]f the Legislature intended to ban only the [intact D & E] procedure, it could easily have manifested that intent either by specifically naming that procedure or by setting forth the medical definition of [intact D & E] utilized by ACOG"); *cf. Women's Medical Prof'l Corp. v. Taft,* 353 F.3d 436,

452–53 (6th Cir.2003) (holding that Ohio partial-birth abortion ban did not pose an undue burden because it "avoided the flaws identified in [*Stenberg* ] by precisely describing the restricted procedure and explicitly permitting D & E procedures").

Moreover, it does not appear to this court that Congress simply overlooked the *Stenberg* Court's language to this effect. Instead, it appears that Congress intentionally chose *not* to explicitly exclude D & Es. The government presented no evidence to this court that supported its arguments regarding congressional intent, and the Congressional Record suggests the contrary. Within Congress, opponents of the Act pointed out the potential overbreadth of the Act and proposed remedies regarding the scope. They noted that:

> Medical experts testified just yesterday before the Constitution Subcommittee that the definition in the bill could easily be construed to ban the most commonly used second trimester procedure.

H.R. Report No. 108–58, at 80 (2003) ("Record Exh. A"). Congress, however, rejected the related amendments to narrow the scope of the Act.

However, even if it was Congress' intent to limit the ban to intact D & Es, this court, like the Supreme Court in *Stenberg,* is "without power to adopt a narrowing construction of [the statute] unless such a construction is reasonable and readily apparent." 530 U.S. at 944, 120 S.Ct. 2597 (citing *Boos v. Barry,* 485 U.S. 312, 330, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988)). Even if this court were to accept the government's argument that the phrase "partial-birth abortion," as used by Congress, is commonly associated with the intact D & E procedure, the use of that phrase does not limit the scope of the Act to intact D & Es. Instead, the phrase "partial-birth abortion" is "subject to the statute's *explicit statutory definition,*" which this court is required to follow even if that definition

"varies from the term's ordinary meaning." *Id.* at 942–43, 120 S.Ct. 2597 (citing *Meese v. Keene,* 481 U.S. 465, 484–85, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987)); *see also Richmond Medical Center v. Hicks,* 301 F.Supp.2d 499, 515 (E.D.Va.2004) (Virginia law posed an undue burden despite fact that it explicitly excepted from coverage "the dilation and evacuation abortion procedure involving dismemberment of the fetus prior to removal from the body of the mother where plain language of the Act [nevertheless] ban[ned] pre-viability D & Es and would cause those who perform such D & Es to fear prosecution, conviction, and imprisonment"). Here, for the reasons discussed above, the Act's statutory definition casts a net wider than intact D & Es, and may include other previability abortion procedures, including D & Es by disarticulation, inductions, and treatment of spontaneous miscarriages.

However, even if this court were to find that linguistic differences in the Act make it less likely that the Act encompasses D & E by disarticulation procedures as did the Nebraska statute in *Stenberg,* this court nevertheless concludes that the Act is unduly burdensome because, even assuming that the Act covers only the intact D & E procedure, the Act does not distinguish between previability and postviability in violation of *Roe* and *Casey. See Stenberg,* 530 U.S. at 930, 120 S.Ct. 2597 (the government's "interest in regulating abortion previability is considerably weaker than postviability"). To the extent that a woman seeks or requires an intact D & E

abortion prior to viability, this Act would undoubtedly place a substantial obstacle in her path and decision.[14]

For the reasons stated above, the court finds that the Act is unconstitutional.

## III. *CONSTITUTIONAL VAGUENESS*

### A. Parties' Positions

Plaintiffs next challenge the Act on the ground that it is void for vagueness, in violation of the Due Process Clause, because the Act fails to clearly define the prohibited medical procedures and does not use terminology that is recognized in the medical community. Therefore, according to plaintiffs, it deprives physicians of fair notice and encourages arbitrary enforcement.[15]

The government, however, contends that the inclusion of scienter requirements in the Act mitigates any possible vagueness. *See, e.g., Village of Hoffman Estates v. Flipside,* 455 U.S. 489, 499, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *Colautti v. Franklin,* 439 U.S. 379, 395 n. 13, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979). It cites to three statutory phrases in the Act that it contends constitute scienter requirements. These phrases appear in § 1531(a), and in § 1531(b)(1)(A) (defining partial-birth abortion), and provide in pertinent part:

(a) Any physician who, in or affecting interstate or foreign commerce, *knowingly performs* a partial-birth abortion and thereby kills a human fetus shall be fined under this title or imprisoned not more than 2 years, or both. . . .

---

14. The *Stenberg* court did not have to reach this issue because it concluded that the statute in that case sufficiently encompassed other D & E procedures in addition to intact D & E procedures. However, as the *Stenberg* court noted, "the fact that Nebraska's law applies both previability and postviability aggravates the constitutional problem presented." *Id.*

15. Plaintiffs also argue that the Act is impermissibly vague regarding what conduct is "in

or affecting interstate or foreign commerce." They contend that physicians, therefore, have no notice regarding when the Act applies, thus subjecting them to arbitrary and discriminatory prosecution. However, because the court concludes that the Act is unconstitutionally vague for the reasons set forth above, it is unnecessary for the court to reach this specific argument.

(b) As used in this section—

(1) the term "partial-birth abortion" means an abortion in which the person performing the abortion—

(A) *deliberately and intentionally* vaginally delivers a living fetus until, in the case of a head-first presentation, the entire fetal head is outside the body of the mother, or, in the case of a breech presentation, any part of the fetal trunk past the navel is outside the body of the mother, *for the purpose of* performing an overt act that the person knows will kill the partially delivered fetus....

(Emphasis added.)

The government contends that the inclusion of these scienter requirements as emphasized above remedies any vagueness. It claims that because of the scienter requirements, "the Act does not criminalize situations, during a D & E [by disarticulation], in which a living fetus may be delivered, by happenstance, intact or even [in] cases where the partial delivery of the intact fetus is intentional or foreseeable, but only procedures where the provider deliberately delivers the fetus both in the manner described by the Act and *with* a specific intent from the outset to perform an overt act that the provider knows will kill the fetus."

## B. Legal Standard

■ The Supreme Court has unambiguously stated that vague laws are unconstitutional:

It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act according-ly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.

*Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Accordingly, to avoid unconstitutional vagueness, the Act must (1) define the offense with sufficient definiteness that ordinary people can understand what conduct is prohibited; and (2) establish standards such that enforcement may be conducted in a non-arbitrary, non-discriminatory manner. *Nunez v. City of San Diego,* 114 F.3d 935, 940 (9th Cir.1997).

■ "The need for definiteness is greater when the ordinance imposes criminal penalties on individual behavior or implicates constitutionally protected rights than when it regulates the economic behavior of businesses." *Id.* (quoting *Village of Hoffman Estates,* 455 U.S. at 494, 102 S.Ct. 1186). Moreover, if the Act does not provide sufficient "standards to prevent arbitrary enforcement," it "would be impermissibly vague even if it did not reach a substantial amount of constitutionally protected conduct, because it would subject people to the risk of arbitrary deprivation of their liberty." *Forbes v. Napolitano,* 236 F.3d 1009, 1011–1012 (9th Cir.2000) (citing *City of Chicago v. Morales,* 527 U.S. 41, 42, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999)). "Regardless of what type of conduct the criminal statute targets, the arbitrary deprivation of liberty is *itself* offensive to the Constitution's due process guarantee." *Id.* at 1012 (citing *Smith v. Goguen,* 415 U.S. 566, 575, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974)).

## C. Findings of Fact and Conclusions of Law

■ As plaintiffs note, several of the terms in the Act are ambiguous, including

"partial-birth abortion," "overt act," "deliberately and intentionally," and "living fetus." The trial testimony of numerous physicians confirmed that, as physicians and practitioners providing abortion services, they do not understand exactly what the Act prohibits. *See, e.g.,* Tr. Vol. 1 at 76:7–82:12 (Paul); Tr. Vol. 4 at 557:4–13 (Broekhuizen); Tr. Vol. 11 at 1787:10–23 (Chasen); Tr. Vol. 5 at 820:6–20 (Westhoff); Tr. Vol. 2 at 200:23–202:3 (Sheehan).

As many of the physicians testified before this court, the term "partial-birth abortion" has little if any medical significance in and of itself. *See, e.g.,* Tr. Vol. 3 at 420:23–421:2(Doe); Grunebaum Depo. at 214:1–7. Dissenting legislators within Congress made the same observation, arguing that:

> This legislation is overly vague. It is unclear exactly, which procedures we would ban. The term 'partial-birth abortion' has no legal or medical meaning. It is a term invented for political purposes. The findings and actual operative clauses of the bill are inconsistent in their definitions, and in both cases are overly vague.

Record Exh. A, at 80.

Additionally, the Act's use of the term "living fetus" adds to the vagueness of the statute, since, the term "living fetus" is not pertinent to the framework set forth by the Supreme Court in *Roe* and *Casey,* and does not pertain to viability. As set forth above in the court's findings regarding undue burden, a previable fetus may nonetheless be "living" if it has a detectable heartbeat or pulsating umbilical cord. Tr. Vol. 1 at 67:3–11; 76:6–18 (Paul); Tr. Vol. 2 at 201:5–8 (Sheehan); Tr. Vol. 3 at 421:12–18(Doe); Tr. Vol. 5 at 822:20–823:12 (Westhoff); Tr. Vol. 11 at 1783:15–1786:3 (Chasen). Moreover, as noted by the Third Circuit, "because a fetus may be 'living' as early as seven weeks lmp, use of the term 'living' instead of 'viable' indicates that, contrary to the understanding of the public and the concomitant rhetoric, the Act is in no way limited to late-term, or even mid-term, abortions." *Farmer,* 220 F.3d at 137 (holding state partial-birth abortion ban unconstitutionally vague, asserting that "the term 'living human fetus' adds little to the Act's constitutional certainty because it does not draw the line at viability, as the Supreme Court has done").

Nor does the requirement of an "overt act" sufficiently narrow the scope of the Act to give notice of the type of abortion procedure prohibited. Again, as set forth above in the court's findings regarding undue burden, the "overt act" may be interpreted to comprise many acts, performed not only in the process of an intact D & E, but in the course of a D & E by disarticulation or induction as well, including disarticulation of the calvarium, cutting the umbilical cord, or compressing or decompressing the skull or abdomen or other fetal part that is obstructing completion of the uterine evacuation. Tr. Vol. 1 at 61:7–15; 70:1–6; 78:25–79:5 (Paul); Tr. Vol. 2 at 193:5–24; 205:8–15 (Sheehan); Tr. Vol. 3 at 405:13–22(Doe); Tr. Vol. 4 at 523:1–524:1 (Broekhuizen); Tr. Vol. 11 at 1783:15–1786:3 (Chasen). Accordingly, the term "overt act" cuts such a wide swath that it cannot possibly be considered sufficient to put physicians on notice of what type of "overt" act violates the Act.

This court further concludes that the Act's vagueness and unconstitutional breadth cannot be cured by the alleged scienter requirements. First, the requirement that the physician "knowingly perform" a "partial-birth abortion," as defined by the Act, is of no help to the government. As plaintiffs have argued and the trial evidence has demonstrated, as part of their routine medical practice, a physician performing a D & E, by disarticulation or

intact, or an induction abortion in the safest, most medically appropriate manner, "knows" that the procedure may proceed in such a manner that the physician may have to engage in procedures proscribed by the Act. *See* Tr. Vol. 1 at 74:14–80:20 (Paul); Tr. Vol. 1 at 165:7–21 (Sheehan); Tr. Vol. 2 at 281:15–21 (Drey); Tr. Vol. 3 at 420:9–22(Doe); Tr. Vol. 4 at 550:18–552:9 (Broekhuizen); Tr. Vol. 4 at 657:3–8 (Creinin); Tr. Vol. 5 at 822:9–824:2 (Westhoff); Tr. Vol. 11 at 1783:15–1786:3 (Chasen).

Nor can the fact that the Act requires that a physician "deliberately and intentionally vaginally deliver a living fetus" cure the unconstitutional vagueness. The parties dispute whether the phrase modifies only the vaginal delivery or the additional steps contained in the Act's definition of "partial-birth abortion." However, this court need not resolve that dispute, because, as the Third Circuit held in *Farmer*, this scienter requirement does nothing to ameliorate the vagueness of Act. *See Farmer*, 220 F.3d at 138 (rejecting state's argument that scienter requirement specifying "deliberate[ ] and intentional[ ] deliver[y] into the vagina of a living fetus" cured unconstitutional vagueness).

> At a minimum, to limit the scope of a statute to 'deliberately and intentionally' performing a certain procedure, the procedure itself must be identified or readily susceptible of identification. Here it is not.

*Id.* (citations omitted); *see also Planned Parenthood of Greater Iowa, Inc. v. Miller*, 195 F.3d 386, 389 (8th Cir.1999) (Iowa partial-birth abortion ban's inclusion of scienter requirement did not save Act because Act still "encompasse[d] more than just the [intact D & E] procedure").

This same analysis applies to the Act's requirement that the procedure be "for the purpose" of performing "an overt act that the [physician] knows will kill the partially delivered fetus." Insofar as the court has already concluded that the Act's definition may encompass many second trimester abortions and that the terms "partial-birth abortion" and "overt act" are ambiguous, the inclusion of a scienter requirement cannot cure the vagueness and save the Act.

As noted previously, the government also argues that this court should narrow the construction of the statute to eliminate any doubts about the Act's unconstitutionality. This court rejects that argument for the reasons set forth above in the court's conclusions of law regarding the undue burden posed by the Act.

Accordingly, the court finds that the Act is unconstitutional on this ground as well.

## IV. *HEALTH EXCEPTION*

Separate and apart from the undue burden and vagueness analyses, *Stenberg* also holds that "where substantial medical authority supports the proposition that banning a particular abortion procedure could endanger women's health, *Casey* requires the statute to include a health exception where the procedure is 'necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.'" *Stenberg*, 530 U.S. at 938, 120 S.Ct. 2597 (citing *Casey*, 505 U.S. at 879, 112 S.Ct. 2791). The Act, by contrast, excepts only "a partial-birth abortion that is necessary to save the *life* of a mother," and omits the health exception and the "appropriate medical judgment" requirements of *Casey* and *Stenberg*.

Although the court has already found that the Act is unconstitutional because it poses an undue burden and because it is vague, given the time and resources expended by the parties and this court, and the extensive evidence presented on the issue, the court is compelled to reach the issue regarding a health exception.

## A. Parties' Arguments

Plaintiffs contend that *Stenberg* requires a health—not just life—exception under the circumstances, and that the congressional findings on the issue are not entitled to any deference. In support, plaintiffs assert that the intact D & E procedure, is a safe, if not a safer, option for pregnancy termination than other abortion procedures, and is necessary to preserve the health of certain women under certain circumstances. Additionally, plaintiffs also argue that the Act's life exception is constitutionally inadequate because it does not allow a physician to determine, in his or her best medical judgment, whether the intact D & E procedure is necessary to preserve a woman's life.

The government, however, argues that the Act's life exception is constitutionally adequate because Congress has concluded that the procedure is never medically necessary, and that this court must defer to Congress' finding. The government, therefore, contends that the evidence before this court is relevant *only* in determining the degree of deference afforded Congress' finding regarding the necessity of a health exception.

## B. Trial Evidence

At the outset, this court recognizes that Congress has made a finding pertinent to the trial evidence before this court, and that in affording the appropriate level of deference to Congress' finding, the evidence before this court may play a limited role in resolution of this issue. Nevertheless, the court, prior to determining the degree of deference to be accorded the congressional findings, summarizes in significant detail and finds as follows regarding the extensive evidence presented by both parties before this court.

### 1. Witnesses' Background and Qualifications

#### a. Plaintiffs' Witnesses

Plaintiffs presented trial testimony from eight expert witnesses in opposition to the Act, several of whom also provided testimony in the New York case. Plaintiffs' testifying experts included: Drs. Maureen Paul, Katharine Sheehan, Carolyn Westhoff, Fredrik Broekhuizen, John Doe, Mitchell Creinin, Eleanor Drey, and Stephen Chasen.[16]

---

**16.** The court briefly sets forth the qualifications of each of plaintiffs' testifying experts. Dr. Maureen Paul is a board-certified obstetrician and gynecologist ("obgyn") who also holds a masters' degree in public health and epidemiology (the study of research methods in determining what groups are affected by what diseases). Dr. Paul serves as the chief medical officer for plaintiff Planned Parenthood Golden Gate and is an associate clinical professor at the University of California San Francisco ("UCSF"). She is also the editor-in-chief of the leading textbook on abortion procedure. Dr. Paul has never previously testified as an expert witness in any abortion-related case. *See* Exh. 60 (Paul CV); Tr. Vol. 1 at 6:13–13:–23.

Likewise, Dr. Katharine Sheehan is a board-certified obgyn who serves as the full-time medical director of the Planned Parenthood affiliate for San Diego and Riverside Counties, which is the only provider of second trimester abortions beyond 18 weeks for the entire area of California south of Los Angeles. She also has a private practice and teaches as a clinical faculty member of the University of California San Diego ("UCSD") medical school. She has never testified in any court cases previously. Exh. 66 (Sheehan CV); Tr. Vol. 1 at 151:6–164:5:3, Tr. Vol. 2 at 178:8–179:8 (Sheehan).

Dr. Doe testified in this case under a pseudonym. He is a board-certified obgyn who is board eligible in maternal-fetal medicine. He practices in the San Francisco Bay Area. He has never given testimony in court before. Tr. Vol. 3 at 377:8–387:23(Doe).

Dr. Fredrik Broekhuizen is a board-certified obgyn who serves as a part-time medical director for Planned Parenthood of Wisconsin, a full professor of obstetrics at the Medi-

Plaintiffs' expert witnesses all currently practice and/or teach in the area of obstetrics and gynecology ("obgyn"), and all were qualified as experts in that area and in abortion practice. Additionally, three of the eight were also qualified as experts in maternal-fetal medicine; two were qualified as experts in epidemiology; and one taught epidemiology jointly with his medical practice. All eight have performed intact D & Es during the course of their practices, with varying frequencies, and all of those experts who teach in the area of abortion practice teach the intact D & E variant. Of plaintiffs' witnesses asked to quantify the number of abortions they had performed, all answered in the thousands. *See, e.g.,* Tr. Vol. 1 at 160:5–14 (Sheehan, estimating 30,000); Tr. Vol. 5 at 732:10–12 (Creinin, estimating 5,000). Moreover, all eight opine that enforcement of the Act would significantly affect their patients and practices, and could subject them to prosecution under the Act. Six of plaintiffs' experts have never previously testified in any case involving a ban on abortion. None of plaintiffs' experts testified before or was consulted by Congress with respect to the drafting of the Act or the findings supporting the Act.[17]

Plaintiffs also submitted the deposition testimony of five experts: one who is an expert in perinatal and gynecological pathology, and four of whom are experts in obgyn and abortion practice, including intact D & E. Three of the four are also experts in maternal-fetal medicine.

### b. Government Witnesses

The government presented trial testimony from five expert witnesses. Several of these witnesses practice and teach in obgyn; and four of the five were, therefore qualified as experts in that area. Two of those four were also qualified as experts in maternal-fetal medicine, and one was qualified as an expert in medical literature. Three of the four were qualified as experts in pregnancy termination. However, none had performed the intact D & E procedure at issue in this case. Moreover, none had been instructed regarding the procedure or had personally observed the procedure being performed.

cal College of Wisconsin, and who also has a private practice. He has previously testified in other abortion litigation. Exh. 6 (Broekhuizen CV), Tr. Vol. 4 at 481:12–494:11 (Broekhuizen).

Dr. Mitchell Creinin is a board-certified obgyn. He is a full professor of obstetrics and epidemiology at the University of Pittsburgh, and the part-time medical director of that area's Planned Parenthood affiliate. He is also the co-author of a chapter in a leading obstetrics textbook on induction abortions. Exh. 28 (Creinin CV), Tr. Vol. 4 at 645:13–656:20 (Creinin).

Dr. Carolyn Westhoff is a board-certified obgyn who is affiliated with the New York Presbyterian Hospital and is a professor at the Columbia University Medical School in both obgyn and epidemiology. She is a member of the board of Planned Parenthood, is a member of the National Abortion Federation ("NAF") and has provided testimony in a number of cases involving Planned Parenthood. Exh. 67 (Westhoff CV), Tr. Vol. 5 at 790:24–798:10, 834:1–835:21 (Westhoff).

Dr. Eleanor Drey is a board-certified obgyn, the medical director of the Women's Option Center at San Francisco General Hospital, and an assistant clinical professor teaching abortion methods at UCSF. She has never offered expert testimony before. Tr. Vol. 2 at 274:9–278:2, 286:15–291:3 (Drey), Exh. 33 (Drey C.V.).

Dr. Stephen Chasen is board-certified in both obgyn and maternal-fetal medicine. He is an associate professor at the Cornell University Medical Collee and directs the high-risk obstetrics program, the obgyn residency program, and the maternal-fetal medicine fellowship program. Exh. 24 (Chasen CV), Tr. Vol. 11 at 1705:12–1717:19 (Chasen).

17. One of plaintiffs' witnesses, Dr. Creinin, wrote a letter to Congress in opposition to the Act.

All four witnesses had testified previously in support of state law restrictions on abortion, or had offered testimony before Congress in support of the Act, or both. The government's fifth testifying expert, Dr. Anand, was qualified as an expert in the areas of pharmacology of anesthetic drugs, fetal neurobiology, and fetal pain.

The government also introduced deposition testimony from one expert witness, an expert in obgyn, maternal-fetal medicine, and abortion practice, with the caveat that he has never performed an intact D & E procedure.

The four government witnesses qualified as experts in obgyn included Drs. Leroy Sprang, Curtis Cook, Watson Bowes, and Elizabeth Shadigian.

Dr. Sprang, an associate clinical professor at Northwestern University and a practicing obgyn for approximately twenty eight years, testified that he had never performed any abortion procedure on a fetus post–17 weeks lmp, that he had performed fewer than twenty D & Es by disarticulation in his twenty eight years of practice, all of which were on demised fetuses, and that he had never been instructed regarding, had never taught, performed, or even observed an intact D & E procedure. Tr. Vol. 7 at 1033:17–18; 1034:1–1038:4 (Sprang). He further testi-

fied that his knowledge regarding intact D & E was based exclusively on his conversations with other physicians,[18] his review of medical literature, and his involvement in this litigation and other litigation in which he was required to read other expert reports and related documents. *Id.* at 1045:2–1052:4. The court also notes that Dr. Sprang has never conducted clinical research in the area of abortion. *Id.* at 1029:3–7.

Like Dr. Sprang, while Dr. Cook possesses expertise generally in obgyn and maternal-fetal medicine, he also lacks expertise regarding the intact D & E procedure in particular. Dr. Cook has never performed, personally observed, supervised, received instruction in, or taught the intact D & E procedure.[19] Tr. Vol. 9 at 1380:7–1381:7 (Cook). Dr. Cook also lacks expertise in post–20 week D & Es generally. *Id.* at 1365:15–22. He has performed only three to five D & Es by disarticulation in his career, limited to cases where fetal demise had already occurred. *Id.* at 1364:14–25. Moreover, in terms of his observation of D & Es by disarticulation, Dr. Cook testified that he generally observes the procedure prior to 18 weeks gestation. *Id.*

The same is true of Dr. Bowes, an emeritus professor of obgyn at the University

---

18. Dr. Sprang testified that his knowledge regarding the intact D & E procedure was derived from conversations with other physicians. *Id.* at 1041:1–1046:6. He claimed that there were two "significant" or "memorable" physicians with whom he had discussions after a meeting, and had received more information than usual regarding the intact D & E procedure. *Id.* at 1042:20–22. However, he could not recall the names, dates, or locations associated with those conversations. *Id.* at 1044:4–14.

Moreover, this basis for Dr. Sprang's knowledge is somewhat questionable since two of plaintiffs' witnesses in this case, Drs. Hammond and Frederiksen, teach at North-

western as well. While he was aware that Dr. Hammond teaches intact D & E at Northwestern, Dr. Sprang testified that he was aware of the practices and teachings of Drs. Hammond and Frederiksen only from the residents at Northwestern because he had never spoken with either of them in person. *Id.* at 1046:3–6. Moreover, although she is on the faculty at his university, he knows Dr. Frederiksen "very minimally" and "if [he] saw her in the room, [he] wouldn't be sure that [he] would recognize her." *Id.* at 1166:1–21.

19. Dr. Cook did testify that he once observed a videotape of the evacuation process of an intact D & E; however, the quality of the videotape was extremely poor.

of North Carolina/ Chapel Hill, retired from his clinical practice. He is board-certified in obgyn and maternal-fetal medicine. Tr. Vol. 6 at 875:1–879:7 (Bowes). Dr. Bowes has never performed an intact D & E; and he has only performed 2–3 D & Es by disarticulation on fetuses that had not already died at the time of the procedure. *Id.* at 978:8–983:23. Those D & Es were performed to save the mother's life, as Dr. Bowes believes that abortion generally is warranted only when there are severe medical complications that threaten a mother's life. *Id.* at 977:1–4.

Likewise, Dr. Elizabeth Shadigian, an obgyn and a clinical associate professor of obgyn at the University of Michigan, testified that she has never performed an intact D & E, and has never supervised, observed, been instructed in, or taught the procedure. Tr. Vol. 8 at 1214:3–1215:3 (Shadigian).[20] Of the abortions that she has performed on fetuses prior to demise, all have been induction abortions under circumstances of severe maternal complications. In her career, all of the D & Es by disarticulation that she has performed have been on demised fetuses.

### c. Expert Qualifications

■ Accordingly, this court found that the government's experts lacked the background, experience, and instruction to qualify as experts regarding the technique of the intact D & E procedure. Instead, the court allowed the government's experts to testify only regarding their opinions on the safety of the procedure, based upon their review of the literature. The court noted that if it were to qualify the government's witnesses, who did not "appear to have any personal experience with late-term abortion procedures at issue here," it would mean that any obgyn would be considered an expert on late-term abortions. *See* Tr. Vol. 7 at 1052:22–25.

Overall, while the government's witnesses are eminently qualified as obgyn practitioners, the court finds that the government's witnesses lack the qualifications, experience, and knowledge possessed by plaintiffs' witnesses with respect to late-term abortion procedures generally, and intact D & E in particular.

### 2. Overview of Plaintiffs' Evidence

Plaintiffs presented evidence that intact D & E is at least as safe as D & E by disarticulation, and under some circumstances safer, because the procedure is quicker and requires fewer passes with the forceps. Plaintiffs also presented evidence that common sense and sound medical judgment indicate that fewer passes reduce the risk of uterine perforation and cervical lacerations from instruments and/or fetal bone fragments. Tr. Vol. 1 at 70:10–17 (Paul); Tr. Vol. 1 at 166:13–167:2, 169:7–13, Tr. Vol. 2 at 186:14–187:16 (Sheehan); Tr. Vol. 3 at 399:18–400:217, 407:12–20(Doe); Tr. Vol. 5 at 798:12–804:5 (Westhoff); Tr. Vol. 11 at 1755:5–1756:19 (Chasen). Certain of defendants' witnesses agreed. Tr. Vol. 6 at 944:20–945:21

---

**20.** She further attested that she probably did not even personally know any physicians who performed the procedure, and had never done any research regarding the procedure other than in connection with the instant litigation. *Id.* at 1214:22–1215:6. Dr. Shadigian testified that she was not aware of the intact D & E procedure being taught at the University of Michigan, where she works. *Id.* at 1231:12–1232:7. However, she did testify that she was aware that the chair of the Maternal–Fetal Medicine Department at the University of Michigan, Dr. Timothy Johnson, whom she testified she respected as a physician, was of the opinion that intact D & E was the safest and most appropriate procedure under certain circumstances and that she had no reason to doubt Dr. Johnson's testimony in the New York case that such procedures are conducted up to 22 wks lmp at the University of Michigan. *Id.* at 1294:20–1297:4; 1316:19–25.

(Bowes); Tr. Vol. 8 at 1285:4–14 (Shadigian); Tr. Vol. 9 at 1486:11–1487:5 (Cook). *But see* Tr. Vol. 7 at 1127:8–1128:12 (Sprang, opining that no risk in additional passes if ultrasound is used).

In addition, since the fetus undergoes less disarticulation, the risk of leaving fetal parts in the uterus is diminished, and the procedure is likely to take less time. Tr. Vol. 1 at 72:7–73:8 (Paul); Tr. Vol. 5 at 799:1–4, 800:13–4, 801:8–21 (Westhoff). The quicker the procedure, the less time the woman must spend under sedation, which further reduces the potential for complications caused by anesthesia. Tr. Vol. 1 at 168:19–169:6 (Sheehan). Plaintiffs also argue that a shorter surgical procedure will decrease the amount of blood loss and the risk of infection. Tr. Vol. 5 at 799:4 (Westhoff); Tr. Vol. 11 at 1756:15–19 (Chasen).

Because the intact D & E procedure results in a fetus that remains relatively intact after surgery, an autopsy of the fetus for diagnostic purposes is possible, particularly if the reason for the abortion was due to fetal anomalies. Such further diagnosis may be helpful for the woman in planning for future pregnancies. Tr. Vol. 2 at 189:3–20 (Sheehan); Tr. Vol. 11 at 1757:14–1758:19 (Chasen). Some women also prefer a surgical procedure that yields a relatively intact fetus for psychological reasons, so that the mother can hold the fetus and, if desired, have the fetus receive religious rites. *See, e.g.,* Tr. Vol. 4 at 503:18–504:3; 562:10–22 (Broekhuizen). However, if the intact D & E procedure destroys the contents of the brain, analysis of the brain tissue would be impossible. Tr. Vol. 2 at 254:17–25 (Sheehan); Tr. Vol. 3 at 433:9–434:6 (Doe, also noting that brain tissue is not always needed in autopsies and cannot always be successfully obtained even in inductions).

The AMA task force, on which government witness Dr. Sprang served, conclud-

ed that intact D & E "may minimize trauma to the woman's uterus, cervix, and other vital organs, [and] may be preferred by some physicians, particularly when the fetus has been diagnosed with hydrocephaly or other anomalies incompatible with life outside the womb." Tr. Vol. 7 at 1133:12–1134:8 (Sprang).

### 3. Overview of Government's Evidence

In contrast, the government took the position that intact D & E is a dangerous procedure that is less safe than any other second trimester abortion method, is never medically necessary, and could potentially pose grave risks to women's health. The government argues that not only is there no scientific evidence showing that the procedure is safe as a whole, but the individual elements of the procedure have been shown to be unsafe as well. *See, e.g.,* Tr. Vol. 7 at 1079:1–1081:5 (Sprang); Tr. Vol. 8 at 1233:12–1234:3 (Shadigian); Tr. Vol. 9 at 1411:22–1416:1 (Cook).

The government also introduced evidence that in no situation is an intact D & E medically necessary, since a woman could always undergo another method of second trimester abortion in any given situation, including D & E by disarticulation, induction, or hysterotomy or hysterectomy. *See, e.g.,* Tr. Vol. 7 at 1110:14–1111:9 (Sprang); Tr. Vol. 8 at 1220:16–21 (Shadigian); Tr. Vol. 9 at 1390:3–22 (Cook).

### 4. Medical Organizations

Numerous medical organizations are divided on their positions regarding the Act. Among the largest organizations that oppose the Act are ACOG, a professional membership organization organized in 1951, concerned with professional practice and education in the health care of women. ACOG has more than 44,000 members in the United States, Canada, and Mexico. Each member of ACOG is a board-certi-

fied obgyn, and more than 90% of all board-certified obgyns are members of ACOG. *See generally* Deposition of Joanna Cain, M.D. ("Cain Depo").

The California Medical Association ("CMA") also opposes the Act. The CMA, which advocates for the interests of physicians and their patients, is California's largest medical association, with more than 30,000 members, comprised of licensed physicians. *See generally* Deposition of John Whitelaw, M.D. ("Whitelaw Depo"). Two other associations, the American Medical Women's Association ("AMWA"), an organization of 10,000 medical professionals, including women physicians, residents, and medical students, dedicated to advancing women in medicine and improving women's health, and the American Public Health Association ("APHA"), an organization with approximately 50,000 members from all public health occupations, including obstetricians and gynecologists, devoted to advancing and promoting public health, also oppose the Act. *See generally* Deposition of Meghan Kissell ("Kissell Depo"); Deposition of Alan Baker ("Baker Depo").

Among those organizations that supported the Act were the Association of American Physicians & Surgeons ("AAPS"), which submitted an amicus brief in support of Nebraska in the *Stenberg* case. AAPS is a nonprofit organization dedicated to defending the practice of private medicine. It submitted the amicus brief on behalf of several other medical organizations, including ISMS, the Illinois State Medical Society. An organization co-founded by government witness Dr. Cook to advocate for the banning of partial-birth abortion, the Physicians' Ad Hoc Coalition for Truth ("PHACT"), with approximately 400 physician members, also opposed the Act. *See* Tr. Vol. 9 at 1361:11–62:14 (Cook).[21]

The American Medical Association ("AMA"), a national association with approximately 250,000 physician and medical student members, created to advocate on behalf of physicians and patient rights, supported the Act initially, but subsequently withdrew its support because of the criminal penalties included in the Act.

## 5. Scientific Studies on Intact D & E

The parties agree that no definitive large-scale studies have been completed that conclusively show that intact D & E is safe, or that it is unsafe. Tr. Vol. 1 at 102:9–14 (Paul); Tr. Vol. 3 at 438:5–11, 443:3–9(Doe); Tr. Vol. 5 at 849:9–12 (Westhoff); Tr. Vol. 6 at 905:19–909:20, 971:14–972:19 (Bowes); Tr. Vol. 8 at 1297:25–1298:12 (Shadigian).

It is the government's position that in the absence of definitive studies concluding that intact D & E is safe, physicians should not be permitted to use the technique. *See, e.g.,* Tr. Vol. 8 at 1221:5–12, 1229:2–6, 1232:8–13 (Shadigian). Plaintiffs, on the other hand, take the position that in the absence of studies concluding that intact D & E is unsafe, physicians should be able to exercise their own medical judgment to determine if the procedure is appropriate under the circumstances presented. *See, e.g.,* Tr. Vol. 1 at 90:13–17 (Paul); Tr. Vol. 11 at 1828:3–21 (Chasen).

### a. Research Methodology

The medical community follows certain epidemiological principles when evaluating the weight and significance of research results, and all parties recognized these principles in presenting trial evidence.

In general, "evidence-based medicine is a way of doing medicine that takes into consideration the scientific information that is available... [I]f there is good evi-

---

21. PHACT, however, is no longer in existence.

dence that one particular method should be used, then it is [the physician's] responsibility to use that method, but where that evidence is lacking or inadequate, then we use our best clinical judgment to render the safest care possible for our patients." Tr. Vol. 1, 91:5–13 (Paul).

Research methodology is evaluated on a hierarchy. Prospective randomized trials, where patients are selected before any treatment begins and randomly placed into treatment groups, yield the most significant results, since this type of study is considered to be subject to the least amount of bias. The next most reliable study is a retrospective cohort study, where records are reviewed after patients have undergone different types of treatment and the results are compared. Somewhat less reliable is a retrospective case study series, where records are reviewed after patients have undergone one specific type of treatment and the results are reported. Finally, if there is no study possible or available, doctors should rely on their clinical judgment and experience in determining what medical methods to use. Tr. Vol. 1 at 95:17–97:21 (Paul); Tr. Vol. 2 at 253:3–254:2 (Sheehan); Tr. Vol. 2 at 346:13–348:15 (Drey); Tr. Vol. 6 at 890:15–894:7, 895:25–896:8 (Bowes); cf. Tr. Vol. 8 at 1298:13–1299:3 (Shadigian, stating that intuitive judgment is of no value in assessing short- and long-term risks). When studies have been conducted, doctors are encouraged to incorporate the results into their practice.[22]

Certain published studies are also subjected to peer review, where other doctors practicing in the same area will review results and provide criticism and commentary designed to ensure the accuracy of the results reported. Tr. Vol. 1 at 97:22–98:6 (Paul); Tr. Vol. 6 at 894:8–895:4 (Bowes).

### b. Studies on Abortion Safety

The parties agree that abortion in general is a safe procedure, and that it is in fact safer than carrying a pregnancy to term. Tr. Vol. 1 at 22:11–38:5 (Paul, noting that risk of death from childbirth is 10 times greater than risk of death in abortion). The parties also agree that while no published studies comparing the safety of intact D & E to other methods of abortion exist, various studies have examined individual aspects of the intact D & E procedure, and others have compared the safety of D & Es generally with other methods of abortion.

The first large-scale studies on abortion safety took place in the 1970s, through the Joint Program for the Study of Abortion ("JPSA"), administered through the Centers for Disease Control ("CDC"). The JPSA study ran from 1971–1979, and included over 250,000 women.[23] It concluded that D & E abortions led to significantly fewer major medical complications than inductions, which at that time were performed using saline injections.[24] Tr. Vol. 1 at 25:18–31:13 (Paul).

**22.** While the government argues that studies have shown that other clinical procedures previously believed to be safe as a matter of clinical judgment, such as episiotomies (surgical incisions in the vagina during childbirth) or fetal heart monitoring, are in fact detrimental to either the woman or the fetus, see, e.g., Tr. Vol. 1 at 103:23–105:7, 109:20 (Paul); Tr. Vol. 3 at 439:22–441:2(Doe); Tr. Vol. 6 at 896:9–897:24 (Bowes), the government also concedes that those studies would not support a ban on these procedures if used in a physi-

cian's best judgment. Tr. Vol. 6 at 972:20–974:15 (Bowes); Tr. Vol. 8 at 1301:12–21 (Shadigian).

**23.** The JPSA program no longer exists. Tr. Vol. 1 at 31:20–32:1.

**24.** While data regarding intact D & E was not broken out separately, plaintiffs argue that at least some of the safety data included in the JPSA study would have included intact D & Es, since intact D & Es are merely a variant

The parties agree that the methods of performing both D & E and induction abortions have changed since the time the JPSA studies were conducted, and both procedures have become even more safe. Tr. Vol. 1 at 31:14–19 (Paul). Individual witnesses, though, disagree as to which method between the two is better. *Compare, e.g.,* Tr. Vol. 5 at 717:24–719:3 (Creinin, noting that while inductions are safe, they have not improved in safety over the last 20 years); Tr. Vol. 3 at 414:8–14 (Doe, noting anecdotally that inductions have more complications than D & Es); Tr. Vol. 11 at 1771:22–1772:19 (Chasen, stating that D & Es are still significantly safer than current induction methods); Tr. Vol. 6 at 946:5–13 (Bowes, agreeing D & E safer than induction) *with* Tr. Vol. 7 at 1092:17–1093:7, 1122:14–1123:5 (Sprang, claiming inductions as safe or safer than D & E); Tr. Vol. 8 at 1229:2–6, 1269:15–1274:25 (Shadigian, claiming inductions unambiguously safer than D & E).

In terms of abortion mortality, the primary study relied upon is based on data collected by the CDC between 1972–1987, and includes information about abortion-related deaths throughout the United States. Exh. 63 (Lawson report). That study concluded that while the risk of death increases with fetal gestational age, the risks of mortality from D & E are very low, and comparable to those for induction.

Most of the witnesses agreed that both of those procedures are also significantly safer than a hysterectomy or hysterotomy. Exh. 63 (table III; listing D & E as "evacuation," and induction as "instillation"). *See also* Tr. Vol. 1 at 32:7–37:7, 82:13–85:11 (Paul); Tr. Vol. 3 at 414:15–415:23(Doe) (noting risks of hysterotomy and hysterectomy). *But see* Tr. Vol. 9 at 1517:2–11 (Cook, recommending hysterotomy over D & E).

### c. Lack of Published Studies on Intact D & E

The JPSA and CDC studies provide the latest available statistics from long-term and large-scale studies on abortion safety comparing D & E to induction. The parties agree that relatively few studies have been conducted on second trimester abortions generally, and none have been published on the subject of intact D & E. *See, e.g.,* Tr. Vol. 5 at 719:19–720:3 (Creinin); Tr. Vol. 6 at 905:19–908:20 (Bowes). Furthermore, the few studies that have been published have not been on the same scale or held the same authoritative value as the JPSA and CDC results.[25]

Because there is no significant authoritative data about intact D & E, while extensive authoritative data about the safety of other methods of second trimester abortion exists, the government presented evidence that physicians have a re-

---

of D & Es in general. Tr. Vol. 1 at 48:18–23 (Paul).

**25.** One study, by Dr. Amy Autry, published in 2001 in the American Journal of Obstetrics and Gynecology, concluded that modern methods of induction had a higher rate of complication than modern methods of D & E. Tr. Vol. 1 at 85:16–86:7 (Paul); Tr. Vol. 5 at 719:19–722:2 (Creinin). However, the study was relatively small, had some methodological problems, and the parties dispute whether the main complication seen (retained placenta) should properly be considered a "complication" of induction. *Compare* Tr. Vol. 1 at

114:3–115:13 (Paul); Tr. Vol. 5 at 776:16–777:19 (Creinin) *with* Tr. Vol. 7 at 1094:9–1099:9 (Sprang); Tr. Vol. 8 at 1278:13–1281:15 (Shadigian); Tr. Vol. 9 at 1394:13–1395:19 (Cook). Another study on modern methods of second trimester abortion, by Dr. David Grimes, was attempted but could not be completed because researchers could not obtain sufficiently high numbers of women consenting to an induction to make the numbers statistically significant. Tr. Vol. 5 at 707:24–709:24 (Creinin); Tr. Vol. 6 at 932:20–938:18, 951:8–954:9 (Bowes, concluding that study would be difficult but not impossible to perform).

sponsibility to use those other methods until such time that intact D & E is proven to be safe. *See, e.g.,* Tr. Vol. 6 at 922:20–924:6 (Bowes); Tr. Vol. 8 at 1237:3–1239:18, 1257:9–1258:12 (Shadigian).

Plaintiffs, on the other hand, presented evidence that the study of abortion poses various methodological difficulties. As an initial matter, since abortion is so safe in general, a large number of women would need to be included in any study to make any meaningful findings on safety. Furthermore, since so few women have second trimester abortions, a large number of institutions would be required to participate in any study to ensure that sufficient numbers of women could be included. *See* Tr. Vol. 1 at 89:4–90:11 (Paul); Tr. Vol. 5 at 705:4–707:19 (Creinin, noting that any study would require over 5000 women in each group to be statistically significant). Plaintiffs note that it is also very difficult to secure sufficient funding or cooperation for studies relating to abortion funding, given the controversial nature of the subject.[26] Tr. Vol. 5 at 780:8–13 (Creinin).

Even if women who are willing to participate in studies can be located, there are further problems related to obtaining their consent. Many women have strong preferences as to which abortion procedures they wish to undergo, and thus it is difficult to achieve consent for true randomization of abortion methods, as would be required to conduct a full prospective study. Tr. Vol. 5 at 703:19–709:24 (Creinin). More significantly, because doctors cannot tell whether an intact D & E is feasible until the procedure has begun, it is difficult to control the number of procedures included in the studies. Tr. Vol. 3 at 441:22–442:9(Doe). Under these circumstances, plaintiffs conclude that the principles of evidence-based medicine permit doctors to continue performing intact D & Es in their best medical judgment, even in the absence of studies on the topic. Tr. Vol. 1 at 90:13–17 (Paul).

### d. Chasen Study

While there are no published studies on the safety of intact D & E, one study by Dr. Stephen Chasen comparing modern methods of intact D & E with D & E by disarticulation is currently in press. Exh. 19.[27] The parties strongly dispute the interpretation of Dr. Chasen's findings.

### i. Methodology and Results of Study

Dr. Chasen conducted a retrospective cohort study examining the medical records of 383 women who had second trimester abortions after 20 weeks of pregnancy at the Cornell Weill Medical Center from 1996 to June 2003. Of those women, 120 underwent an intact D & E, and 282 underwent a D & E by disarticulation.[28]

**26.** Because of this distinction, the government's use of the studies published in the *Lancet* journal on breech deliveries as a comparator is unpersuasive. *See, e.g.,* Tr. Vol. 6 at 924:9–925:10 (Bowes). While breech deliveries are rare, they are not as rare as second trimester abortions, they occur worldwide, and they are not associated with political controversy. To obtain a statistically significant sample size, the studies done of breech deliveries involved 121 different hospital centers located in 26 different countries. Additionally, breech deliveries are performed in standard ways. Tr. Vol. 5 at 778:22–779:22 (Creinin); Tr. Vol. 6 at 955:10–956:21 (Bowes); Tr. Vol. 8 at

1299:14–1301:21 (Shadigian). Given the nature of abortion practice and policy, it would be extremely difficult to obtain a similar level of support for studies of the intact D & E procedure.

**27.** The article is scheduled for publication in May 2004 in the American Journal of Obstetrics and Gynecology, by Elsevier.

**28.** The article refers to intact D & E as "intact D & X," and D & E by disarticulation as "D & E." Intact D & E in the article is defined as any extraction where forceps were not needed to disarticulate the fetus.

Exh. 29. *See generally* Exh. 29, Tr. Vol. 11 at 1735:1–1754:17 (Chasen); *see also* Vol. 5 at 805:16–811:17, 850:22–864:17 (Westhoff).

The fetuses of the women who underwent an intact D & E were at a median of 23 weeks gestation, which was two weeks more advanced than the median gestational age of the fetuses of the women who underwent a D & E by disarticulation (21 weeks). The median blood loss suffered by each group was identical (100 mL), and the median procedure time was identical as well (22 minutes). The blood loss for the D & E by disarticulation group ranged from 40 mL to 1500 mL, and the procedure time ranged from 6–60 minutes. The blood loss for the intact D & E group ranged from 20 mL to 1200 mL, and the procedure time ranged from 6–45 minutes. Exh. 29.

Of the 383 women, 19 suffered complications, with equal frequency in both groups. However, the six complications observed in the intact D & E group were considered relatively minor (4 superficial lacerations and 2 follow-up curettages), and none were major (defined as requiring admission to an intensive care unit). In the group undergoing D & E by disarticulation, most injuries were minor, but three major complications occurred: one amniotic fluid embolus, where amniotic fluid is introduced into the woman's bloodstream; one case of sepsis, or generalized infection throughout the woman's system; and one perforated uterus. Exh. 29. Both parties concede that these complications are generally very rare, and that these results thus cannot be given much weight. Tr. Vol. 11 at 1746:9–1747:10 (Chasen); Tr. Vol. 7 at 1104:7–1105:18 (Sprang).

The study also followed 62 of these women into subsequent pregnancies, when they obtained their prenatal care at the Cornell Medical Center. Of these 62 women, only 4 experienced preterm birth, 2 who had undergone a D & E by disarticulation and 2 who had undergone an intact D & E. The two women who had undergone intact D & E and subsequently experienced early labor were both previously considered at high risk for premature labor, and were able to continue their subsequent pregnancies significantly longer than their previous ones. Tr. Vol. 5 at 810:21–24 (Westhoff); Tr. Vol. 11 at 1749:16–1751:17 (Chasen).

The article concludes that intact D & E and D & E by disarticulation are equally safe procedures, and that the decision of which technique to use should be left to the performing physician's medical judgment. The article also concludes that intact D & E does not appear to have adverse effects on maternal health. Exh. 29.

### ii. The Parties' Interpretations of the Chasen Study

Plaintiffs interpret this study as indicating not only that intact D & E is safe, but that it is in fact safer than D & E by disarticulation. For instance, the women undergoing intact D & E had more advanced pregnancies, which normally would indicate a higher likelihood of complications, since abortions become more difficult to perform as gestational age increases. However, the complication rates were identical for intact D & Es at 23 weeks gestational age and D & Es by disarticulation at 21 weeks gestational age, which plaintiffs argue permits the inference that the intact D & E is in fact safer than D & E by disarticulation. Tr. Vol. 5 at 808:11–810:9 (Westhoff); Tr. Vol. 11 at 1747:11–1748:18 (Chasen); *see also* Tr. Vol. 6 at 945:22–946:4 (government witness Bowes, agreeing).

The government, in contrast, notes that any arguments concerning the increased safety of the intact D & E due to the shorter time of the procedure and smaller

amounts of blood loss are contradicted by the findings which show that on average, an intact D & E takes exactly as much time as a D & E by disarticulation. Tr. Vol. 11 at 1807:2–1811:18 (Chasen, agreeing with these findings).

Plaintiffs emphasized that while the median blood loss and procedure times were identical for intact D & E and D & E by disarticulation, the maximum values for these factors were significantly lower for the intact D & E group. This indicated to certain of plaintiffs' experts that the most difficult intact D & Es take less time and result in less blood loss than the most difficult D & E by disarticulation, and therefore they believed this indicated the greater safety of the intact D & E procedure. Tr. Vol. 5 at 860:20–862:13 (Westhoff).

The government presented evidence in response that the Chasen study, while useful as an initial study of intact D & E, was too small in scale to support any conclusions.[29] Tr. Vol. 6 at 915:20–920:25 (Bowes), Tr. Vol. 7 at 1101:8–1108:13 (Sprang). The government noted, for example, that after peer review of the article, Dr. Chasen agreed to add language noting that the study's retrospective nature and the relatively small sample size made it difficult to draw more generalized conclusions about the safety of the procedure. Tr. Vol. 11 at 1810:12–1814:18 (Chasen). This difficulty applies both to the findings as to safety, as well as to the findings on subsequent preterm labor, which the government notes is further flawed in that follow-up care could be reviewed only for patients who returned to the Cornell Medical Center. Tr. Vol. 11 at 1793:23–1794:22 (Chasen, on cross); Tr. Vol. 6 at 919:12–25 (Bowes).

### e. Risks of Intact D & E

The government argues that intact D & E is a dangerous procedure that is less safe than any other second trimester abortion method and that it poses grave risks to women's health. *See, e.g.,* Tr. Vol. 7 at 1079:1–1081:5 (Sprang). *But see* Tr. Vol. 6 at 974:21–976:7 (Bowes, stating that intact D & E does not appear to pose any long-term risks to women's health). Plaintiffs take a contrary position and refute the risks asserted by the government. These risks primarily include the following.

### i. Cervical Incompetence

The government presented evidence that the use of 25–30 osmotic dilators could potentially overstretch the cervix and lead to a condition called "cervical incompetence," a condition where the cervix painlessly dilates during a subsequent pregnancy and causes either miscarriage or preterm delivery. Tr. Vol. 7 at 1081:14–1082:8 (Sprang); Tr. Vol. 9 at 1413:4–1415:5 (Cook). In support of this position, the government relies on an October 2001 study by Dr. Laurence Henriet published in the British Journal of Obstetrics and Gynaecology, which studied 12,000 women in France and concluded that abortion increased the risk of preterm delivery.

Plaintiffs dispute the methodology of the Henriet study as "awful," Tr. Vol. 5 at

---

29. The government also argued that Dr. Chasen, as a plaintiff in the New York litigation, was biased in favor of intact D & E, as seen by his failure to disclose to the journal publishers his plaintiff status or his previous participation in Planned Parenthood litigation. *See, e.g.,* Tr. Vol. 6 at 921:1–922:4 (Bowes). Dr. Chasen convincingly testified that he had fully complied with the publisher's ethical policy, and noted that the research for the article was completed before these lawsuits were filed. Tr. Vol. 11 at 1802:13–1806:11, 1825:3–1826:19 (Chasen). While Dr. Chasen's support of Planned Parenthood in previous litigation is noted, the court is not persuaded that Dr. Chasen acted unethically or that his research results are biased as a result of his outside activities.

755:25 (Creinin), noting that the study was purely retrospective and based on subjective self-reporting, which could have notably skewed the results, since women who experienced preterm delivery would be predisposed to recall previous abortions at a higher rate than those who did not (a phenomenon known as "recall bias").[30] The study also was designed to compare women who had had abortions to women who had not had abortions. Plaintiffs presented evidence that these two groups are irrelevant to a study whose aim is to compare women who have undergone one method of abortion (intact D & E) with women who have undergone another method of abortion. Tr. Vol. 5 at 780:15–784:2 (Creinin); Tr. Vol. 9 at 1493:22–1496:25 (Cook).

Plaintiffs also question the relevance of the results to the issues at hand. For instance, 96% of the abortions reported in the study were performed in the first trimester. Data regarding those abortions does not relate to the question whether intact D & E abortions in the second trimester cause cervical incompetence, especially since most first trimester abortions do not involve the use of osmotic dilators or prostaglandin drugs but rather mechanical dilators, which are known to cause more trauma to the cervix. Plaintiffs also note that "preterm delivery" is different from "cervical incompetence," in that cervical incompetence can cause preterm delivery, but not all preterm deliveries are caused by cervical incompetence. Tr. Vol. 5 at 780:15–784:2 (Creinin); Tr. Vol. 7 at 1144:22–1147:7 (Sprang, on cross).

Plaintiffs cite instead a 2002 article by Dr. Robin Kalish from the American Journal of Obstetrics and Gynecology, which concluded that second trimester D & Es did not cause an increased risk of miscarriage or preterm birth. Exh. 17 (study co-authored by Chasen). This paper was a retrospective case series, which followed 96 women who subsequently became pregnant after a second trimester D & E. The paper also noted that increased cervical dilation in the D & E actually decreased the likelihood of miscarriage or preterm birth in the second trimester, theorizing that increased dilation reduced the risk of cervical trauma when removing the fetus. Tr. Vol. 11 at 1726:13–1735:2 (Chasen); see also Tr. Vol. 4 at 692:3–691:17 (Creinin testimony on study); Exh. 29 (Chasen study discussed above, similarly concluding no increased risk of preterm birth after intact D & E). See also Tr. Vol. 8 at 1282:5–1283:17 (Shadigian, admitting use of serial laminara was "not unsafe").

The government notes in response that the fact that these studies involved a relatively small number of participants, and followed only a limited number of women who returned to the same hospital where the abortion was performed for care in their subsequent pregnancies, might have skewed the results. See, e.g., Tr. Vol. 6 at 919:8–25 (Bowes); Tr. Vol. 7 at 1105:20–1106:23 (Sprang).

Plaintiffs also cite the AMA task force's report on second trimester abortion, which concluded that there was insufficient medical research or evidence to conclude that dilation increases the risk of cervical incompetence, and noted that the government's witness Dr. Sprang was a member of that task force. Tr. Vol. 7 at 1147:8–1148:6 (Sprang). Also, practitioners report that they have not seen in their practices any increased incidence of cervical incompetence for subsequent pregnancies after intact D & E. Tr. Vol. 11 at 1734:2–25 (Chasen).

---

**30.** Plaintiffs also note that the government's position makes no physiological sense, since the cervix is dilated much wider and in a much shorter period of time in both induction abortions and in childbirth at term. Tr. Vol. 4 at 691:15–692:2 (Creinin).

### ii. Infection

The government also claimed, and plaintiffs acknowledged, that the insertion of the laminaria could potentially rupture the amniotic sac, introduce bacteria from the vagina into the uterus, and increase the risk of a woman's chance of infection. Tr. Vol. 7 at 1082:19–1085:17 (Sprang); *see also* Tr. Vol. 4 at 626:3–7 (Broekhuizen). Plaintiffs' experts, testified, however, they have never encountered this actual situation except in cases where the amniotic sac had already ruptured, which predisposes the uterus to infection. *See, e.g.,* Tr. Vol. 11 at 1719:23–1720:10 (Chasen).

### iii. Injuries from Podalic Version

Not all doctors perform a podalic version before commencing D & Es of any kind, but the doctors who do stated that rotation of the fetus is naturally effected as part of the procedure when the doctor takes hold of a fetal extremity and begins the extraction process, for any D & E. Furthermore, any placental separation that might occur does not pose a problem because the placenta will be removed in the extraction process in any event, and the risk of amniotic fluid embolus is nonexistent, because all amniotic fluid is removed from the uterus before a D & E begins. No doctors who perform podalic version preliminary to an intact D & E reported any of the complications discussed by the government's witness, Dr. Sprang. *See, e.g.,* Tr. Vol. 4 at 516:8–518:6 (Broekhuizen); Tr. Vol. 4 at 668:18–678:4 (Creinin, discussing and discounting all purported risks); Tr. Vol. 5 at 827:19–829:1 (Westhoff). Moreover, plaintiffs note that Dr. Sprang's citation for these complications comes directly from a textbook on full-term delivery, where the fetus is significantly larger than it is in the second trimester, and furthermore, that the references to the complications were removed in subsequent editions of the textbook. Tr. Vol. 7 at 1087:24–1089:1

(Sprang, speculating that section of the text was removed for space considerations).

### iv. Injury from Instrumentation

The government also claims that the use of the trocar or scissors to reduce the size of the fetal head could cause injury to the woman if the instrument slips, especially when the instruments are used blindly, without the doctor's being able to see where the instruments are being inserted. This appears to be based on Dr. Haskell's 1992 description of the intact D & E procedure. The government also argues that if the fetal head is crushed with forceps before removal, the sharp ends of the skull fragments may pose a risk of laceration to the woman. Tr. Vol. 7 at 1089:25–1091:14 (Sprang). *But see* Tr. Vol. 7 at 1127:8–1128:12 (Sprang, arguing no risk of laceration or injury if ultrasound is used).

While the plaintiffs concede that laceration by instruments used to crush the skull or by fragments of fetal bones can pose a risk to women's health, plaintiffs argue that intact D & E reduces the amount of risk from such laceration. Tr. Vol. 1 at 110:25–111:17 (Paul); Tr. Vol. 2 at 271:3–16, 273:3–14 (Sheehan), Tr. Vol. 3 at 445:4–446:23(Doe); Tr. Vol. 4 at 631:18–634:2 (Broekhuizen).

Of the testifying doctors who perform intact D & E by puncturing the calvarium, none insert the trocar or scissors blindly; rather, they all visualize the insertion point either directly or through ultrasound. Tr. Vol. 4 at 632:2–8, 638:18–640:7 (Broekhuizen); Tr. Vol. 4 at 682:14–19 (Creinin); Tr. Vol. 5 at 801:25–802:5, 818:8–11 (Westhoff). Cf. Tr. Vol. 7 at 1136:7–14 (Sprang, agreeing that visualization would reduce risk). Similarly, when fetal bones are crushed, the doctor takes special care to ensure that the bone fragments are covered with the

forceps when removing them through the cervix.[31]

Of plaintiffs' experts, only a few testified that they had ever perforated a uterus while performing a D & E, and the ones who had, had done so only when performing a D & E by disarticulation. No expert had perforated a uterus while performing an intact D & E. *See* Tr. Vol. 1 at 73:13–18, 123:12–125:25 (Paul); Tr. Vol. 2 at 195:3–12 (Sheehan); Tr. Vol. 5 at 800:5–12 (Westhoff); Tr. Vol. 11 at 1755:24–1756:6 (Chasen).

### f. Maternal and Fetal Health Concerns

Finally, plaintiffs presented evidence that for certain women or certain fetuses, an intact D & E may be the best option for their particular health situation. *See, e.g.,* Tr. Vol. 11 at 1762:8–25 (Chasen, noting that intact D & E is the quickest and therefore the safest procedure for these women); *see also* Tr. Vol. 6 at 943:4–944:19 (government witness Bowes, testifying that doctors should be allowed to use their judgment in determining whether any particular procedure is in a patient's best interest, including intact D & E).

The government presented evidence that even in those circumstances, an intact D & E is never a physician's only option for terminating the pregnancy, and thus the procedure is never medically necessary. The government's position appears to be that induction is almost always a viable option for terminating a second trimester pregnancy, and in those rare circumstances when it is not, hysterotomy or hysterectomy would be. Furthermore, D & E by disarticulation also remains an option for women who would otherwise seek an intact D & E. *See, e.g.,* Tr. Vol. 7 at 1109:19–1114:9 (Sprang); Tr. Vol. 8 at

1220:16–21 (Shadigian); Tr. Vol. 9 at 1390:3–22, 1411:22–1416:2 (Cook).

### i. Maternal Health

*Uterine Scarring*

Women with uterine scars, from previous caesarean operations or other uterine surgery, cannot be treated with prostaglandins such as misoprostyl, because the contractions caused by these medications can cause uterine rupture along the scar. Uterine rupture has serious implications for a woman's future reproductive health, and can endanger a woman's life. Accordingly, ACOG strongly discourages the use of prostaglandins for women with uterine scars, and thus doctors ordinarily recommend that women with uterine scars undergoing a second trimester abortion proceed with a D & E. *See, e.g.,* Tr. Vol. 2 at 190:14–20 (Sheehan); Tr. Vol. 3 at 410:20–413:2(Doe); Tr. Vol. 4 at 506:2–10, 506:25–507:20 (Broekhuizen); Tr. Vol. 5 at 712:9–714:4 (Creinin); Tr. Vol. 6 at 947:4–13 (Bowes).

The government presented evidence that an induction is still possible for such women, as long as milder prostaglandins or different labor inducing drugs are administered and she is well-monitored, but concedes that a risk of uterine rupture still exists. Tr. Vol. 9 at 1413:9–1436:5 (Cook). *But see* Tr. Vol. 3 at 434:13–435:10 (Doe, noting that other drugs are less likely to induce labor successfully); Tr. Vol. 8 at 1285:17–1286:13 (Shadigian, admitting that other drugs may cause uterine rupture).

*Blood Loss*

Some pregnant women suffer from bleeding-related disorders that render the blood loss inherent in a two-day induction procedure risky to their health. For in-

---

**31.** Furthermore, to the extent that blindly used instruments or skull fragments pose a risk of laceration, the risk would be identical in an intact D & E and a D & E by disarticulation.

stance, women with bleeding disorders, on blood-thinning medications, or suffering from renal disease have a propensity to bleed excessively, which makes any extended procedure causing blood loss dangerous. Analogously, pregnant women diagnosed with preeclampsia, a rare and potentially fatal condition caused by the pregnancy itself, often lose blood volume as their blood thickens and begins to clot, so even a slight loss of blood can have drastic effects on their health. Women with cardiac or pulmonary disease, including asthma, also cannot tolerate excessive blood loss, because it causes excessive strain on their systems. *See, e.g.,* Tr. Vol. 1 15:14–17:18 (Paul); Tr. Vol. 3 at 383:17–22, 388:3–390:6(Doe); Tr. Vol. 8 at 1286:14–1287:11 (Shadigian). Thus, plaintiffs presented evidence that women with these health considerations who are undergoing second trimester abortions are better served by the quicker D & E procedure, and particularly by intact D & E. *See, e.g.,* Tr. Vol. 11 at 1763:1–20 (Chasen).

In response, the government presented evidence that with any surgery, there is the risk of traumatic injury, which could cause extreme blood loss as well, and that on balance, it is safer to treat such a woman in the hospital, where her blood loss can be monitored and transfusions can be given if necessary, than in an outpatient setting where there is not likely to be emergency care immediately available. Tr. Vol. 9 at 1391:10–20, 1420:22–1428:2 (Cook); *see also* Tr. Vol. 8 at 1223:8–1224:2 (Shadigian, recommending induction or hysterotomy for preeclampsia). *But see* Tr. Vol. 9 at 1477:12–1478:16 (Cook, conceding that intact D & E could be performed in a hospital setting).

### Placenta Previa

Certain women develop the condition of placenta previa in pregnancy, where the placenta grows over the cervix and thus blocks the cervical opening. The parties agree that an induction cannot be performed in this circumstance because the fetus cannot pass through the blocked opening. Tr. Vol. 3 at 410:12–19(Doe); Tr. Vol. 4 at 506:14–24 (Broekhuizen). Plaintiffs presented evidence that in this circumstance, the placenta should be removed or pierced in a D & E. Tr. Vol. 11 at 1768:5–21 (Chasen).

The government, however, takes the position that a D & E is not indicated in this circumstance. The government witnesses would instead recommend that a hysterotomy be performed, even though the hysterotomy is significantly riskier than a D & E and has serious implications for the woman's future reproductive health. Tr. Vol. 9 at 1428:3–1429:10 (Cook, stating that in later gestational ages, hysterotomy or caesarean delivery is the way to deliver a baby with placenta previa).

### Uterine Infections

Women sometimes develop uterine or amniotic infections during pregnancy, and if these infections are not treated, they can lead to sepsis, or a generalized blood infection, which can spread throughout the body. If that happens, the uterus must be emptied immediately. Plaintiffs presented evidence that an induction would not be appropriate in that circumstance because the procedure takes too long and the woman's health could be compromised while waiting for the fetus to deliver. Tr. Vol. 11 at 1766:19–1767:5 (Chasen).

In response, the government presented evidence that if an infection is present, the D & E surgery could potentially spread the infection if the uterus were perforated, and that induction would be acceptable as long as the woman was closely monitored over the two-day period. Tr. Vol. 9 at 1400:12–1401:1, 1429:14–1430:16 (Cook); see also Tr. Vol. 8 at 1224:3–22, 1266:23–1268:10 (Shadigian).

### Emergency Situations

The government witnesses testified that if time was of the essence and a pregnancy needed to be terminated immediately, an intact D & E would take too long as well, since the cervix must be prepared over a two day period, and that a hysterotomy or hysterectomy would be the quickest way to proceed. Tr. Vol. 8 at 1227:6–12 (Shadigian); Tr. Vol. 9 at 1436:12–1437:12 (Cook). Plaintiffs agreed that D & Es in general require several hours of cervical preparation, though in certain situations, when misoprostyl and osmotic dilators are used, the cervix can be dilated in as little as 90 minutes. *See, e.g.,* Tr. Vol. 1 at 59:9–11 (Paul).

### Psychological Reasons

Finally, many women do not wish to undergo inductions, primarily for psychological and emotional reasons. Some women do not wish to go through the physical and psychological pain of labor if the pregnancy is to be terminated, especially if the termination is for medical reasons, and some women also prefer having a quicker outpatient procedure, rather than checking into a hospital as is required for an induction. *See, e.g.,* Tr. Vol. 1 at 91:17–92:1 (Paul), Tr. Vol. 3 at 457:1–458:10(Doe); Tr. Vol. 4 at 503:22–504:3 (Broekhuizen); Tr. Vol. 5 at 802:11–803:19 (Westhoff), Tr. Vol. 11 at 1773:23–1776:10 (Chasen). *But see* Tr. Vol. 8 at 1277:22–1278:3 (Shadigian, stating that labor pains from induction should not be characterized as "traumatic").

### ii. Fetal Anomalies

Fetuses sometimes have anomalies that can create contraindications for induction. Examples of this include hydrocephaly, ascites, or non-immune hydrops, where fluid collects in the fetal head, abdomen, or extremities and grossly distends those portions of the fetal body. In those circumstances, the fetal body may be so distend-ed that it cannot be removed from the uterus unless reduced in size. Tr. Vol. 4 at 499:9–22 (Broekhuzien); Tr. Vol. 9 at 1446:16–1447:7 (Cook). These conditions can be, but are not always, fatal to the fetus. Tr. Vol. 7 at 1114:5–9 (Sprang); Tr. Vol. 9 at 1447:8–1448:5 (Cook).

If a D & E is performed, many doctors will remove all portions of the fetus from the uterus except for the oversized portion, and then take a deliberate action to reduce the size of the distended body part so that it too can be removed. All parties agree that this action could violate the Act if it caused fetal demise. Plaintiffs argue that this type of intact D & E is the best way to terminate a pregnancy where these conditions are present. Tr. Vol. 11 at 1759:8–1760:22 (Chasen).

The government argues that doctors could instead use a hypodermic needle to aspirate the fluid from the distended body part before the abortion is performed and proceed with either an induction or D & E by disarticulation. Tr. Vol. 7 at 1113:21–1114:9 (Sprang); Tr. Vol. 9 at 1446:16–1447:7 (Cook). Plaintiffs rebut this argument by stating that in some circumstances, fluid would refill the body part before the abortion could be completed, which would render aspiration futile, and furthermore, that there is no reason to subject the woman to an additional injection and the concomitant risks associated with it when an intact D & E procedure achieves the same end more efficiently. Tr. Vol. 11 at 1759:23–1762:7 (Chasen).

The government responds by arguing that if an injection is contraindicated, a hysterotomy or hysterectomy could be performed instead to terminate the pregnancy. The government also argues that the induction could be completed to the point at which the fetal body part lodges in the cervical os, and then "Duhrssen's incisions" of approximately 1–2 cm in length

could be made in the cervix to widen the os sufficiently for the fetus to pass. Plaintiffs contend that Duhrssen's incisions are extremely risky to the woman's future fertility, while the government argues that when properly performed, they do not represent any serious risk. *Compare* Tr. Vol. 4 at 533:18–534:24 (Broekhuizen, stating that Duhrssen's incisions not appropriate to use in an induction); Tr. Vol. 11 at 1787:3–4 (Chasen) *with* Tr. Vol. 9 at 1509:20–1513:25 (Cook).

### 6. Fetal Demise

The Act does not proscribe intact D & Es performed after the death of the fetus. Thus, the government contends that if an intact D & E were ever necessary, the doctor could simply effect fetal demise before performing the procedure to escape liability under the Act. *See, e.g.,* Tr. Vol. 7 at 1114:10–13 (Sprang).

Plaintiffs argue that effecting fetal demise before a D & E is unnecessary, and doctors should not be required to subject their patients to an additional medical procedure that poses some risk and no benefit to the patient solely to protect themselves from liability. Tr. Vol. 2 at 291:5–20 (Drey); Tr. Vol. 5 at 727:22–728:4 (Creinin); Tr. Vol. 5 at 819:20–820:5 (Westhoff). *See also* Tr. Vol. 2 at 334:19–335:14 (Drey) (stating that it would be "a very painful decision" for her to begin using digoxin to avoid liability under the Act because "I wouldn't even have any idea how to consent a patient if I am giving digoxin for my benefit as a provider ... I wouldn't be saying that this is for her clinical benefit ... It is for me. I would feel very much forced to do something to a patient that wasn't for her. That would just really be awful for me.").

### a. Injection Techniques

Fetal demise can be effected in a number of ways, but the methods primarily discussed at trial were the injection of either digoxin or potassium chloride ("KCI") through the woman's abdomen and either into the amniotic fluid ("intra-amniotically") or directly into the fetus' heart ("intra-cardiac" or "intra-fetal injection"), both of which are toxic to the fetus.

Digoxin can be administered either intra-amniotically or through an intra-cardiac injection, while KCI can only be administered intra-fetally. Tr. Vol. 2 at 295:9–25 (Drey). It is relatively simple to inject digoxin intra-amniotically, but intra-amniotic injection is not always effective in causing fetal demise. An intra-cardiac injection of either KCI or digoxin is virtually 100% effective, but requires more skill to perform, and thus is typically performed only by maternal-fetal medicine obgyn specialists. Tr. Vol. 2 at 197:15–198:7, 243:25–245:1 (Sheehan); Tr. Vol. 2 at 312:7–24 (Drey); Tr. Vol. 6 at 964:18–968:17 (Bowes); Tr. Vol. 11 at 1780:20–1782:24 (Chasen).

After fetal demise, the fetal tissue rapidly undergoes a number of physiological changes, so by the time the D & E begins, the tissue is much softer and will disarticulate more easily (known as tissue "friability"). Tr. Vol. 2 at 243:16–24 (Sheehan); Tr. Vol. 2 at 341:12–25 (Drey); Tr. Vol. 8 at 1284:19–1285:3 (Shadigian). This process, known as "maceration," also renders the fetal tissue unusable for autopsy or diagnostic testing. Tr. Vol. 11 at 1758:7–19, 1781:25–1782:5 (Chasen).

Some doctors effect fetal demise routinely as part of their D & E practice, while others have only done so upon direct request by the patient. Some doctors report that some of their patients are strongly opposed to causing fetal demise before the procedure begins, while other doctors indicate that their patients strongly prefer that an injection be given. *Compare* Tr. Vol. 2 at 196:5–20, 242:12–243:2 (Sheehan, stating that all patients accept digoxin in-

jection) *with* Tr. Vol. 2 at 342:9–15 (Drey, stating that some patients find digoxin upsetting); Tr. Vol. 3 at 418:2–15 (Doe, stating that patients generally do not want fetal demise effected upon discussion); Tr. Vol. 4 at 561:15–562:22 (Broekhuizen, saying that opinions on this issue differ sharply among his patients).

### b. Risks of Procedure

As with any medical procedure, there are risks associated with these injections, which include bleeding and infection. While these risks are minimal, they can have significant ramifications for women with certain medical conditions, such as HIV or hepatitis. The injection itself is also uncomfortable, and some women experience nausea or vomiting afterwards. Tr. Vol. 2 at 197:2–14 (Sheehan); Tr. Vol. 2 at 314:14–329:20 (Drey); Tr. Vol. 3 at 417:6–419:19(Doe); Tr. Vol. 5 at 728:5–19 (Creinin); Tr. Vol. 6 at 968:25–969:6 (Bowes).

After fetal demise is effected, some women will also spontaneously miscarry the fetus before surgical extraction begins, which can be distressing, particularly if the woman is not in the hospital at the time. Tr. Vol. 2 at 198:12–13 (Sheehan); Tr. Vol. 2 at 296:7–22 (Drey).

Finally, during the procedure, if the fetus has already died, the increased friability of the tissue can increase the risk of leaving fetal parts in the uterus and subsequent infection. Tr. Vol. 2 at 341:23–25 (Drey); Tr. Vol. 5 at 820:6–822:4 (Westhoff, noting that she encountered this situation shortly after the Act was passed and she was using KCI for the first time, and believes she may have caused a uterine perforation as a result of the softened tissue).

### c. Scientific Studies

Dr. Drey has conducted two prospective randomized studies on the safety and efficacy of intra-amniotic injections of digoxin,

and has concluded that while digoxin is generally safe to use, it did not improve the performance of D & E abortions in any significant way. *See generally* Tr. Vol. 2 at 291:5–20 (Drey).

For the safety aspect of the study, Drey followed eight women who received intra-amniotic digoxin injections before their second trimester abortions and monitored their reactions to the drug. The study concluded that digoxin was generally safe for use in women for whom digoxin was not contraindicated. Exh. 34 (article); Tr. Vol. 2 at 305:4–314:14 (Drey).

Drey and her colleagues then studied the efficacy of the drug in facilitating D & E abortions. In that study, the doctors followed 126 women, 62 of whom received digoxin injections before their abortions and 64 of whom did not. The doctors performing the abortions could not tell the differences between the groups, and the study found no benefit to either the doctors or the women from having the injection. Women who received digoxin injections reported significantly higher incidents of vomiting. The report also demonstrated that intra-amniotic injections failed to cause fetal demise in 8% of the women. Exh. 30 (article); Tr. Vol. 2 at 314:14–329:20 (Drey).

The article on the efficacy of digoxin concluded that "[digoxin] did not decrease procedure time, difficulty, or pain compared to placebo," and thus recommended its use only when a patient specifically requests fetal death before the procedure begins. Exh. 30. Accordingly, UCSF discontinued the routine use of digoxin in second trimester abortions. Tr. Vol. 2 at 328:24–329:11 (Drey).

### d. Contraindications

Some women have contraindications for these injections. For example, women with heart conditions should not receive

digoxin injections because if the digoxin inadvertently enters the woman's bloodstream, it could cause major heart damage. Women who have low amniotic fluid levels or who have had a rupture of the amniotic sac cannot be monitored with ultrasound or receive intra-amniotic injections. Injections are also contraindicated for morbidly obese women, if the hospital is unable to provide needles long enough to inject into the woman's uterus. Tr. Vol. 2 at 308:10–3:10:18 (Drey); Tr. Vol. 6 at 964:10–17, 968:21–24 (Bowes); Tr. Vol. 11 at 1781:10–24 (Chasen).

### e. Cutting of Umbilical Cord

The other method of causing fetal demise discussed at trial was the cutting of the fetal umbilical cord at the beginning of the D & E extraction procedure, which cuts off the fetal blood and oxygen supply. The cord is not always accessible to the doctor, though, and once the cord is cut, it can take up to five to ten minutes for fetal demise to occur. Tr. Vol. 7 at 1119:12–20 (Sprang); Tr. Vol. 11 at 1782:6–21 (Chasen).

### 7. Fetal Pain

Finally, the government presented testimony on the issue of fetal pain, in support of the congressional finding that fetuses do feel pain. There is no consensus of medical opinion on the issue.

### a. Physiology

The fetus develops the basic elements and connections of a nervous system by approximately 20 weeks after conception.[32] Fetuses at this age have been observed to respond to outside sensory stimuli such as sound, light, and smell, and when fetuses undergo stressful stimuli, such as fetal sur-

gery or fetal blood transfusions, the fetus releases stress hormones and blood flow to the brain increases, just as it does for newborn infants and adults. *See generally* Tr. Vol. 10 at 1570:1–1614:11 (Anand).

However, the fact that the fetus responds to stimuli does not necessarily mean that it feels pain. For the fetus to interpret stimuli as pain requires not only that the fetus respond to stimuli, but also that when the stimulus reaches the brain, the brain interprets it as unpleasant or painful.[33] In other words, the fetus must have developed some form of consciousness to be said to "feel pain." Tr. Vol. 10 at 1626:10–1627:16 (Anand).

The only way that an outside observer can determine whether any entity feels pain is if the entity communicates distress to the observer. The parties agree that fetuses are unable to communicate, so it is impossible to determine conclusively if the stress responses seen in fetuses in fact translate into an actual pain response, and thus no studies on fetal pain suffered during abortions have been conducted. Both parties agreed that as a result, much of the debate on this issue is based on speculation and inference. Tr. Vol. 10 at 1629:24–1630:24 (Anand).

### b. Scientific Debate

### i. Early Development of Pain

One group of physicians believe that fetuses feel intense pain starting as early as 22 weeks lmp. These physicians argue that at this point, since the entire nervous system has developed and has connected to the brain, the fetus can be considered to have developed consciousness, and is thus fully able to feel pain. These physicians

---

**32.** This is at 22 weeks lmp.

**33.** For instance, the body produces a pain response during surgery, but anesthetics

block the brain from interpreting those responses as pain. Tr. Vol. 5 at 725:22–726:2 (Creinin).

argue further that since the last part of the nervous system to develop is the nervous system's inhibitory mechanisms, which permit the modulation or blocking of pain impulses, fetuses at this age feel intense pain, even more so than infants or adults. Tr. Vol. 10 at 1570:1–1614:11 (Anand); Tr. Vol. 7 at 1120:4–10 (Sprang).

These physicians admit that they have no way of conclusively determining whether this hypothesis is true, but note that fetuses in this age range often demonstrate shifting patterns of brain wave activity in response to stimuli, much like sentient infants and adults do. They also argue that empirically, fetuses at this age are observed to recoil from outside stimuli, such as needles, that are introduced into the womb. Tr. Vol. 7 at 1046:23–25 (Sprang); Tr. Vol. 10 at 1583:14–1586:5, 1618:1627:7 (Anand); Tr. Vol. 11 at 1823:16–1824:20 (Chasen).

Physicians who ascribe to this school of thought argue that the process of intact D & E, where the skull is collapsed, causes the fetus extreme pain. These doctors also believe that a D & E by dismemberment would be excruciatingly painful for the fetus, and that even a needle injection of digoxin or KCl would cause the fetus pain as well. Tr. Vol. 10 at 1605:16–1608:15, 1666:16–1668:7 (Anand).

### ii. Later Development of Pain

Other physicians believe that the fetus does not develop full consciousness until approximately 26 weeks lmp at the earliest, citing a study conducted by the British Royal College of Obstetricians and Gynecologists, which indicated that the nervous system was not fully integrated until that time. These physicians argue that consciousness cannot be said to be based on an on/off model and instead, should be seen as existing in gradations, so that fetuses before 26 weeks have rudimentary consciousness but not the full conscious-

ness which would enable them to process stimuli as pain. Tr. Vol. 5 at 722:8–727:21 (Creinin).

These physicians also believe that fetuses cannot be compared to infants or even premature infants, since the birth process and the lack of dependency on the mother makes infants physiologically different from fetuses in utero. While certain physiological markers may look similar, it is possible that the fetal brain interprets these markers differently than it would if the fetus was entirely delivered. Furthermore, these physicians note that physiological markers such as a rise in stress hormones may not necessarily be correlated with the sensation of pain even in adults, so it is impossible to determine what, if anything, the fetus feels in response to these physiological events. Tr. Vol. 10 at 1614:13–1668:8 (Anand, explaining opposing position).

### C. Findings of Fact

Having reviewed the trial evidence, the court finds as follows.

### 1. Credibility of Witnesses

The court found all of the plaintiffs' experts not only qualified to testify as experts, but credible witnesses based largely on their vast experience in abortion practice.

However, of the four government witnesses who were qualified as experts in obgyn, all revealed a strong objection either to abortion in general or, at a minimum, to the D & E method of abortion. The court finds that their objections to entirely legal and acceptable abortion procedures color, to some extent, their opinions on the contested intact D & E procedure.

Dr. Sprang testified that he "wouldn't be comfortable actually taking the life of the fetus." In his "practice, if patients want to

have an abortion, they are referred to abortion providers." Tr. Vol. 7 at 1060:6–7 (Sprang). Dr. Sprang also testified that he felt so strongly regarding the benefits of induction because it is a more "physiologic" process with less "instrumentation" to D & E post–20 weeks that he would not even discuss D & E as an option with his patients. *Id.* at 1122:20–1123:1. This is in spite of the fact that he admits that post–20 weeks, D & E and induction are comparably safe. *Id.* at 1124:9–10.

Dr. Shadigian is a member of AAPLOG, the American Association of Pro–Life Obstetricians and Gynecologists, and likewise, will not personally perform an abortion on a previable fetus that has not already died unless "the woman is so sick that the only way she is going to survive is to have the pregnancy ended." Tr. Vol. 8 at 1210:6–21 (Shadigian). Dr. Bowes similarly testified that he would not personally perform an abortion even to save the life of one of his patients unless he believed that there was at least a 50% likelihood that she would die absent the abortion—even if the pregnancy was the result of rape or incest. Tr. Vol. 6 at 977:1–12 (Bowes).

Additionally, Dr. Cook testified that because of his beliefs, he will not perform abortions for "elective" reasons. Tr. Vol. 9 at 1353:25—1354:2 (Cook). Like the other government witnesses, Dr. Cook testified

that he strongly prefers inductions because he believes that they are "more physiologic." *Id.* at 1513:5–1514:25. However, the strength of Dr. Cook's preference for induction is not supported by the medical evidence, and there appear to be several circumstances under which Dr. Cook would utilize induction, or an even less safe alternative, hysterotomy, when the medical evidence and literature suggest that the safest procedure is D & E.[34] The court also has some misgivings regarding Dr. Cook's credibility based on his extremely equivocal and elusive testimony regarding the medical necessity of D & E under certain circumstances.[35]

Finally, the court notes that Dr. Anand, the government's expert witness on the issue of fetal pain, is not an anesthesiologist, neurologist, obstetrician, or maternal-fetal medicine specialist. Anand is a pediatrician who has conducted research on pain in general, focusing primarily on infants. Tr. Vol. 10 at 1540:6–1568:14 (Anand). Thus, Anand's opinions on fetal pain as they relate to fetal development have been given no more weight than the testimony of other obstetricians and maternal-fetal medicine experts, who reviewed the same material and concluded that fetal consciousness and pain do not exist until at least 26 weeks. *See, e.g.,* Tr.

---

**34.** Dr. Cook asserted that he so strongly preferred induction, that he would prefer to allow a woman who was suffering from an infection of the amniotic membranes called chorioamniocentitis to continue to labor for several hours as opposed to performing a D & E. *Id.* at 1475. Moreover, Dr. Cook also testified that in the case of an induction complication, in which the fetal head became trapped in the woman's cervical opening, he would prefer to utilize Duhrssens' incisions, a series of up to three cervical incisions up to two centimeters long and the full-depth of the cervix, as opposed to performing a D & E. *Id.* at 1512:5–1513:9. He compared the incisions to "cervical lacerations that occur during the

normal labor process," and referred to them as "a variation on a normal process," and still "more physiologic" than dilation with laminaria, associated with a D & E. *Id.* at 1512:20. Finally, Dr. Cook stated that he does not consider D & E an option post–20 weeks, and would utilize hysterotomy as opposed to D & E. *Id.* at 1517:2–7.

**35.** Dr. Cook contradicted himself several times regarding whether he had ever found D & E to be "medically necessary" in his practice, before agreeing that he found it to be not only medically necessary on occasion, but under certain circumstances, superior to induction. *Id.* at 1459:3–1461:25; 1472:21–24.

Vol. 3 at 419:20–420:4(Doe); Tr. Vol. 5 at 722:8–727:21 (Creinin).

### 2. Findings of Fact Regarding Relevant Abortion Procedures Both D & E and Induction are Safe Procedures

Both D & E and induction are safe procedures, with extremely low rates of morbidity (medical complications) and mortality. Between the two, however, the studies consistently show that D & E is as safe or even significantly safer than induction, and both procedures are greatly safer than either hysterotomy or hysterectomy.

*Intact D & E is a Variant of the D & E Procedure*

Intact D & E is not a separate procedure, but rather, simply a variant of the established D & E technique. While doctors cannot always predict beforehand whether a D & E abortion will proceed by disarticulation or through an intact extraction, the record is clear that some doctors may prefer to perform an intact extraction if at all possible.

*Intact D & E v. Induction and Other Abortion Procedures*

D & E, including intact D & E, presents significant medical benefits over an induction, hysterotomy, or hysterectomy. A D & E, including an intact D & E, takes significantly less time than an induction, and to the extent that up to 10% of inductions require a subsequent D & E to remove unexpelled fetal parts, surgical procedures are not necessarily avoided in an induction. Moreover, other benefits to D & E, including intact D & E, include a reduced exposure to risks and maternal complications associated with induction abortions, including uterine rupture and infection, and a decreased risk of blood loss and infection and complications arising from unexpelled fetal parts.

A D & E, including an intact D & E, also does not require a woman to undergo labor. For this reason, most women strongly prefer a D & E abortion. Moreover, the record is clear that some individual women, for health reasons, cannot undergo an induction abortion. The court finds that it would be unreasonable to expect women for whom inductions are contraindicated to put their health at risk by undergoing induction, hysterotomy, or hysterectomy. While an induction has the benefit that an intact fetus can be obtained for autopsy or psychological grieving purposes, an intact D & E can have the same result without requiring women to undergo induced labor.

*Intact D & E v. D & E by Disarticulation*

The existing studies show that intact D & Es are at least as safe as D & Es by disarticulation. Exh. 27 (Chasen report). While the Chasen study indicates neither that intact D & E is in every circumstance safer than D & E by disarticulation, nor that intact D & E is in every circumstance less safe than D & E by disarticulation, and cannot be considered conclusive on the issue, even the government's expert Dr. Bowes agrees that such small-scale studies are an important first step in designing further studies on the issue. Tr. Vol. 6 at 960:23–961:8 (Bowes, discussing Chasen report). Thus, these preliminary results indicate the relative safety of intact D & E, and provide valuable information for doctors in exercising their clinical judgment.

Furthermore, the court finds that it is wholly appropriate for doctors, in their best medical judgment, to rely on their clinical judgment and these relatively small-scale retrospective studies in determining, with their patients, whether they wish to perform intact D & E abortions—just as the government's experts rely on their clinical judgment (or "intuition") in recommending induction abortions over D

& E abortions, despite the lack of studies indicating that modern induction abortions are superior to D & Es and despite the fact that D & E remains overwhelmingly the procedure of choice for women undergoing second trimester abortions. *Cf.* Vol. 8 at 1302:15–1303:24 (Shadigian, defending her position that induction is safest method of late second trimester abortion).

Moreover, all of the doctors who actually perform intact D & Es concluded that in their opinion and clinical judgment, intact D & Es remain the safest option for certain individual women under certain individual health circumstances, and are significantly safer for these women than other abortion techniques, and are thus medically necessary. *See also, e.g.,* Cain Depo. at 205:14–210:16 (ACOG policy reflecting same finding). These doctors are all well-respected in their practices, and their expertise in recommending and performing D & E and intact D & Es is unassailable. As noted, the court accepts their testimony over that of the government witnesses, who, while also well-respected and qualified to provide testimony in general on obgyn practice and safety, do not perform intact D & Es and who were not qualified to testify as experts on the practice.

The evidence also demonstrates that intact D & E presents significant safety benefits over D & E by disarticulation under certain circumstances for the following reasons, including: (1) fewer passes are made with the forceps and/or other instruments, resulting in a reduced risk of lacerations to the cervix and/or uterus; (2) since the fetus is removed either intact or largely intact, there is a reduced risk of inadvertently leaving fetal parts in the uterus and thus a reduced risk of infection; (3) because the fetus is removed intact or partially intact, there is a reduced risk of injury to the woman caused by the removal of bony fetal fragments; and (4) there may be a reduced operating time, which likewise decreases the risks associated with blood loss and infection.

### Alleged Risks of Intact D & E

There also appears to be little risk from the various elements of an intact D & E procedure. As an initial matter, not all doctors perform all four ACOG elements of an intact D & E, so to the extent that certain doctors do not perform certain elements, the attendant risks are nonexistent for their patients. In addition, no doctors who actually perform intact D & Es have reported any of the claimed risks from podalic version or infection caused by laminaria. Dr. Sprang, who has never performed an intact D & E, provided testimony that may be more appropriate in the context of a full-term birth, but it is of limited relevance to an inquiry into the safety of intact D & E.

The government also has not shown that intact D & E increases a woman's likelihood of cervical incompetence. While the Kalish and Chasen studies are not conclusive, they provide strong preliminary evidence that no correlation between the two exists. The methodological problems with the Henriet study, as well as the fact that it primarily addresses first trimester abortions, renders it of limited relevance to this inquiry.

On the question of uterine laceration, plaintiffs admit there is a risk of injury caused by misplaced instruments or fetal bone fragments from the collapsed fetal skull. However, it appears that this risk is minimal, and it does not appear to be any greater than the risk of laceration from D & Es by disarticulation in general. Furthermore, the physicians who perform this procedure state that this risk is greatly minimized by the use of ultrasound guidance and direct visualization.

*Fetal Demise*

The evidence shows that there is no medical benefit to causing fetal demise before beginning a D & E procedure, including intact D & Es, except potentially as psychological comfort to some, but not all, women. It does not make the abortion procedure safer, easier, or quicker, and the injection procedure itself is not without risk.

Furthermore, each method of causing fetal demise has serious drawbacks. While most doctors can inject digoxin intra-amniotically, this method is not always effective in causing fetal demise, which would defeat the purpose for its use and place doctors using this method at risk of prosecution. While intra-cardiac injection is almost always effective, not all hospitals and virtually no clinics have access to maternal-fetal medicine specialists to perform the injection. In addition, a number of women will be unable to tolerate the injection process.

While cutting the umbilical cord will guarantee fetal demise, it is not always possible to reach the cord in utero. Also, the doctor performing the abortion would have to wait five to ten minutes before death occurred with the woman under sedation and prepared for surgery, which would almost double the time of the extraction procedure.

*Fetal Pain*

The issue of whether fetuses feel pain is unsettled in the scientific community. However, it appears to be irrelevant to the question of whether intact D & E should be banned, because it is undisputed that if a fetus feels pain, the amount is no less and in fact might be greater in D & E by disarticulation than with the intact D & E method. Tr. Vol. 10 at 1605:16–1608:15, 1666:16–1668:7 (Anand).

*Intact D & E May Be Significantly Safer For Some Women Under Certain Circumstances*

In conclusion, the court finds that intact D & E is in fact the safest medical option for some women in some circumstances and is significantly safer than induction, hysterotomy, or hysterectomy for terminating a second trimester pregnancy, and under certain circumstances, also significantly safer than D & E by disarticulation.

However, plaintiffs have not demonstrated the existence of any particular situation for these women for whom induction is contraindicated in which an intact D & E would be a doctor's only option to preserve the life or health of a woman. The government is correct that for most women, a D & E by disarticulation could be utilized instead of induction when contraindications for induction exist. Furthermore, plaintiffs concede that an intact D & E abortion cannot be guaranteed before the extraction procedure begins. A woman can request that an intact D & E be attempted, but the doctor cannot guarantee that it will occur. *See, e.g.*, Tr. Vol. 2 at 190:5–7 (Sheehan), Tr. Vol. 11 at 1758:2–6 (Chasen).

### D. Congressional Findings

In support of the Act, the 108th Congress made numerous findings, which are discussed in detail below. The first fourteen findings, (1) through (14), include Congress' interpretation of the United States Supreme Court's decision in *Stenberg*, and Congress' analysis regarding (1) why it believes that it is entitled to make factual findings contrary to those in *Stenberg*; (2) the degree of deference that Congress asserts the courts should accord its factual findings subsequently set forth in section (14) at (A) through (O); and (3) its ultimate findings regarding the necessity of a health exception. Sections 14(A)

through (O) subsequently detail Congress' more specific or particular factual findings pertinent to the issue of a health exception. *See* Act, § 2(1)-(14); (14)(A)-(O).

### 1. Congressional Legal "Findings" and Interpretations

■ As noted, some of the "findings" made by Congress include legal interpretations of *Stenberg* and other Supreme Court jurisprudence. There is no dispute that this court reviews issues of constitutional law *de novo*. Accordingly, Congress' legal conclusions and its characterization of the Supreme Court's holding in *Stenberg*, and any additional legal analysis, is not entitled to deference by this court. Nor are any of Congress' legal conclusions, which may be disguised as factual findings, entitled to deference by this court. However, to the extent that such interpretations provided Congress with a framework for its factual findings, the Court discusses those findings below and notes that many of Congress' legal interpretations are inaccurate and mischaracterize Supreme Court precedent.

#### a. The Congressional Findings Mischaracterize the *Stenberg* Case in Many Respects

Specifically, regarding the *Stenberg* case, Congress, in its findings, mischaracterizes: (1) the Supreme Court's holding regarding "undue burden;" (2) the quantity and quality of the evidence supporting the district court's factual findings; (3) and the Supreme Court's treatment of the district court's factual findings. *See id.* at § 2(3), (5)-(8).

#### i. Supreme Court's Holding regarding *Undue Burden*

First, Congress incorrectly combined the two bases for the Supreme Court's holding in *Stenberg*, asserting that the Court concluded that the Nebraska law in *Stenberg* posed an undue burden "because it failed to include an exception for partial-birth abortions deemed necessary to preserve the 'health' of the mother." However, as discussed above, this was not the basis for the Supreme Court's holding regarding the law's undue burden on a woman's right to seek an abortion.

Contrary to Congress' assertions, *Stenberg*'s conclusion regarding the necessity of a health exception was distinct from its undue burden analysis, and concerned the ban's impact not on abortion procedures as a whole, but on a smaller group of women: those patients for whom the banned procedure "may bring with it greater safety." *Stenberg*, 530 U.S. at 937, 934, 120 S.Ct. 2597 ("the State cannot prohibit a person from obtaining ['a rarely used'] treatment simply by pointing out that most people do not need it"); *see also Planned Parenthood v. Brady*, 2003 WL 21383721, at *2 (D.Del. June 9, 2003) ("whether [partial-birth abortion] ban poses an obstacle to one ... woman or thousands does not change the constitutional analysis" of the ban's failure to contain a health exception).

#### ii. District Court Record and Findings and Supreme Court Review of Record

Preliminary to Congress' ultimate finding that a health exception is never medically necessary, Congress also criticized the district court's findings in *Stenberg* and the Supreme Court's alleged reliance on those findings. *See* Act, § 2(5)-(8). First, Congress second guessed the *Stenberg* district court's findings, based *not* on the evidence compiled independently by Congress, but instead based on the evidence heard by the district court. Congress asserted that there was a "dearth of evidence in the *Stenberg* trial court record supporting the district court's findings;" and that none of the witnesses in the *Stenberg* case "identified a single circumstance

during which a partial-birth abortion was necessary to preserve the health of a woman." Act, § 2(6); (14)(D).

While this court will not attempt to second guess the findings made by the district court in *Stenberg,* which was in a much better position to evaluate the evidence and the credibility of the evidence before it *at the time of the trial,* this court nevertheless notes that the pertinent congressional findings grossly mischaracterize the state of the trial evidence in *Stenberg,* as reflected in the trial court's reported decisions.

Following an evidentiary hearing, the district court in *Stenberg* held, based on the evidence before it, that Nebraska's partial-birth abortion law was likely to be found unconstitutional after a trial on the merits, and should be preliminarily enjoined. *See Carhart v. Stenberg ("Carhart I"),* 972 F.Supp. 507 (D.Neb.1997).[36] Subsequently, after a trial on the merits, the district court held that the law, as applied to plaintiff Dr. Carhart and his patients, was unconstitutional because it posed an undue burden and was unconstitutionally vague. *See Carhart v. Stenberg ("Carhart II"),* 11 F.Supp.2d 1099 (D.Neb.1998).[37] In support, it found that "[intact D & E] significantly obviates health risks in certain circumstances," a finding that the Supreme Court, in contrast to Congress, subsequently characterized as supported by "a

highly plausible *record-based* explanation of why that might be so...." *Stenberg,* 530 U.S. at 936–37, 120 S.Ct. 2597.

The record that the *Stenberg* district court had before it included the Congressional Record that existed to date, an AMA report regarding late-term abortions, CDC data and reports, a January 1997 ACOG policy statement regarding intact D & Es, and the testimony of six expert witnesses, including plaintiffs' witnesses Dr. Carhart, Dr. Jane Hodgson, the founding fellow of ACOG and an obgyn who had supervised and/or performed at least 30,000 abortions at that time, Dr. Phillip Stubblefield, chief obgyn at the Boston Medical Center who regularly performed abortions, Dr. Stanley Henshaw, a director of research at the Alan Guttmacher Institute, who held a Ph.D. in sociology and specialized in non-profit research and writing regarding abortion data; and defense witnesses Dr. Riegel, an obgyn and infertility expert, and Dr. Frank Boehm, the director of obstetrics at Vanderbilt Medical Center. *Carhart II,* 11 F.Supp.2d at 1116.[38] Accordingly, the evidence before the district court in *Stenberg* cannot credibly be characterized as a "dearth of evidence."

Additionally, Congress asserted that the *Stenberg* district court failed to "identif[y] a single circumstance *during which a par-*

---

**36.** At that stage, as opposed to a trial on the merits, the district court was required to evaluate:

(1) the threat of irreparable harm to the movant; (2) the state of the balance of the harm and injury that granting the injunction will inflict on other parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest.

*Id.* at 523 (citing *Dataphase Systems, Inc. v. CL Systems, Inc.,* 640 F.2d 109, 113 (8th Cir. 1981)).

**37.** The *Stenberg* district court limited its review to the constitutionality of the Nebraska

law as it applied to Dr. Carhart and his patients only, declining to decide generally the facial validity of the state law. *See id.* at 1119–1120.

**38.** The district court, however, found that Dr. Riegel's testimony regarding abortion procedures lacked credibility due to the fact that he lacked experience and was poorly informed regarding the intact D & E procedure, having not performed any abortions due to moral objections, and having never even observed, let alone performed, a D & E or intact D & E. *Id.* at 1116.

*tial-birth abortion was necessary to preserve the health of a woman."* Act, § 2(14)(D). This assertion is somewhat misleading because at the time of the trial before the district court in 1998, the Supreme Court had not enunciated the requirement of a health exception with respect to partial-birth abortion bans. Therefore, to the extent that Congress intended to imply that the evidence before the district court was deficient on this basis, it ignored both the chronology of the *Stenberg* case and prior Supreme Court precedent on the issue.

Nevertheless, an examination of the district court record and findings reflects that Congress' assertion is also factually erroneous. First, there was record evidence in support of the district court's findings regarding the safety of intact D & E generally. The district court cited to substantial record evidence in support of its conclusion that intact D & E, as applied to Dr. Carhart and his patients, was "the safest procedure in certain circumstances." *Carhart II*, 11 F.Supp.2d at 1122. Specifically, the district court relied on Dr. Hodgson's "credible" testimony that the "[intact D & E] procedure [was] 'an advance in technology' because by removing the fetus intact there is 'less instrument manipulation' and greater safety;" the corroborating testimony of Drs. Carhart and Stubblefield, whose testimony the district court found "particularly persuasive" given that "[Stubblefield] possessed the most extensive training, experience, and knowledge about the use and teaching of abortion procedures;" the testimony received by district courts in two other cases involving state partial-birth abortion bans, which included the testimony of at least two experts in the case at hand, Drs. Westhoff and Cook; and Dr. Haskell's testimony before Congress. *See id.* at 1107–08, 1116, 1123 (incorporating prior decision).

Moreover, and most importantly, the district court specifically found based on the trial evidence, and contrary to Congress' assertion otherwise, that as a result of Nebraska's partial-birth abortion ban, approximately "10 to 20 women a year . . . could not receive the best care from Dr. Carhart . . . [and] would be forced against their will to endure appreciably greater risks to their health and lives than are necessary." *Id.* at 1127. In support, the district court found that:

> "[a]mong other things, [these women] would suffer a larger than necessary risk of: (1) longer operating time; (2) greater blood loss and infection; (3) complications from bony fragments; (4) instrument-inflicted damage to the uterus and cervix; (5) exposure to the most common causes of maternal mortality (DIC and amniotic fluid embolus); [and] (6) 'horrible complications' arising from retained fetal parts."

*Id.*

Congress also implies that the Supreme Court blindly deferred to the allegedly erroneous factual findings by the district court, and that the law regarding judicial standards of review required such blind deference. *See* Act, § 2(6)-(8). Specifically, Congress found that:

> Despite the dearth of evidence in the *Stenberg* trial court record supporting the district court's findings, the United States Court of Appeals for the Eighth Circuit and the Supreme Court *refused to set aside* the district court's factual findings because, under the applicable standard of appellate review, they were not 'clearly erroneous.'
>
> . . . .
>
> Thus, in *Stenberg,* the United States Supreme Court *was required to accept*

*the very questionable findings* issued by the district court judge.

*Id.* at § 2(6),(7).

Neither is the case. Putting aside Congress' disparaging characterization of the district court's factual and evidentiary findings, this court notes that, as a matter of law, the Supreme Court will not blindly defer to factual findings that are as questionable as Congress portrays the *Stenberg* district court's factual findings to have been. *See, e.g., Easley v. Cromartie,* 532 U.S. 234, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001) (reversing district court's determination that North Carolina's Legislature used race as the "predominant factor" in drawing Congressional district boundaries). In reviewing a trial court's findings for "clear error," the Supreme Court "will not reverse a lower court's finding[s] of fact simply because [it] 'would have decided the case differently.'" *Id.* at 242, 121 S.Ct. 1452 (quoting *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). However, where a review of the trial court's findings "leaves [the Court] 'with the definite and firm conviction' that the District Court's key findings are mistaken," it will reverse those findings. *Id.* at 242–43, 121 S.Ct. 1452 (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)) (noting that although the Court had "given weight to the fact that the District Court was familiar with [the] litigation, heard the testimony of each witness, and considered all the evidence with care," the Court "[n]onetheless ... cannot accept the District Court's findings as adequate").

Nowhere in the Supreme Court's decision in *Stenberg* does the Court imply that there was an inadequacy or insufficiency of relevant evidence before the district court; nor does the Court imply that it considered the district court's findings to be "very questionable." As noted, to the contrary, the Supreme Court approved of the district court's ultimate finding that intact D & E "significantly obviates health risks in certain circumstances" as a "highly plausible record-based explanation...." *Stenberg,* 530 U.S. at 936–37, 120 S.Ct. 2597. Moreover, the Supreme Court clearly conducted its own review of the record evidence before the district court, and summarized the evidence in its decision. *See id.* at 923–30, 120 S.Ct. 2597 (noting that "[t]he evidence before the trial court, as supported or supplemented in the literature, indicates the following").[39]

### 2. Congressional Findings Regarding Necessity of a Health Exception

Congress also proffers its interpretation of the law regarding judicial review in an attempt to justify its ultimate "finding," contrary to the Supreme Court's decision in *Stenberg,* that the Act is "not required to contain a 'health' exception ... because a partial-birth abortion is *never* necessary to preserve the health of a woman." Act, § 2(13) (emphasis added).

Congress interprets the *Stenberg* Court's requirement that partial-birth abortion bans contain a health exception "where it is necessary, in appropriate medical judgment for the preservation of the life of the mother," as a finding of fact unique to the facts in *Stenberg,* and, therefore, susceptible to contrary congressional

---

**39.** Congress also mischaracterized the effect of *Stenberg* on legislative determinations, asserting that *Stenberg* "render[ed] null and void the reasoned factual findings and policy determinations of the United States Congress...." Act, § 2(7). However, that con-

clusion again ignores the chronology of events. At the time that *Stenberg* was decided, prior Congresses may have voted to ban "partial-birth abortions," but none of those bans had been signed into law.

fact-finding. *See id.* at § 2(4)-(13). Accordingly, Congress "finds" that it is "entitled to reach its own factual findings [on the issue]—findings that the Supreme Court [is required to] accord[ ] great deference—and to enact legislation based upon these findings so long as [Congress] seeks to pursue a legitimate interest that is within the scope of the Constitution, and draws reasonable inferences based on substantial evidence." *Id.* at § 2(8). In support, Congress cites to and discusses several Supreme Court cases for its assertion that the courts "owe Congress' findings an additional measure of deference out of respect for its authority to exercise the legislative power." *Id.* at § 2(12). Congress' "findings" then conclude for the courts that its ultimate finding reflects the "very informed judgment of ... Congress" and is supported by "substantial record evidence." *Id.* at § 2(13).

However, Congress' assertion that the courts are required to defer to its "factual" findings raises questions regarding: (1) the nature of the Supreme Court's holding that a health exception was required in the *Stenberg* case; and (2) Congress' ability to make factual findings contrary to the Court's holding.

### a. *Stenberg* Court's Ruling Regarding Necessity of Health Exception

Accordingly, this court examines the *Stenberg* Court's determination that the Nebraska statute was unconstitutional because it "lack[ed] any exception 'for the preservation of the ... health of the mother.'" 530 U.S. at 930, 120 S.Ct. 2597 (citing *Casey*, 505 U.S. at 879, 112 S.Ct. 2791).

The *Stenberg* Court reiterated its prior holdings in *Roe* and *Casey* that "subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe abortion *except where it is neces-*

*sary, in appropriate medical judgment, for the preservation of the life or health of the mother.*" *Id.* at 921, 120 S.Ct. 2597 (quoting *Casey*, 505 U.S. at 879, 112 S.Ct. 2791). Noting that the Nebraska statute, like the Act at issue in this case, applied both pre- and postviability, and that "the State's interest in regulating abortion previability is considerably weaker than postviability," the *Stenberg* Court concluded, that since "a health exception [is required] to validate even a postviability abortion regulation, it at a minimum requires the same in respect to previability regulation." *Id.* at 930, 120 S.Ct. 2597.

The Court was clear that a health exception is required regardless of whether it is the pregnancy itself, an unrelated health condition, or a "state regulation forc[ing] women to use riskier methods of abortion." 530 U.S. at 931, 120 S.Ct. 2597. The court noted:

> Our cases have repeatedly invalidated statutes that in the process of regulating the *methods* of abortion, imposed significant health risks. They make clear that a risk to ... women's health is the same whether it happens to arise from regulating a particular method of abortion, or from barring abortion entirely.

*Id.*

The state of Nebraska, however, asserted that the law did not require a health exception "unless there is a need for such exception," and that there was no need for it in the *Stenberg* case because safe alternatives were available to women and the ban created no risk to the health of women, arguments strikingly similar to the congressional findings in this case.

The Court rejected Nebraska's argument, concluding that, given the "medically related evidentiary circumstances," the Nebraska statute required a health exception. *Id.* at 937, 120 S.Ct. 2597. The "medically related evidentiary circum-

stances" supporting the Court's determination included: (1) the district court's findings that were supported by the record; (2) "a division of opinion among some medical experts over whether [intact D & E] is generally safer;" and (3) "an absence of controlled medical studies that would help answer these medical questions." *Id.* at 936–37, 120 S.Ct. 2597. Accordingly, the district court findings and record was just one of the three bases upon which the Supreme Court based its conclusion that a health exception was required.

### i. District Court Findings and Record

The Supreme Court found that the district court record "show[ed] that significant medical authority supports the proposition that in some circumstances, [intact D & E] would be the safest procedure." *Id.* at 932, 120 S.Ct. 2597. Moreover, the state of Nebraska failed to rebut the substantial record evidence to this effect. *See id.* (noting that "[t]he State fails to demonstrate that banning [intact D & E] without a health exception may not create significant health risks for women").

The Court then noted the record findings and evidence supporting a health exception, and rejected arguments made by Nebraska in support of its position that no exception was necessary. *See id.* at 934, 120 S.Ct. 2597 ("We find these eight arguments insufficient to demonstrate that Nebraska's law needs no health exception."). The specific eight arguments made by the State that the *Stenberg* Court rejected almost entirely were:

(1) that the intact D & E procedure is "little-used;"

(2) that the intact D & E procedure is used by only a "handful of doctors;"

(3) that D & E [by disarticulation] and labor induction are at all times 'safe and alternative procedures;'

(4) that the ban does not increase a woman's risk of several rare abortion complications;

(5) Amici Association of American Physicians and Surgeon's ("AAPS") argument that the intact D & E procedure creates its own special risks;

(6) that there are no medical studies establishing the safety of the intact D & E procedure or comparing it to other abortion procedures;

(7) an AMA policy statement that intact D & E is not "the only appropriate procedure to induce abortion;" and

(8) ACOG's qualification of its statement that intact D & E "may be the best or most appropriate procedure" with the fact that ACOG "could identify no circumstances under which [the intact D & E] procedure ... would be the only option to save the life or preserve the health of the woman."

*Id.* at 933–937, 120 S.Ct. 2597.

The Court found that several of the above arguments advanced by the State were "beside the point." *Id.* at 934, 120 S.Ct. 2597. First, it held that "[t]he [intact D & E] procedure's relative rarity is not highly relevant." *Id.* The court noted that the health exception was concerned instead with

whether protecting women's health requires an exception for those infrequent occasions. A rarely used treatment might be necessary to treat a rarely occurring disease that could strike anyone—the State cannot prohibit a person from obtaining treatment simply by pointing out that most people do not need it.

*Id.* The Court further found that the number of physicians who performed the procedure was not relevant as there was no way of discerning the reason behind those numbers. *Id.*

As for alternative methods, the Supreme Court noted the trial court's agreement that there were "safe alternatives," but rejected Nebraska's argument based on the related district court finding that under certain circumstances, "the [intact D & E] method was significantly *safer.*" *Id.* Moreover, regarding complications associated with intact D & E, the Supreme Court implied that there was a split of opinion, and that the trial court had relied on testimony contrary to that relied on by the State, which suggested that intact D & E may eliminate the risk of certain complications. *Id.* at 935, 120 S.Ct. 2597.

The Court also rejected Amici AAPS's arguments regarding special risks associated with intact D & E. The Court noted that another Amici, ACOG, pointed out that the risks highlighted by AAPS are risks generally associated with all abortion procedures, including the alternatives advanced by the State, and were not specifically associated with intact D & E. *Id.* at 935, 120 S.Ct. 2597. Additionally, the court rejected the State's characterization of ACOG's position, especially in light of ACOG's contrary position in its amicus brief. *Id.* at 935–36, 120 S.Ct. 2597 (noting that ACOG asserted that "[intact D & E] presents a variety of potential safety advantages over other abortion procedures used during the same gestational period").

Of the eight arguments, the only ones that the Supreme Court did not reject were Nebraska's assertions regarding the absence of medical studies and the AMA policy statement. However, it did note that Nebraska had cited only to the most favorable language in the AMA statement, and had omitted a portion of the statement. *Id.* As for the absence of studies, the Court noted that Nebraska was correct that "[t]here are no general medical studies documenting [the] comparative safety of the intact D & E procedure with other abortion procedures." *Id.* at 935, 120 S.Ct. 2597.

### ii. Significance of Division of Medical Opinion and Absence of Medical Studies

Expounding on its holding in *Casey,* that "the governing standard requires an exception 'where it is *necessary, in appropriate medical judgment* for the preservation of the life or health of the mother,'" the *Stenberg* Court explained that "necessity" contained in the above phrase "cannot refer to an absolute necessity or to absolute proof;" nor to "unanimity of medical opinion." *Id.* at 937, 120 S.Ct. 2597. It found that the necessity or propriety of a certain procedure depended on the particular circumstances of a particular case, and its relative health risks and/or benefits. *Id.*

The court further noted that "[d]octors often differ in their estimation of comparative health risks and appropriate treatment." *Id.* It, therefore, held that *Casey* requires "the judicial need to tolerate differences of medical opinion." *Id.* The Court noted that the division of medical opinion regarding the safety and propriety of the intact D & E procedure "involve[d] highly qualified knowledgeable experts on both sides of the issue"—division "of a sort that [the AMA] and [ACOG]'s statements together indicate are present here." *Id.*

Accordingly, the Court held that the existence of a division of medical opinion supported the need for an exception, as opposed to the contrary. *Id.*

> Where a significant body of medical opinion believes a procedure may bring with it greater safety for some patients and explains the medical reasons supporting that view, we cannot say that the presence of a different view by itself proves the contrary.

*Id.* The Supreme Court reasoned that such a division of medical opinion meant that

there was a "significant likelihood that those [physicians] who believe that [intact D & E] is a safer abortion method in certain circumstances may turn out to be right." *Id.* Accordingly, this likelihood justifies a health exception, because to hold otherwise would "place women at an unnecessary risk of tragic health consequences." *Id.*

In conclusion, the *Stenberg* Court held that:

> [w]here substantial medical authority supports the proposition that banning a particular abortion procedure could endanger women's health, *Casey* requires the statute to include a health exception when the procedure is 'necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.'

*Id.* at 938, 120 S.Ct. 2597.

### b. Relationship of *Stenberg* Health Exception and Related Congressional Findings

The dispute as to congressional factfinding regarding the necessity of a health exception is two-fold: (1) whether the issue is one of fact susceptible to contrary fact-finding by Congress; and (2) assuming that the issue is one of fact, the degree of deference that this court is required to afford congressional findings on the issue.

At this court's request, the parties briefed those issues pertinent to the deference that this court was required to afford the congressional findings. The parties disagreed as to the characterization of *Stenberg*'s health exception and the appropriate standard of deference, as did law professors in an amicus brief submitted to this court.

### i. Plaintiff's Position Regarding Deference to Congressional Findings

Plaintiffs contend that the congressional findings are not really "findings," but an attempt to evade the constitutional standards set forth by the Supreme Court in *Stenberg.* Accordingly, plaintiffs contend that the "findings" should be reviewed *de novo.* See, e.g., Dickerson v. United States, 530 U.S. 428, 432, 437, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (*Miranda* warnings were a "constitutional decision of [the Supreme] Court" and may not be "legislatively supersede[d]" by an Act of Congress); *see also United States v. Morrison,* 529 U.S. 598, 615–617, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (striking down Violence Against Women Act ("VAWA"), concluding that Congress lacked constitutional power under Commerce Clause and that "the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation"); *City of Boerne v. Flores,* 521 U.S. 507, 532, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (striking down Religious Freedom Restoration Act ("RFRA"), enacted by Congress under Section 5 of the 14th Amendment, "regardless of the state of the legislative record," where Act was in direct response to a prior Supreme Court decision and sought to legislatively supersede the legal standards set by the Court in that prior case).

### ii. Government's Position Regarding Deference to Congressional Findings

The government, on the other hand, argues that this case is distinguishable from the cases cited by the plaintiffs because *Stenberg's* determination regarding the necessity of a health exception does not rise to the level of a "constitutional rule," like the *Miranda* requirements that Congress sought to overrule in *Dickerson,* or the Supreme Court's constitutional interpretation of the RFRA, which Congress sought to overrule in *City of Boerne.* Instead, the government contends that whether a health exception is required is a "factual" issue, "decided on review of the particular

record ... in the [*Stenberg*] district court."

The government contends that the *Stenberg* Court's conclusion regarding the necessity of a health exception was "inextricably tied to the record evidence compiled in that specific case" and "did [n]ot suggest that Congress could not make an independent assessment of the medical evidence." Accordingly, the government asserts that Congress did not attempt to overrule a constitutional standard, but instead that its findings fell within the constitutional parameters articulated by the Supreme Court in *Stenberg* and *Casey*.

Because it asserts that Congress was entitled to make the contrary factual findings, the government urges this court to apply the standard of review set forth by the Supreme Court in *Turner Broadcasting Sys., Inc. v. FCC ("Turner II")*. 520 U.S. 180, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997). In *Turner II*, the Supreme Court decided the second of a pair of cases involving the appropriate standard of judicial deference due congressional findings of fact in First Amendment free expression cases.

The Supreme Court held in *Turner II* that the "must-carry" provisions of the Cable Television Consumer Protection and Competition Act of 1992, requiring cable television providers to dedicate a portion of their channels to local broadcast television stations, as challenged by cable operators and programmers, did not run afoul of the First Amendment. *Id.* at 224–25, 117 S.Ct. 1174. In so holding, the Court gave substantial deference to congressional findings in support of the regulation. Those findings included Congress' ultimate conclusion that the confluence of undue market influence possessed by cable operators, cable operators' economic interests not to carry broadcast signals, and local broadcasters' reliance on cable operators for access to viewers, together, significant-ly threatened the future viability of local broadcast television.

In according substantial deference to the legislative findings, the *Turner II* Court noted that its:

> sole obligation is to assure that in formulating its judgment, Congress has drawn reasonable inferences based on substantial evidence. As noted in [*Turner I*], substantiality is to be measured in this context by a standard more deferential than we accord to the judgments of an administrative agency.

*Id.* at 195, 117 S.Ct. 1174.

Accordingly, the government argues that this court should consider the trial evidence "only to supplement the Congressional record [such] that the Court may determine whether Congress' judgment was reasonable and based on substantial evidence." *See id.* at 196, 117 S.Ct. 1174 (examining "first the evidence before Congress and then the further evidence presented to the district court on remand to supplement the congressional determination").

### iii. Amici's Position Regarding Deference to Congressional Findings

A third and distinct approach regarding the deference to be accorded the congressional findings was advanced by Amici, a group of law professors who teach and write in the area of constitutional law. Amici argue that the necessity of a health exception under *Stenberg* is not a pure fact as the government would characterize it, but instead a constitutional or "legislative" fact. *See, e.g., A Woman's Choice–East Side Women's Clinic v. Newman*, 305 F.3d 684, 688 (7th Cir.2002) (discussing difference between legislative and adjudicative facts, and noting that Supreme Court had suggested "constitutionality must be assessed at the level of legislative fact, rather than adjudicative fact.... [because]

only treating the matter as one of legislative fact produces the nationally uniform approach that *Stenberg* demands"); *see also Casey,* 505 U.S. at 888–893, 112 S.Ct. 2791 (ruling that spousal notification requirement placed a substantial obstacle in the path of women seeking to terminate their pregnancies as a matter of law).

While the government would like to characterize *Stenberg*'s health exception as an "adjudicative fact," tried by courts and concerning only the immediate parties to the dispute," Amici note, in contrast, that legislative facts "transcend particular cases and must be decided by courts as a matter of law." March 1, 2004 Amicus brief at 4. According to Amici, the issue here must be treated as one of legislative fact, because otherwise,

> the [government's] proposed standard would create the prospect that different legislatures could find different facts predicated on essentially the same record.... Such a result would leave different jurisdictions with disparate constitutional practices notwithstanding the fact that the empirical issue is identical in each of them.

*Id.* Accordingly, "the necessity of a medical exception must be found at the level of constitutional fact—not amenable to alteration by the fact-finding of individual legislatures." *Id.* at 5.

Amici do not agree with plaintiffs that this court should review the findings *de novo* simply because they constitute legislative or constitutional facts. Nor do Amici agree with the standard advocated by the government.

Amici contend that although the *Turner* standard of deference may apply to legislative facts under some circumstances, that is not true of a case in which a fundamental right, as opposed to economic regulation, is implicated.[40] In cases such as this, involving fundamental rights or liberties, Amici argue that the standard of deference to be applied is a "hard-look" standard.[41] Amici acknowledge that the Supreme Court "has not specifically articulated the standard it employs," but contend that "case law makes it clear that the Court stringently reviews proffered findings of fact when basic liberties are infringed, and the Court does not hesitate to go well beyond the legislative record in finding facts regarding the relevant inquiry." March 1, 2004 amicus brief, at 2. According to Amici, this approach requires "that courts conduct a stringent and broadly-based review of the methods and principles underlying factual claims that affect the existence of protection of basic liberties." *Id.*

#### iv. Analysis Re: Level of Deference

This court is inclined to agree with Amici regarding both the characterization of the Supreme Court's requirement of a health exception in *Stenberg* as one of "constitutional fact," and the applicable standard of deference.

This court's discussion of *Stenberg* above dispels Congress' and the government's

**40.** Amici also appropriately note that the government's suggestion that the Act at issue here is "economic" simply because it was passed pursuant to Congress' Commerce Clause power mischaracterizes the Act. According to such analysis, all legislation enacted pursuant to Congress' power under the Commerce Clause could be deemed "economic" regardless of its impact on fundamental rights.

**41.** This "hard-look" standard of review is applied only to congressional findings regarding the issue of the necessity of a health exception under *Stenberg.* As for the inquiry regarding undue burden, Amici note that this court is required to make an independent legal judgment regarding whether the Act unduly burdens a woman's right to terminate a pregnancy.

characterization of the issue as one of pure fact, limited to the record in that particular case. Instead, as noted, the record was only one of several "medically related evidentiary circumstances" that the Supreme Court considered in concluding that a health exception was required. The other two significant considerations included the state of medical studies and the division of expert medical opinion on the issue—general evidentiary considerations that were not limited exclusively to the record in the *Stenberg* case. *See* 530 U.S. at 879, 120 S.Ct. 2530.

Accordingly, this case appears to be factually closer to those cases relied on by plaintiffs, including *City of Boerne, Dickerson,* and *Morrison,* in which the Supreme Court held that, as a matter of law, congressional factfinding was not entitled to deference where Congress intended to legislatively supersede constitutional standards. However, this case is, at the same time, not identical to those cases. As the government has pointed out, those cases involved constitutional "rules." Here, *Stenberg's* health exception requirement does not appear to arise to the level of a constitutional "rule" like *Miranda* requirements. Instead, because it is based on "medically related evidentiary circumstances," the necessity of the exception is, for the reasons explained by Amici, more appropriately considered an issue of "legislative" or "constitutional" fact.

Assuming that the Supreme Court's holding in *Stenberg* regarding the necessity of a health exception is amenable to subsequent legislative factfinding, this court would be inclined to agree with the "hard look" standard of deference advanced by Amici. That is, that while this court does not review congressional findings regarding these types of facts *de novo,* as plaintiffs have advocated, the court also does not believe the standard is one of substantial deference, advocated by

the government. *See also Newman,* 305 F.3d at 688 (noting that with respect to abortion regulations, "constitutionality must be assessed at the level of legislative fact, rather than adjudicative fact determined by more than 650 district judges"). "Only treating the matter as one of legislative fact produces the nationally uniform approach that *Stenberg* demands." *Id.*

This court agrees that the issue of deference in this case is not clearly established by Supreme Court precedent. Because this case involves a woman's fundamental right to choose an abortion, the court is not persuaded that it should afford congressional findings that undermine that right the same substantial deference utilized by the Supreme Court in cases involving economic regulation, like *Turner II.* In *Turner II,* regarding the applicability of the standard of substantial deference, the Supreme Court explicitly noted that:

> [The] principle has special significance in cases, like this one, involving congressional judgments concerning *regulatory schemes of inherent complexity and assessments about the likely interaction of industries undergoing rapid economic and technological change.* Though different in degree, the deference to Congress is in one respect akin to deference owed to administrative agencies because of their expertise.

520 U.S. at 196, 117 S.Ct. 1174 (citing *FCC v. National Citizens Comm. for Broadcasting,* 436 U.S. 775, 814, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978)) (emphasis added).

Nevertheless, while recognizing the importance of the issue, this court need not articulate the precise degree of deference to be accorded the congressional findings in this case. That is because, even if this court were to assume that the findings are entitled to the most stringent standard of deference advocated by the government and Congress: that of substantial defer-

ence, the court concludes for the reasons set forth below, that Congress has not drawn reasonable inferences based on substantial evidence, and its findings are therefore not entitled to substantial deference.

### 3. Congress' Determination that the Partial–Birth Abortion Procedure is Never Medically Necessary is not Reasonable and is not Based on Substantial Evidence

In *City of Boerne*, the Supreme Court recognized that "[o]ur national experience teaches that the Constitution is preserved best when each part of the Government respects both the Constitution and the proper actions and determinations of the other branches." 521 U.S. at 535–36, 117 S.Ct. 2157. In recognition of this principle and the pertinent congressional findings, this court believes it necessary to set forth in detail the history of the congressional proceedings and Congressional Record underlying Congress' ultimate finding, and to discuss the specific findings made by Congress, in support of this court's conclusion that Congress' finding regarding the necessity of a health exception is not entitled to deference.

#### a. Overview of Congressional Record

In evaluating the congressional findings in this case, it is helpful first to briefly summarize the record before Congress. The evidence presented before Congress was qualitatively different than the evidence presented before this court. While some witnesses testified both before Congress and the court, the court was presented with much more extensive medical and scientific evidence on both sides of the issue concerning the safety and necessity of intact D & Es. Congress, on the other

hand, heard significantly more policy-based arguments.

From 1995 to 2003, the 104th through the 108th Congresses held a total of six hearings relating to "partial-birth abortion." In addition, various individuals and organizations submitted numerous policy statements and letters for inclusion in the Congressional Record.[42]

#### i. 104th Congress (1995)

In 1995, Congress held three hearings on intact D & E.

*House Judiciary Committee Hearings*

The first hearing of the 104th Congress took place before the House Judiciary Committee on June 15, 1995. Partial–Birth Abortion Hearing before the Subcomm. on the Constitution of the House Comm. on the Judiciary, 104th Cong 1st Sess (1995) ("Record Exh. G"). In those proceedings, various representatives debated the issue of intact D & E in the context of Dr. Haskell's description of the procedure before the National Abortion Federation in 1992.

Two physicians, Dr. Pamela Smith and Dr. Robert White, and one nurse, Mary Ellen Morton, testified in favor of a ban. Dr. Smith, a gynecologist who does not perform abortions, gave a general overview of the procedure, and stated that there was no medical need for the procedure, while Dr. White, a neurosurgeon with no obstetrics training, testified that he believed that the fetus would feel intense pain during an intact D & E procedure. Record Exh. G at 38–44, 90 (Smith testimony), 67–71 (White testimony). Morton, a neonatal nurse, presented photographs of premature infants and testified in a written statement that she believed

---

**42.** As both parties have agreed, the court takes judicial notice of the fact that materials and testimony are included in the Congressional Record but not necessarily for the truth of the matters asserted therein. *See* Fed. R.Evid. 201.

that premature infants were identical to fetuses in the second trimester of pregnancy and that they would feel pain during an intact D & E procedure. *Id.* at 76–86.

One physician testified against the ban, Dr. J. Courtland Robinson, an obgyn with training in public health. Dr. Robinson testified that intact D & E is a rare procedure, that the ban seemed vague, and that Congress should not substitute its judgment for those of women and their physicians. Dr. Robinson did not provide information about how an intact D & E is performed, and stated that he was unfamiliar with this technique until a few weeks before testifying. Record Exh. G at 63–67, 88.

One woman, Tammy Watts, who had undergone an intact D & E, also provided testimony. Watts had discovered 7 months into her pregnancy that her fetus suffered from trisomy 13, a fatal chromosomal anomaly, and decided to terminate the pregnancy. Because she had an intact D & E, Watts was able to see and hold the fetus, and the fetus was autopsied for future diagnostic purposes. Record Exh. G at 71–76.

The four testifying witnesses were then questioned by various members of Congress. The witnesses did not provide extensive medical explanations of the procedure, as the representatives focused mainly on policy issues in the debate. Record Exh. G at 86–97.

Various statements were also read into the Record, including newspaper articles on intact D & E, statements from pro-life groups, letters from pro-life doctors, including Dr. Bowes, letters from the National Abortion Federation (a pro-choice organization), a copy of Dr. Haskell's article and a written response from Dr. Haskell generally objecting to mischaracterizations of his article, and statements from attorneys on the constitutionality of a ban. *See, e.g.,* Exh. G at 4–28, 97–142.

*Senate Judiciary Hearings*

The second hearing on intact D & E took place before the Senate Judiciary Committee on November 19, 1995. Partial Birth Abortion Ban Act of 1995: Hearing on H.R. 1833 before the Senate Comm. on the Judiciary, 104th Cong. 1st Sess. (1995) ("Record Exh. F").

The first witness to testify was Brenda Pratt Shafer, a nurse who claimed to have worked in Dr. Haskell's office. Shafer testified that she observed an intact D & E procedure where a 26–week fetus visibly struggled during the procedure. Dr. Haskell's office submitted a letter in response stating that they do not perform intact D & E procedures after 24 weeks and noting other inconsistencies in Shafer's testimony. Certain senators also noted that Shafer's deposition testimony had previously been ruled inadmissible in Ohio's litigation concerning a state ban on intact D & E. Record Exh. F at 17–21, 205–06.

Next, the Senate heard from the first panel of witnesses, which included: Dr. Smith and Dr. Robinson, who had previously testified before the House; Dr. Mary Campbell, Dr. Nancy Romer, Dr. Norig Ellison, and Helen Alvare. Dr. Smith and Dr. Romer, who supported a ban on intact D & E, discussed generally the dangers of intact D & E and the lack of medical necessity for the procedure. Dr. Romer indicated that she had never performed an intact D & E.

Dr. Campbell, the medical director for the Washington DC Planned Parenthood affiliate, discussed in general how second trimester abortions are performed, and Dr. Robinson reiterated his belief that Congress should not legislate how doctors practice medicine. Dr. Ellison, an anesthesiologist, offered testimony solely on the issue of whether anesthetic given to the woman would cause fetal demise, and he testified that it would not. Alvare of-

**1016**

fered testimony as a representative of the Catholic church that intact D & Es were immoral. The witnesses did not explain matters in great scientific detail, though they were questioned extensively on policy issues by the committee members and some medical research issues were discussed in that context. Record Exh. F at 75–158.

The next panel of witnesses consisted of three women, two of whom had undergone intact D & Es: Coreen Costello, Viki Wilson, and Jeannie French. Costello was carrying a fetus diagnosed at seven months with a fatal neurological anomaly and needed to terminate the pregnancy. She had requested a caesarean but her doctors advised against the risk, and she could not undergo an induction because the fetus was suffering from hydrocephaly. She underwent an intact D & E, believed that the fetus had died before birth, and was able to hold the baby after the procedure. Wilson testified that her fetus was diagnosed at 36 weeks with an encephalocoele, where the brain develops outside the fetal skull, and would not live outside the uterus. Because of the size of the head, Wilson could not undergo an induction, and thus underwent an intact D & E. French testified that she gave birth to twins, one of whom was diagnosed with an encephalocoele and did not survive, and that intact D & E was not necessary for her. Record Exh. F at 158–168.

The third panel consisted of two law professors who debated the constitutionality of a ban, Record Exh. F at 169–207, and the remainder of the hearing materials consist of written statements from various doctors, medical associations, and pro-life advocacy groups. *Id.* at 207–363.

*House Hearings on Anesthesia*

The third and final hearing of the 104th Congress, held on March 21, 1996, focused on the issue of whether anesthesia given to the mother in an intact D & E would cause fetal demise.[43] Effects of Anesthesia During a Partial–Birth Abortion: Hearing before the Subcomm. on the Constitution of the House Comm. on the Judiciary, 104th Cong. 2nd Sess (1996) ("Record Exh. E").

In previous hearings, some doctors, patients, and pro-choice advocacy groups had indicated that they believed that the anesthetic given to a woman undergoing an intact D & E would be sufficient to cause fetal demise before the extraction procedure began. Record Exh. E at 1–3. A congressman who is also a doctor, Tom Coburn, testified that it would not. *Id.* at 135–136.

Next, a panel of four anesthesiologists provided testimony: Dr. Ellison, who had testified previously, Dr. David Birnbach, Dr. David Chestnut, and Dr. Jean Wright. All four doctors testified that anesthetic given to the mother would not cause fetal demise, and Dr. Wright testified that beginning around 26 weeks after gestation (28 weeks lmp) fetuses can feel intense pain. Record Exh. E at 137–150. The panel was then questioned by various members of Congress. *Id.* at 291–303.

The final panel consisted of Shafer, who had previously testified before the Senate; Costello, who had previously testified before the Senate, Mary–Dorothy Line, who had undergone an intact D & E, and Alvare, who had previously testified before the Senate. Shafer reiterated her testimony from the first hearing, as did Costello and Alvare. Line, who had not previously testified, stated that her fetus had been diagnosed as hydrocephalic at 22 weeks,

43. Plaintiffs in this matter agree with the government that the anesthetic given to women will not cause fetal demise, and thus this question is not an issue in this litigation.

and she had undergone an intact D & E where a needle was used to aspirate the fluid from the fetus' head. Record Exh. E at 310–335. Members of Congress then questioned the witnesses. *Id.* at 335–352.

The remainder of the record of this hearing consists of letters from advocacy groups and doctors, a letter from President Clinton opposing the ban, excerpts from previous portions of the Congressional Record before the Senate Judiciary Committee, medical research articles on fetal pain, a letter from Dr. Creinin, who testified before this court, stating that fetuses do not feel pain, and a copy of the order from the Ohio district court finding the Ohio ban on intact D & E unconstitutional. *See, e.g.,* Record Exh. E at 4–134, 151–282, 352–56.

The proposed bill was then passed by both chambers of Congress, and President Clinton vetoed it on April 10, 1996. 142 Cong. Rec. H3338 (daily ed. Apr. 15, 1996). The Senate was unable to override the veto, and it was sustained. 142 Cong. Rec. S11389 (daily ed. Sept. 26, 1996).

### ii. 105th Congress

New legislation to ban intact D & E was then proposed in the 105th Congress. The House and Senate Judiciary Committees held a joint hearing on March 11, 1997, on the issue. Partial–Birth Abortion: The Truth: Joint Hearing on S. 6 and H.R. 929 before the Senate Comm. on the Judiciary and the Subcomm. on the Constitution of the House Comm. on the Judiciary, 105th Cong. 1st Sess (1997) ("Record Exh. D").

The first panel to testify at this hearing consisted of members of various advocacy groups: Renee Chelian, of the National Coalition of Abortion Providers; Kate Michelman, of NARAL; Helen Alvare, of the Catholic Church; Gloria Feldt, of Planned Parenthood; Vicki Saporta, of NAF; and Douglas Johnson, of the National Right to Life Committee. The witnesses presented primarily policy-based reasons for their positions, and not medical ones; some statistics on both sides were introduced into the record, but not discussed. Record Exh. D at 17–66. Members of Congress then extensively questioned the panel. *Id.* at 67–119.

The second panel consisted of Dr. Cook, who testified before this court, and is one of the co-founders of Physicians' Ad–Hoc Coalition for Truth ("PHACT"), a group opposed to intact D & E; Eileen Sullivan and Maureen Britell, who underwent intact D & Es; and Whitney Goin, whose fetus was diagnosed with fetal anomalies but who declined an abortion. Dr. Cook testified that there was no need for intact D & E but did not explain the medical reasons for his conclusions. Sullivan's fetus was diagnosed with a fatal heart anomaly at 26 weeks, and Sullivan decided on an intact D & E so the fetus could be autopsied to help her in making her future reproductive decisions. Britell, who was previously active in the pro-life movement, was pregnant with a fetus diagnosed with anencephaly at the beginning of her third trimester. When Britell's induction abortion failed, she underwent an intact D & E so her priest could deliver religious rites to the fetus. Goin's fetus was diagnosed with abdominal defects which were not fatal but would require extensive surgery after birth. Goin declined a second trimester abortion and her child is alive today. Members of Congress questioned the women and Dr. Cook whether intact D & E procedures were necessary in their circumstances. Record Exh. D at 120–135.

The remainder of the record consists of prepared statements by attorneys on the issue of the constitutionality of the bill, copies of medical research articles, copies of previous testimony given before Congress on the issue, and letters from advocacy groups. *See, e.g.,* Record Exh. D at 1–17, 135–142, Record Appendix.

The bill was passed, and President Clinton vetoed it. 143 Cong. Rec. H8891 (daily ed. Oct. 21, 1997). The Senate was again unable to override the veto. 144 Cong. Rec. S10564 (daily ed. Sept. 18, 1998).

### iii. 106th Congress

No hearings were held in the 106th Congress, but other written materials were introduced into the Congressional Record, such as letters from doctors and policy groups.

The Supreme Court decided *Stenberg* on June 28, 2000, and relied in part on evidence presented in the Congressional Record up to this point.

### iv. 107th Congress

On July 9, 2002, Congress again held a hearing on the issue of intact D & E. Partial Birth Abortion Ban Act of 2002: Hearing before the Subcomm. on the Constitution of the House Comm. of the Judiciary, 107th Cong. 2nd Sess (2002) ("Record Exh. C").

The only panel of witnesses that testified at this hearing consisted of Dr. Aultman and Dr. Cook, both of whom supported the ban and had previously testified before Congress; Simon Heller, an attorney on behalf of the Center for Reproductive Law and Policy who believed the proposed law to be unconstitutional; and Robert Destro, an attorney who believed the proposed law to be constitutional. Dr. Aultman testified that the bill was not vague and that no health exception was needed, and Dr. Cook testified that intact D & E was not medically necessary. Dr. Aultman also provided a position paper outlining the medical basis for her opinion. Heller and Destro presented opposing views on the constitutionality of the ban. Record Exh. C at 6–28. Members of Congress then questioned the witnesses. Id. at 28–46.

The record also includes an extensive appendix of materials, which includes letters from doctors and advocacy groups, statements from senators, and medical papers on both sides of the issue. Record Exh. C at 47–280.

### v. 108th Congress

The House held its final hearing on this issue on March 25, 2003. Partial–Birth Abortion Ban Act of 2003: Hearing before the Subcomm. on the Constitution of the House Comm. on the Judiciary, 108th Cong. 1st Sess (2003) ("Record Exh. B").

Only one panel of witnesses testified at this hearing, consisting of Dr. Mark Neerhof, who supported a ban, and Simon Heller and Gerard Bradley, attorneys testifying regarding the constitutionality of the act. Dr. Neerhof provided an overview of his medical opinion concerning the lack of necessity for the procedure. The Congressional Findings of Fact appear to have drawn in significant part from this overview. Record Exh. B at 6–10. Heller and Bradley discussed the constitutionality of the act in light of *Stenberg,* and Bradley's conclusions appear to have been incorporated into the Congressional Findings of Fact as well. *Id.* at 10–22. Members of Congress then questioned the witnesses. *Id.* at 22–35.

The record of this hearing also includes an extensive appendix, consisting of statements from doctors and policy groups on both sides of the issue. Record Exh. B at 37–279.

### b. Analysis re: Congressional Record

### i. Witnesses

The oral testimony before Congress was heavily weighted in favor of the Act. As was the case with many of the government's witnesses before this court, Congress heard disproportionately from physicians opposed to abortion generally, unless

the life of the mother was absolutely compromised. This court's review of the Congressional Record reflects that over a period of approximately eight years, Congress entertained live testimony from a total of eight physicians, six of whom supported the ban, and two of whom opposed the ban.[44] Of those six physicians who supported the ban, two are related to the instant case: Drs. Cook and Neerhof. Like the government's witnesses in this case, none of the six physicians who testified before Congress had ever performed an intact D & E. Several did not provide abortion services at all; and one was not even an obgyn.

It is apparent to this court, having heard the testimony of the thirteen expert witnesses in this case, and having reviewed the deposition testimony of an additional six expert witnesses, that the oral testimony before Congress was not only unbalanced, but intentionally polemic. In contrast to the evidence before Congress, this court heard from eight physicians who have all performed the banned procedure, and have been instructed in the procedure, many of whom teach the procedure themselves.

This court cannot evaluate the credibility of those witnesses who appeared both before this court and also testified or submitted materials to Congress *as they appeared before Congress*. However, this court has made findings regarding those witnesses' credibility, set forth above, *as they appeared before this court*. That group includes Drs. Cook, Sprang, and Bowes.

While Dr. Sprang did not testify personally before Congress, he submitted letters in favor of the ban, and along with Dr. Neerhof, who testified before Congress in support of a ban, is the co-author of an article submitted to and cited by Congress in support of its findings. *See* Exh. A–55, Sprang & Neerhof, *Rationales for Banning Abortions Late in Pregnancy*, 280 Journal of the American Medical Association ("JAMA") 8, at 744–47 (August 26, 1998). Many of the congressional "findings" mirror substantially the conclusions reached in Dr. Sprang's article. That article, upon which Congress very obviously relied, and which was admitted into evidence at trial, was published in 1998, prior to the Supreme Court's decision in *Stenberg*, and was considered and implicitly rejected by the Supreme Court in its decision. *See* 530 U.S. at 933, 120 S.Ct. 2597 (citing to article).

This court finds a number of the conclusions in that article, including those resembling many of Congress' findings, troublesome and contrary to the medical evidence presented by both sides to this court. The article itself constitutes an opinion piece, representing a generally anti-late-term abortion view. The article was published in the "Controversies" section of the journal, a section that includes "one article pro and one article con on an issue." Dr. Sprang himself agreed that the article was one part of a two-part piece taking opposite viewpoints on restrictions on late-term abortions. Tr. Vol. 7 at 1020:19–23; 1032:17–19 (Sprang).[45]

Unlike other studies that this court admitted into evidence, the article did not rely on any clinical research or medical studies conducted by Dr. Sprang. Instead, it was based on his review of the literature on the issue—literature which included non-medical sources like newspaper articles and weekly periodicals. For that reason, this court indicated at trial

---

44. This does not include the four physicians who testified exclusively regarding the effect of maternal anesthesia on the fetus, not at issue here.

45. Dr. Sprang was asked to draft his article in response to an article by Dr. David Grimes, opposing restrictions on late-term abortion methods. *Id.* at 1020:17–25.

that it found the article itself to be lacking in trustworthiness. Tr. Vol. 8 at 1340:2–11 (Sprang). Moreover, given Dr. Sprang's lack of expertise in late-term abortion procedures, and intact D & E procedures specifically, and the contradictory testimony that Dr. Sprang gave at trial, the article and many of its conclusions become even more questionable.

This court shares similar qualification and credibility concerns regarding Dr. Cook, another government witness, based on his testimony before this court. Dr. Cook testified before Congress several times and also submitted written materials to Congress in opposition to the ban from himself, and from an organization that he co-founded, PHACT. Congress relied in part on Dr. Cook's testimony for its findings, testimony which included his opinion regarding two specific medical situations concerning the necessity of intact D & E.[46] Tr. Vol. 9 at 1437:13–20 (Cook).

Both Dr. Bowes, who testified for the government, and Dr. Creinin, plaintiffs' witness, submitted letters to Congress in support of, and in opposition to the Act, respectively. However, this court does not have the same credibility concerns with respect to the government's witness, Dr. Bowes, or plaintiffs' witness, Dr. Creinin.

### ii. Medical Organizations

Congress also had before it policy statements and materials from numerous medical organizations, the majority of which opposed the Act. Among the medical organizations who submitted materials in opposition to the Act were ACOG, CMA, AMWA, NAF, APHA, PRCH ("Physicians for Reproductive Choice and Health"), and ANA ("American Nurses Association"). Two organizations supporting the bill also submitted materials: PHACT, co-founded by Dr. Cook, and AAPS. As noted, the AMA, which supported a ban initially, subsequently withdrew its support.

In the materials submitted before Congress, the two largest medical organizations, ACOG and AMA, while agreeing in their opposition to the Act, disagreed regarding their positions on "partial-birth abortion." The AMA was ethically opposed to "partial-birth abortion," whereas ACOG believes that there are circumstances during which "partial-birth abortion" "may be the most appropriate and safest procedure to save the life or health of a woman." *See* Record Exh. B, at 146–152 (1997 AMA "Fact Sheet"); Record Exh. C, at 186 (AMA Statement); *id.* at 260 (AMA Policyfinder); *id.* at 240 (4/00 ACOG "Fact Sheet"); Record Exh. B, at 197 (7/02 ACOG Statement). In recognition of their differences, the AMA and ACOG submitted to Congress a "Joint Statement," noting that "they were concerned regarding the negative impact caused by different positions reached by [the organizations]," and provided goals common to both organizations. *See* Rec-

---

**46.** Dr. Cook testified, however, that he did not review the actual medical records associated with the cases about which he testified. *Id.* at 1382:3–11. The two medical situations regarding which Dr. Cook opined before Congress were in rebuttal to a letter written by a physician, Dr. Phillip Darney, in opposition to the Act. In that letter, Dr. Darney detailed two specific situations for Congress in which he believed that the intact D & E procedure had been necessary to the life of the women. Dr. Cook responded, rebutting the necessity of the intact D & E procedure. *Id.* at 1437:13–20.

Government counsel posed the same two situations as hypotheticals to Dr. Cook before this court, both of which included women with placenta previa and other disorders or emergency circumstances requiring pregnancy termination. *Id.* at 1438:10–1441:14. Dr. Cook opined that intact D & E was neither necessary nor recommended. However, Dr. Chasen, in subsequent testimony, disagreed with Dr. Cook's opinions. *See* Tr. Vol. 11 at 1768–1782 (Chasen).

ord Exh. C, at 220 (AMA/ACOG Joint Statement). One commonality shared by both ACOG and the AMA was that they opposed any partial-birth abortion ban that included criminal sanctions. *Id.*

Congress in its findings, however, chose to disregard the statements by ACOG and other medical organizations in opposition to the Act, and then exclusively utilized statements derived directly from 1997 AMA policy statements in its findings— policy statements that the Supreme Court had before it in *Stenberg,* but did not rely upon in reaching a contrary conclusion.[47] *See Stenberg,* 530 U.S. at 934–35, 120 S.Ct. 2597 (noting 1997 AMA policy statement asserting that "there does not appear to be any identified situation in which intact [D & E] is the only appropriate procedure to induce abortion"). Among the statements that Congress disregarded was ACOG's amicus brief submitted to the Supreme Court in *Stenberg,* and cited by the Supreme Court approvingly in that case,[48] and a July 2002 ACOG statement, one of the few new statements submitted by a medical organization post-*Stenberg. See* Record Exh. A, at 98 (ACOG amicus brief); Record Exh. B, at 197 (7/02 ACOG statement). That statement provides in pertinent part that:

> ACOG has concluded that there are circumstances under which this type of procedure would be the most appropriate and the safest procedure to save the life or health of a woman. Only the doctor, in consultation with the patient, based upon the woman's particular circumstances, can make this decision.

> This bill violates a fundamental principle at the very heart of the doctor-patient relationship; that the doctor, in consultation with the patient, based on the patient's individual circumstances, must choose the most appropriate method of care for the patient. This bill removes decision-making about medical appropriateness from the physician and the patient. ACOG's members, whatever their beliefs about abortion, share an interest in opposing laws that interfere with a physician's ability to exercise his or her best medical judgment in providing care for each patient.

> ACOG opposes legislation such as HR 4965 as inappropriate, ill-advised and dangerous intervention into medical decision-making. HR 4965 is vague and broad, with the potential to restrict other techniques in obstetrics and gynecology. It fails to use recognized medical terminology and fails to define explicitly the prohibited medical techniques it criminalizes. ACOG notes particularly that imposing criminal penalties for use of a procedure that includes elements of recognized gynecologic and obstetric techniques could outlaw use of those techniques in both abortion and non-abortion circumstances. Some of these techniques can be critical to the lives and health of American women.

Record Exh. B, at 197.

### iii. Congressional Debate

The Act itself and especially the Act's ultimate finding that "partial-birth abor-

---

**47.** All of the quotations attributed to a "prominent medical association" in the Congressional findings refer to statements made by the AMA, primarily in its Fact Sheet issued June 1997. *See* Act § 2(14)(C), (I); *see also* Record Exh. B, at 146–152.

**48.** Citing to ACOG's amicus brief filed in that case, the Supreme Court rejected the defen-

dant's mischaracterization of ACOG's position on intact D & E. Specifically, the Court noted ACOG's reasoning regarding why intact D & E may be the most appropriate and safest abortion procedure under certain circumstances, and safer than the alternatives. *See Stenberg,* 530 U.S. at 936, 120 S.Ct. 2597.

tion is never medically indicated to preserve the health of the mother," were hotly contested within Congress. *See generally, e.g.,* Record Exh. A, at 147–154 (dissenting views signed by fourteen legislators). Dissenting legislators opposed the Act on numerous grounds, both legal and policy-based, including that: (1) the Act unconstitutionally omits an exception to protect maternal health; (2) that the Supreme Court will not defer to erroneous factual and legal conclusions masked as congressional "findings;" (3) the threat to the separation of powers; (4) the Act's overbreadth and undue burden on a woman's right to obtain an abortion; (5) the danger to women's health posed by the Act's ban on safe abortion procedures; and (6) the criminalization of doctors and the conflict the Act encourages between pregnant women and their husbands, or in the case of minors, their parents. *Id.*

Opponents of the Act argued before Congress that the Act was both legally unsound and a mischaracterization of abortion procedures. Opponents contended that:

> This bill as written fails every test the Supreme Court has laid down for what may or may not be a constitutional regulation on abortion. . . . While . . . proponents of this bill view all abortion as tantamount to infanticide, that is not a mainstream view. This bill attempts to foist a marginal view on the general public by characterizing this bill as having to do only with abortions involving healthy, full-term fetuses. If the proponents of this bill really want to deal with post-viability abortions in situations in which a woman's life and health are not in jeopardy, then they should write a bill dealing with that issue.

Record Exh. A, at 73–74.

Moreover, Congress debated and ultimately rejected an amendment that would have added a health exception to the Act.

*Id.* at 27, 65. Arguing in favor of a health exception, opponents asserted that:

> [T]he families that are affected by this bill are dealing with the tragic circumstances of crisis pregnancies. In most cases, they have just learned that their babies will not survive. They are then confronted by choices that none of us would wish on any human being. This is the context in which . . . this legislation comes into play. And any suggestion to the contrary deceives the American public about the realities of this issue.
>
> . . . .
>
> Typically, women who must face this decision want nothing more than to have a child and are devastated to learn that their baby would not survive outside the womb. In consultation with their doctors and families, they make difficult decisions to terminate pregnancies to preserve their own health, and in many cases to preserve their ability to have children in the future.

*Id.* at 69–70.

### iv. Comparison with *Stenberg* Record

In support of its conclusion that "partial-birth abortion" is never necessary, Congress asserted, and the government has argued, that following the courts' decisions in *Stenberg,* Congress had evidence available to it that was not available at the time *Stenberg* was decided. In its findings, Congress stated:

> [O]verwhelming evidence presented and compiled at extensive congressional hearings, *much of which was compiled after the district court hearing in Stenberg,* and thus not included in the *Stenberg* trial record, demonstrates that a partial-birth abortion is never necessary to preserve the health of a woman, poses significant risks to a woman upon whom

the procedure is performed, and is outside the standard of medical care.

Act, § 2(5) (emphasis added). However, this court's review of the Congressional Record reveals that the opposite is true.

Although Congress utilized the *Stenberg* district court's decision from July 1998, as the benchmark regarding the status of the medical evidence on the issue, the real benchmark must be the Supreme Court's decision in *Stenberg*, which was issued on June 28, 2000. As noted, the district court record was just one of the "medically related evidentiary circumstances" supporting the Supreme Court's determination that a health exception was required. *Stenberg*, 530 U.S. at 936–37, 120 S.Ct. 2597. The Supreme Court considered also the division of opinion among medical experts and the state of medical studies that *existed at the time the Supreme Court decided Stenberg*—including the Congressional Record to date and numerous amicus briefs submitted by interested parties. *Id.* at 933–36, 120 S.Ct. 2597.

However, regardless of which benchmark is utilized—the *Stenberg* district court's decision in 1998, or the Supreme Court's decision in June 2000—this congressional finding is inaccurate and contrary to the very record that existed before Congress. The majority of congressional hearings and evidence were conducted before and collected by the 104th and 105th Congresses from 1995–1997, prior to both the district court's and the Supreme Court's decisions. Following the district court's decision in *Stenberg* in 1998, Congress held only two hearings on the intact D & E pro-

cedure. None of the testimony received by Congress at those hearings can reasonably be considered "new" medical evidence not available to the courts at the time *Stenberg* was decided.[49]

Outside of the *Stenberg* record, which included the amicus briefs considered by the Supreme Court, several medical organizations, including ACOG, APHA, PRCH, and AMWA, submitted new materials in opposition to the Act. PHACT, the organization co-founded by Dr. Cook, also submitted new material in support of the Act. Additionally, there were numerous letters from physicians and other interested individuals both in support of and in opposition to the Act. However, review of these documents and materials confirms that there was no new medical evidence before Congress, and that the post-*Stenberg* submissions simply reiterated the same arguments and positions that Congress had before it prior to the courts' decisions in *Stenberg*.

Accordingly, based on the record before this court and a review of the Congressional Record, this court finds that at the time that it made its findings, Congress did not have before it any *new* medical evidence or studies not available to both the district court and Supreme Court in *Stenberg*, at the time that the courts issued their decisions.

### c. Specific Congressional Findings

As noted, in support of its conclusion that the partial-birth abortion procedure is never necessary to preserve the health of the mother, Congress also made numerous

---

**49.** Of the three physicians who testified before Congress regarding the proposed ban and the necessity or safety of the procedure, all three offered positions supporting the ban. Two of the three included Dr. Cook, who testified before this court, and Dr. Neerhof, the physician who co-authored the pre-*Sten-*

*berg* 1998 article relied on by Congress extensively for its findings. Moreover, two of the three, Dr. Cook and Dr. Aultman, had testified prior to the *Stenberg* decision. Dr. Neerhof, who had not testified previously, offered testimony that mirrored the Sprang/Neerhof article published in 1998.

other findings at sections 14(A) through (O). *See* Act, § 2(14)(A)-(O). These findings include Congress' more specific or particular factual findings pertinent to its ultimate conclusion. Many of these findings were also disputed within Congress.[50]

In support of its argument that this court must defer to Congress' determination that the procedure is never medically necessary, the government argues that Congress' finding is reasonable because "numerous express findings" support its "considered judgment" or ultimate finding that the procedure is never necessary. However, based on the evidence before this court, which includes the Congressional Record, and this court's review of Congress' specific findings in support of its conclusion, this court finds that Congress' conclusion that the procedure is never medically necessary is not reasonable and is not based on substantial evidence.

The individual findings, which Congress and the government contend support deference to Congress' ultimate finding, tend to fall into one of two categories: (1) the findings are factually wrong; or (2) there is a split in the medical evidence regarding the particular issue, and Congress has chosen a position. With respect to this latter category, there are, however, several findings that are legally irrelevant to the necessity of a health exception, as discussed in this court's conclusions of law below.

It is noteworthy that all of the government's own witnesses disagreed with many of the specific congressional findings. In particular, Dr. Bowes, who had submitted several letters to Congress in support of a ban and one of the government witnesses whom this court found particularly credible, disagreed not only with particular findings, but with Congress' ultimate finding that:

> Partial-birth abortion remains a disfavored procedure that is not only unnecessary to preserve the health of the mother, but, in fact, poses serious risks to the long-term health of women, and in some circumstances their lives.

Act, § (2); see Tr. Vol. 6 at 975: 1–8 (Bowes).[51]

---

**50.** Congress rejected an amendment to strike the congressional findings of fact. *See* Record Exh. A, at 29. Proponents of the amendment argued that:

> [M]any of the findings are incorrect and inaccurate. As we have already discussed, the majority of medical evidence indicates that intact D & E ... procedure is a safe abortion procedure and may be the safest option for some women.... It's not just these medical experts who believe that [intact D & E] is a safe and effective procedure that is most appropriate in certain cases, [but][t]he United States Supreme Court came to the same decision in *Stenberg v. Carhart*.... The findings in this bill simply ignore the significant evidence of medical experts and the reasoned judgment of the Supreme Court.... The second reason to remove these findings is that they are not supported by any sort of legislative record. These findings, which are identical to last year's bill, were drafted and introduced before the Constitution Subcommittee even

had a legislative hearing to establish any case to justify the bill. Talk about putting the cart before the horse.
*Id.* at 83–84.

**51.** Dr. Bowes, testified that he disagreed with this congressional finding, and asserted that it was his view that "no valid scientific evidence support[ed] the finding." *Id.* at 975:9–11. Dr. Bowes asserted that no one in Congress "sought his opinion whether [he] thought the findings in the bill were accurate," and that if they had, he would have advised Congress that "they were not accurate." *Id.* at 986:5–11. Moreover, he noted that his support for the Act is not "based on any concerns for protecting maternal health" because he does not "think that those have been established." *Id.* at 976:8–11. Instead, his "support for the Act is based on [his] ethical opposition to abortion in general," and his "ethical opposition to abortion procedures previability is not in any way particular to the intact D & E procedure as opposed to other methods of abortion." *Id.* at 976:17–21.

### i. *Alleged Consensus of Opinion Regarding Procedure*

In support of its ultimate finding, Congress found that "[a] moral, medical, and ethical consensus exists that the practice of performing a partial-birth abortion ... is a gruesome and inhumane procedure that is never medically necessary and should be prohibited." Act § 2, (1). This particular finding resembles the assertion in the Sprang/Neerhof article that "[a]n extraordinary medical consensus has emerged that intact [D & E] is neither necessary nor the safest method for late-term abortions," and the article's reference to the procedure as "needlessly inhumane." Exh. A–55, at 745.

However, the evidence available to Congress in passing the Act in 2003, and currently before this court, very clearly demonstrates the opposite: that there is no medical or ethical consensus regarding either the humanity, necessity, or safety of the procedure. Instead, the same division of opinion among physicians and the relevant ethical groups exists today as existed when *Stenberg* was decided. There is no consensus that intact D & E, which this court has found is a variant of the D & E procedure, is any less humane than other surgical abortion procedures. Nor is there a consensus regarding its safety or necessity.

Indeed, Congress' very findings contradict its assertion that there is a consensus. Congress subsequently noted in its findings that "a prominent medical association," the AMA, concluded that "there is no consensus among obstetricians about" the use of intact D & E. *See* Act, § 2(14)(C) (citing AMA Fact Sheet 6/97). In fact, there was no consensus even within the AMA itself regarding the procedure. *See* Tr. Vol. 7 at 1163 (Sprang) (agreeing that AMA task force did not reach a consensus regarding the ethics of intact D & E). As noted, Congress also had before it a joint statement from the AMA and ACOG, the two largest medical organizations taking positions on the issue, which recognized the disagreement among and within the two organizations. *See also* Record Exh. A, at 66 (opponents to the Act in Congress argued that the "medical community does not support banning partial-birth abortions," and cited to ACOG findings and sixteen medical organizations in addition to ACOG who oppose a ban).

Moreover, three of the four government witnesses that testified on the subject recognized that there was no consensus regarding the procedure. This included Dr. Sprang, who testified contrary to his 1998 article, and agreed that "there is a variation of opinion" among the medical community regarding whether intact D & E should be banned. Tr. Vol. 7 at 1170:6 (Sprang); *see also id.* at 1168:22–1169:1 (also agreeing that there is no ethical consensus among physicians and professors at Northwestern University, where he teaches and practices). Another government witness, Dr. Shadigian, further agreed that "there is no consensus in the medical community that the procedures banned by the [Act] are not safer for some women in some circumstances than other available procedures." Tr. Vol. 8 at 1297:18–24 (Shadigian). She testified that "responsible physicians could reach different conclusions as to the medical appropriateness of banning the procedures covered by the Act." *Id.* at 1297:12–17; *see also* Tr. Vol. 6 at 960:13–22 (Bowes) (agreeing that "there is a body of medical opinion which consists of [a] responsible group of physicians that hold the opinion that intact removal of a fetus during a surgical abortion may be the safest procedure for some women in some circumstances"); *see also* Cain Depo. 37:12–22; 220:14–222:21; 234:20–235:12; Exh. 14 (noting that ACOG's Executive Board reaffirmed the group's January 1997 policy statement regarding "partial-

birth abortion" and that it remains the policy of ACOG today); Kissell Depo. Exh. 41, 42, 43 (AMWA position); Baker Depo. Exh. 5 (APHA position); Whitelaw Depo. Exh. 70(CMA); CMA Amicus Brief.

### ii. *Current Medical Practice Regarding Intact D & E*

Additionally, Congress found that "particularly among physicians who routinely perform other abortion procedures, partial-birth abortion remains a disfavored procedure ... [within] the medical community" and asserted that it "is in fact unrecognized as a valid abortion procedure by the mainstream medical community." Act, § 2(2); 14(O).

Congress appears to have based this finding on the testimony of a few physicians who themselves never perform intact D & E procedures. However, as demonstrated both by the lack of consensus in the medical community as discussed above, and by twelve of the plaintiffs' witnesses before this court who routinely perform abortion procedures at highly-respected institutions, this finding is simply inaccurate. Several of plaintiffs' witnesses were, in the course of caring for their patients, performing intact D & E procedures at the time Congress conducted its hearings and was gathering evidence regarding intact D & Es. *See, e.g.,* Tr. Vol. 2 at 187:15–19 (Sheehan); Tr. Vol. 4 at 584:16–585:3 (Broekhuizen). Had Congress attempted to obtain an opinion from "physicians who routinely perform other abortion procedures," it would have learned that this was the case.

Moreover, among the government experts that testified, it is apparent that it is not just intact D & Es that they disfavor. Those experts who disfavored intact D & E, which included all of the government's witnesses, tend to disfavor elective abortion generally and *all* D & E procedures, whether intact or by disarticulation.

Among these are Dr. Cook and Dr. Sprang. As noted, Dr. Cook's preference for induction over D & E, intact or by disarticulation, is so strong that there are circumstances under which Dr. Cook would utilize induction, or an even less safe alternative, hysterotomy, when the medical evidence and literature suggests that the safest procedure is D & E. *See, e.g.,* Tr. Vol. 6 at 972:6–8 (Bowes) ("in most cases an intact D & E would be preferable to a hysterotomy").

Dr. Sprang attested that his ethical objections could be extended to any D & E, and even to an induction abortion in which a fetus was delivered partially, and having become lodged in the mother's cervix, was subject to demise outside the body of the mother. Tr. Vol. 7 at 1165:10–15 (Sprang). He asserted that his ethical objections "were not limited to intact D & E, but to any situation where the act that killed the fetus occurred outside of the body of the mother." *Id.* Dr. Shadigian and Dr. Bowes likewise testified that they did not find intact D & E any more objectionable than D & E in general. Tr. Vol. 8 at 1303:25–1304:12 (Shadigian); Tr. Vol. 6 at 976:17–21 (Bowes).

### iii. *Alleged Complications Associated with Intact D & E*

Congress further found that intact D & E "poses serious risks to the long-term health of a woman and in some circumstances, their lives." Act, § 2(2); 14(A). Again, this finding is very similar to the Sprang/Neerhof article, which concludes that "intact [D & E] poses serious medical risks to the mother." Exh. A–55, at 744. The specific risks listed by Congress mirror those listed in the article:

(1) an alleged risk of cervical incompetence, a result of cervical dilation making it difficult or impossible for a

woman to successfully carry a subsequent pregnancy to term;

(2) an increased risk of uterine rupture, abruption, amniotic fluid embolus, and trauma to the uterus as a result of converting the fetus to a footling breach position, a procedure which, according to a leading obstetrics textbook, "there are very few, if any indications for other than delivery of a second twin";[52]

(3) a risk of lacerations and secondary hemorrhaging due to the doctor blindly forcing a sharp instrument into the base of the unborn child's skull while he or she is lodged in the birth canal;[53]

(4) a risk [that the procedure described above in # 3] could result in severe bleeding, bringing with it the threat of shock, and ultimately resulting in maternal death.[54]

*See id.* at § 2(14)(A).

The risks described above, however, to the extent that they exist, are not specific to intact D & E, but instead may be present in any D & E, a procedure whose necessity and safety are not at issue because it is generally considered both necessary and safe. *See, e.g.,* Tr. Vol. 7 at 1148:4–6 (Sprang) (agreeing with AMA task force that it is unresolved whether these complications are more likely to result from D & E or intact D & E than from labor induction techniques). Moreover, this court has already found, based

on medical evidence—evidence that was available to Congress at the time that it made its findings—that the government has not shown that intact D & E increases the likelihood of cervical incompetence, and that the risk of laceration caused by instrumentation or fetal bone fragments is minimal and no greater than that associated with all D & E procedures.

Additionally, the evidence before this court demonstrated that abruption, the separation of the placenta from the uterus prior to birth, and amniotic fluid embolus, in which amniotic fluid enters the mother's blood stream via the placenta, resulting in a potentially lethal maternal infection, are not risks specific or relevant to an intact D & E. *See* Grunebaum Depo 198:11–22; 200:7–201:2; Tr. Vol. 4 at 669:20–671:8 (Creinin) (explaining that in an abortion, "separating the placenta from the uterus is an innate part of the D & E" and that it is irrelevant to the procedure when the placenta is removed); *id.* at 673:5–675:17 (amniotic fluid embolus likewise irrelevant to D & E abortion because the amniotic fluid is removed at the beginning of the procedure); Tr. Vol. 5 at 827:19–829:1 (Westhoff). While the parties did not offer testimony at trial on the issue of whether intact D & E is more likely to cause maternal death, the court notes that abortion, generally, remains an extremely safe procedure in terms of mortality. Moreover, none of

---

**52.** According to the Sprang/Neerhof article:

An integral part of the [intact D & E] procedure is an internal podalic version, during which the physician... convert[s] the lie to a footling breech. The internal version carries risk of uterine rupture, abruption, amniotic fluid embolus, and trauma to the uterus. According to *Williams Obstetrics*, 'there are very few, if any indications for internal podalic version other than for delivery of a second twin.'
Exh. A–55, at 744.

**53.** The Sprang/Neerhof article provides in pertinent part:

The second potential complication of intact [D & E] is the risk of iatrogenic laceration and secondary hemorrhage. Following internal version and partial breech extraction, scissors are forced into the base of the fetal skull while it is lodged in the birth canal. This blind procedure risks maternal injury from laceration of the uterus or cervix by the scissors....
Exh. A–55, at 745.

**54.** The article continues, that the "blind procedure," quoted above, "could result in severe bleeding and the threat of shock or even maternal death." *Id.*

the physicians who testified before this court and who perform intact D & Es have had a patient die as a result of the procedure.[55]

#### iv. *Comparative Safety of Intact D & E*

Congress further found that "[t]here is no credible medical evidence that partial-birth abortions are safe or are safer than other abortion procedures." Act. § 2, 14(B). In support Congress asserted that:
(1) No controlled studies of partial-birth abortions have been conducted nor have any comparative studies been conducted to demonstrate its safety and efficacy compared to other abortion methods;[56]
(2) there have been no articles published in peer-reviewed journals that establish that partial-birth abortions are superior in any way to established abortion procedures;
(3) there are currently no medical schools that provide instruction on abortions that include the instruction in partial-birth abortions in their curriculum.[57]

*See id.* at § 2, (14)(B).

However, for the reasons discussed above in this court's findings, the trial evidence in this case demonstrates that the intact D & E procedure is as safe as D & E, and under some circumstances, is safer.

Even the government's witnesses, including Dr. Sprang, testified that there is no medical proof that intact D & E is less safe. *See* Tr. Vol. 7 at 1167:23–24 (Sprang) (agreeing that there is no absolute proof that intact D & E is less safe

than D & E generally); *see also* Tr. Vol. 9 at 1486:22–1487:5 (Cook) (agreeing that with respect to instrumentation, "when comparing D & E with intact D & E at the same gestational age, there appear to be some benefits to intact D & E"); Tr. Vol. 8 at 1293:1–3; 1298:4–7 (Shadigian) (agreeing that "there is no basis in the literature to prove that [intact D & E] is less safe" and that the necessity of a procedure is not the same thing as its safety).

Government witness Dr. Bowes testified that it has been established that "overall D & E is a safer procedure than induction." Tr. Vol. 6 at 946:5–7 (Bowes). Moreover, he noted that he was "not aware of any evidence-based medicine that establishes that the removal of the fetus intact during the D & E is less safe than a D & E with disarticulation." *Id.* at 971:14–17; 972:9–13 (agreeing also that "there is no reliable medical basis upon which to say that intact removal of a fetus during a D & E is any more dangerous to a woman than any other abortion method"). Dr. Bowes further agreed that "intuitively, it is safer if the fetus can be removed with fewer instrumental passes" and generally that, intact D & E may be safer for this reason. *Id.* at 944:21–25.

#### *Absence of Controlled Studies or Peer-Reviewed Articles*

As was the case at the time the Supreme Court decided *Stenberg*, there was a similar absence of studies or peer-reviewed articles at the time that Congress made its

---

55. Additionally, Chasen's study, completed following the congressional findings, preliminarily indicated that the intact D & E method led to fewer major health complications than D & Es by disarticulation, which leads to the inference that the death rate for intact D & E would be lower as well.

56. The Sprang/Neerhof article states: "There exist no credible studies on intact [D & E]

that evaluate or attest to its safety." Exh. A–55, at 744.

57. Again, Congress appears to have taken this at least in part from the Sprang/Neerhof article which asserts that the intact D & E "procedure is not recognized in medical textbooks nor is it taught in medical schools or in obstetrics and gynecology residencies." *Id.*

findings regarding the comparative safety of intact D & E.[58]

However, the court notes, based on the Supreme Court's decision in *Stenberg,* that the absence of studies does not support Congress' ultimate finding that the procedure is never necessary or that a health exception is never necessary. Instead, the Supreme Court specifically held that the "absence of controlled medical studies that would help answer these medical questions" was one of the "medically related evidentiary circumstances," which led it to conclude that the Nebraska law "requires a health exception." *Stenberg,* 530 U.S. at 937, 120 S.Ct. 2597.

*Medical School Instruction/Curriculum*

Congress appears to have based its erroneous conclusion that "there are currently no medical schools that provide instruction on abortions that include the instruction of partial-birth abortions in their curriculum" on the testimony of one of the witnesses in the *Stenberg* case. *See* Act, § 2(14)(B).

Based on the evidence available to this court, the intact D & E procedure is taught at several major medical schools, including those that are a part of New York University, Columbia University, Cornell University, Albert Einstein College of Medicine, Northwestern University, UCSF, UCSD, and the University of Pittsburgh, and is performed at some of the leading medical institutions in the country, including the hospitals associated with those universities. Tr. Vol. 5 at 795:15–22; 805:1–6; 830:10–832:6 (West-

hoff) (the procedure "lies within the standard of medical care" as it is taught and performed safely at "a number of . . . university-based abortion services" and is "widely accepted among academically-based abortion providers"). Moreover, intact D & E is discussed in authoritative medical texts, including those authored or co-authored by Drs. Paul and Westhoff. *See, e.g.* Tr. Vol. 6 at 950:16–24 (Bowes) (agreeing that Dr. Paul's abortion textbook is authoritative and that Westhoff's reputation was high in the obgyn community).

Accordingly, because there are circumstances in which intact D & E may be the safest procedure, contrary to the congressional finding otherwise, a ban on intact D & E does not promote or advance the health interest of pregnant women seeking to terminate a pregnancy. The opposite is true because the Act, as written, may force pregnant women to undergo a procedure that is less safe under their particular circumstances.

**v. *Characterization of Intact D & E as "Infanticide"***

Congress also found that the ban "will draw a bright line that clearly distinguishes between abortion and infanticide." Act, § 2(14)(G). It found that intact D & E constitutes "the killing of a child that is in the process, in fact mere inches away from becoming a 'person.'" *See id.* at § 2(14)(H). Congress further analogized the procedure to the "killing of a newborn infant," and asserted that the "vast majority of babies killed during partial-birth abortions are 'alive' until the end of the procedure." *See id.* at § 2(14)(L),(M).[59]

---

**58.** However, as noted above in this court's findings, since the enactment of the Act, the Chasen study, a historical cohort study comparing the safety of D & E with intact D & E has been accepted for publication by a leading peer-reviewed obgyn journal. Government witness Dr. Bowes agreed "that a study like Dr. Chasen's is often the first step in the

process towards a randomized controlled trial." Tr. Vol. 6 at 961:5–8 (Bowes).

**59.** Again, these "findings" were undoubtedly derived in part from the Sprang/Neerhof article, which provides in pertinent part:

The intact [D & E] procedure involves literally delivering the fetus so that only the

However, what the congressional findings omit, as discussed, is that the Act applies regardless of gestational age or viability. It is not disputed in this case that the "newborn infant" or "baby" "mere inches away from being born," as referred to by Congress, and with respect to all of the intact D & E procedures at issue in this case, *is not viable,* meaning that the fetus would be unable to survive outside of the mother. Tr. Vol. 1 at 74:14–80:20 (Paul); Tr. Vol. 1 at 165:7–21 (Sheehan); Tr. Vol. 2 at 281:15–21 (Drey); Tr. Vol. 3 at 420:9–22(Doe); Tr. Vol. 4 at 550:18–552:9 (Broekhuizen); Tr. Vol. 4 at 657:3–8 (Creinin); Tr. Vol. 5 at 822:9–824:2 (Westhof); Tr. Vol. 11 at 1783:15–1786:3 (Chasen).

Congress' grossly misleading and inaccurate language, comparing the procedure to the "killing of a newborn infant," appears to have been intentional. Congress was aware that the Act as written applied to previable fetuses. In fact, as noted in this court's discussion regarding the Act's undue burden, Congress rejected alternatives and amendments to the Act that would have limited its applicability to viable fetuses. *See* 149 Cong. Rec. S3600 (daily ed. March 12, 2003) (statement of

Sen. Feinstein); 149 Cong. Rec. H4939 (daily ed. June 4, 2003) (statement of Rep. Greenwood); 149 Cong. Rec. H4948 (daily ed. June 4, 2003) (statement of Rep. Baldwin). Moreover, government witness, Dr. Cook, who testified twice before Congress, testified before this court that he suggested to Congress limiting the applicability of the law to 20 weeks lmp, and his advice was ignored. Tr. Vol. 9 at 1529:7–21 (Cook).

Finally, for reasons that this court has already discussed with respect to the undue burden and overbreadth of the law, a "live" fetus is not the same as a "viable" fetus. In using the term "live," Congress appears to have intentionally disregarded the relevant medical distinction.

### vi. *Fetal Pain*

Congress also made findings that, in the course of an intact D & E, the fetus experiences pain.[60] *See* Act, § 2(14)(M). This finding appears to have been based on the testimony of a nurse from Dr. Haskell's office who claimed that she observed an intact D & E on a 26 week lmp fetus who visibly showed signs of pain,[61] and on the testimony and submissions of other physicians, including several articles on the subject authored by Dr. Anand, a government witness before this court.[62]

head remains within the cervix. At this juncture, the fetus is merely inches from being delivered and obtaining the full legal rights of personhood under the U.S. Constitution.... [M]any otherwise prochoice individuals have found intact [D & E] too close to infanticide to ethically justify its continued use.

Exh. A–55, at 745. In support, that article cites to one Senator's statement that intact D & E "is as close to infanticide as anything I have come upon," as reported by *The Washington Post. Id.* at 746 & n. 20.

**60.** Congress found that "the fetus' perception of pain is even more intense than that of newborn infants and older children when subjected to the same stimuli" and that the "fetus fully experiences the pain associated with decompression of the skull and suction

of its contents." *See id.* at § 2(14)(M). This is commensurate with the Sprang/Neerhof article, which concluded that: "[W]ith intact [D & E], pain management is not provided for the fetus, which is literally within inches of being delivered. Forcibly incising the cranium with a scissors and then suctioning out the intracranial contents is certainly excruciatingly painful." Exh. A–55, at 745.

**61.** Dr. Haskell's office rebutted the nurse's testimony with a letter to Congress attesting that he did not perform the procedure on fetuses post–24 wks. Additionally, the nurse's testimony to that effect was ruled inadmissible in subsequent litigation. *See* Record Exh. F, at 17–21, 205–206.

**62.** All of those articles were published considerably prior to any of the *Stenberg* decisions.

For the reasons discussed in this court's findings, there is debate within the medical community on this issue. Therefore, the position that Congress has taken is neither incorrect nor entirely unsupported. It is, however, irrelevant to the question of whether the Act requires a health exception, as discussed in this court's conclusions of law.

### vii. *Impact on Medical Profession*

Finally, Congress also found that the Act preserves the integrity of the medical profession. *See* Act, § 2(14)(G). In support, Congress found that intact D & E "confuses the medical, legal, and ethical duties of physicians to preserve and promote life" because the "physician acts directly against the physical life of a child, whom he or she had just delivered, all but the head, out of the womb, in order to end that life." *Id.* at § 2(14)(J). Congress further asserts that the procedure "appropriates the terminology and techniques used by obstetricians in the delivery of living children ... and instead uses those techniques to end the life of the partially-born child." *Id.* Accordingly, Congress found that intact D & E "undermines the public's perception of the appropriate role of a physician during the delivery process, and perverts a process during which life is brought into the world, in order to destroy a partially-born child." *Id.* at § 2(14)(K).

Aside from Congress' mischaracterization of the intact D & E procedure, which is already discussed above and in this court's findings, Congress' conclusion that the Act would somehow promote the integrity of the medical profession is not supported by the evidence before Congress or before this court. In addition to the plaintiffs' witnesses who all discussed the ex-

traordinarily negative impact that the Act would have and has had on their relationships with their patients and on their ability to provide the care that they deem to be in their patients' best interests, many, if not all, of the government witnesses also testified contrary to this congressional finding.

Dr. Cook, who testified before Congress, testified at trial that if he had written the bill, he probably would have written it so that physicians had greater leeway depending on whether fetal demise had already occurred. Tr. Vol. 9 at 1524:10–1526:8 (Cook). Moreover, Dr. Shadigian agreed, testifying that "the decision of whether there is a threat to the woman's life must be left to the physician's best medical judgment." Tr. Vol. 8 at 1322:1–4 (Shadigian); *see also* Tr. Vol. 6 at 944:15–19 (Bowes) (agreeing that regarding a medical exception, "a physician should be permitted to rely on his or her own best medical judgment to determine if there is such an emergency").

Further, as noted above, many major medical organizations, including ACOG, AMWA, and the CMA oppose the Act on this basis alone. The CMA submitted an amicus brief before this court that was especially illustrative of the negative impact that the ban will have on the medical profession. The CMA was persuasive in noting that the Act will likely have the following adverse consequences:

(1) it will disrupt the informed consent relationship between physicians and their patients because physicians are ethically bound to assist the patient in choosing among safe medical options and providing the safest care possible consistent with the patients' wishes;

*See, e.g.,* Record Exh. A, at 4 & n. 6 (citing Anand & Hickey, *Pain and Its Effects in the Human Neonate and Fetus,* 317 New England Journal of Medicine 1321 (Nov.1987) in sup-

port of the proposition that "[i]t is well documented that a baby is highly sensitive to pain stimuli at [around 20 weeks] and even earlier").

(2) because of the ambiguity in the act, it will have a particularly chilling effect on all abortion practices since physicians will have difficulty interpreting what conduct is prohibited by the Act;

(3) the Act's lack of a health exception will prevent physicians from exercising their best medical judgment in light of a woman's particular condition and situation;

(4) the Act could have the effect of placing physicians in an awkward situation with their staff, and could result in a conflict of interest very similar to the nurse who testified before Congress;

(5) the Act's civil liability provisions may force physicians to violate patients' confidentiality, requiring the consent of the patients' husband or parents under certain circumstances; and

(6) the Act could hinder medical advancements in reproductive health.

*See generally* March 25, 2004 CMA amicus brief.

### d. Conclusion Regarding Deference to Congress' Finding that a Health Exception is Unnecessary

It is apparent to this court, upon examination of the record before Congress and the evidence presented at trial, that Congress' ultimate finding that "partial-birth abortion" is never necessary to preserve the health of the mother is the type of "finding" described by Justice Thomas in *Lamprecht v. FCC.*[63] In that case, Justice Thomas noted:

We know of no support ... for the proposition that if the constitutionality of a statute depends in part on the existence of certain facts, a court may not review a legislature's judgment that the facts exist. If a legislature could make a statute constitutional simply by "finding" that black is white or freedom, slav-

ery, judicial review would be an elaborate farce. At least since *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), that has not been the law. 958 F.2d 382, 392 n. 2 (D.C.Cir.1992).

For all of the reasons discussed above, this court concludes that Congress' "finding" that the intact D & E procedure is never medically necessary is unreasonable and is not supported by substantial evidence as was available to Congress at the time. Accordingly, this court declines to defer to Congress' "finding." *See Turner II,* 520 U.S. at 196, 117 S.Ct. 1174.

Instead, this court will rely on its own findings set forth above, based on the evidence before this court, deferring also to the Supreme Court's decision in *Stenberg* because:

When the Court has interpreted the Constitution, it has acted within the province of the Judicial Branch, which embraces the duty to say what the law is. When the political branches of the Government act against the background of judicial interpretation of the Constitution already issued, it must be understood that in later cases and controversies the Court will treat its precedents with the respect due them under settled principles, including *stare decisis,* and contrary expectations must be disappointed.

*City of Boerne,* 521 U.S. at 534, 117 S.Ct. 2157 (citations omitted) (striking down the RFRA and concluding that it "is the Court's precedent, not RFRA, which must control").

### E. Conclusions of Law: A Health Exception is Constitutionally Required

■ Based on the evidence before this court, and the court's determination that

---

**63.** In *Lamprecht,* the D.C. Circuit held that an FCC preference for female owners of radio

stations violated equal protection principles. 958 F.2d 382 (D.C.Cir.1992).

Congress' ultimate finding that partial-birth abortion is never necessary to preserve the health of the mother is not entitled to deference, the court finds that the Act's life exception is constitutionally inadequate.

As noted, the Supreme Court was clear in *Stenberg* that a health exception is required "[w]here substantial medical authority supports the proposition that banning a particular abortion procedure could endanger women's health." 530 U.S. at 938, 120 S.Ct. 2597. Under those circumstances, the *Stenberg* Court held that "*Casey* requires the statute to include a health exception when the procedure is 'necessary, in appropriate medical judgment, for the preservation of the life *or health* of the mother.'" *Id.*

Here, the evidence establishes that the Act would ban procedures performed prior to 24 weeks lmp, which is generally considered previability. However, based on the Supreme Court's holding in *Stenberg*, the necessity of a health exception does not depend on whether the 24 week period is considered pre- or postviability. *Id.* at 931, 120 S.Ct. 2597. Accordingly, to the extent that there is any dispute regarding fetal viability in accordance with the evidence before this court, the court's conclusion that a health exception is required does not depend on whether the procedures at issue are performed pre- or postviability.

The Act here excepts only "a partial-birth abortion that is necessary to save the life of a mother." The court finds, however, that a health exception is necessary as well because, the three "medically related evidentiary circumstances" present before the Supreme Court in *Stenberg* exist here as well. *See id.* at 936–37, 120 S.Ct. 2597.

First, the record before this court, like the district court's record in *Stenberg*, demonstrates that "significant medical authority supports the proposition that in some circumstances, [intact D & E] is the safest procedure." *Id.* at 932, 120 S.Ct. 2597. These include the following considerations, present also in the *Stenberg* case, that among other maternal and fetal conditions for some woman, other abortion procedures present "a larger than necessary risk" of:

(1) a longer operating time; (2) greater blood loss and infection; (3) complications from bony fragments; (4) instrument-inflicted damage to the uterus and cervix; (5) exposure to the most common causes of maternal mortality (DIC and amniotic fluid embolus); [and] (6) complications arising from retained fetal parts.

*Carhart II*, 11 F.Supp.2d at 1127.

While this court has also found that an intact D & E, under these circumstances, may not be the *only* safe option available to preserve the life or the health of a woman, that finding does not undermine the necessity of a health exception in this case. As the Supreme Court explained in *Stenberg*, such a finding is irrelevant where the evidence demonstrates that intact D & E is "significantly safer." *Stenberg*, 530 U.S. at 934, 120 S.Ct. 2597. This court has similarly found that intact D & E may be significantly safer for certain women under the particular circumstances listed above.[64]

Second, for the reasons explained above, this court has also found that there continues to be a division of opinion among highly qualified experts regarding the necessity or safety of intact D & E. If anything, since the Supreme Court's decision in

---

**64.** Moreover, to the extent that the Act bans D & E by disarticulation, which this court has found that it does (in accordance with the undue burden analysis), a health exception is undoubtedly necessary, and the Act is unconstitutional on that basis alone.

*Stenberg,* the evidence before this court suggests that the majority of highly-qualified experts on the subject believe intact D & E to be the safest, most appropriate procedure under certain circumstances.

Finally, as discussed, there continues to be an absence of controlled medical studies that provide a definitive answer regarding the safety and necessity of intact D & E. However, those studies that have been conducted since the Supreme Court decided *Stenberg,* including the Chasen study, provide medical support for the conclusion that intact D & E is a safe, and sometimes necessary, procedure. While the government has suggested a lack of diligence or effort on the part of the Act's opponents in conducting such controlled medical studies, as this court has noted, experts agree that the Chasen study is the "first step" in conducting even more comprehensive studies regarding intact D & E.[65]

The government's interests in protecting potential life and minimizing potential pain to the fetus do not alter this court's finding regarding the necessity of a health exception. In *Stenberg,* the Supreme Court rejected the same arguments that were made by Nebraska regarding the state's interests in that case. 530 U.S. at 930–931, 120 S.Ct. 2597. The Court recognized that "subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion...." *Id.* at 931, 120 S.Ct. 2597. Nevertheless, it found Nebraska's argument regarding its interest in the potentiality of life unpersuasive because, like the Act here, Nebraska's law did not "sav[e] the fetus from destruction," but instead simply "regulate[d] only a

*method* of performing abortion." *Id.* Most significantly, the Supreme Court held that Nebraska's alleged interests did not "make any difference to the question at hand, namely, the application of the 'health' requirement." *Id.*

Accordingly, for these reasons, this court does not find that the government's asserted fetal interests override the necessity of a health exception to preserve the life and health of the mother.

Nor does this court find that the possibility of inducing fetal demise prior to performing an intact D & E obviates the need for a health exception. The government has suggested that physicians and patients can avoid falling within the Act's prohibitions if fetal demise, by chemical injection or otherwise, is induced prior to the procedure. However, to read into the Act such a requirement would, for the reasons discussed in this court's findings, subject women to unnecessary side effects and risks, however small, without providing any medical benefit to them. Moreover, there are certain circumstances under which inducing fetal demise is not possible or effective.

Accordingly, for all the reasons discussed above, this court finds that the Act's omission of a health exception renders the Act unconstitutional.[66]

## CONCLUSION

For all of the reasons discussed above, this court concludes that the Act is unconstitutional because it (1) poses an undue burden on a woman's ability to choose a second trimester abortion; (2) is unconstitutionally vague; and (3) requires a health

---

**65.** The court notes that enforcement of the Act would make any further studies impossible to conduct.

**66.** In view of this finding, it is unnecessary for the court to reach the plaintiffs' challenge

to the adequacy of the existing life exception on the basis that it does not provide for a determination made pursuant to the physician's "appropriate medical judgment."

exception as set forth by the Supreme Court in *Stenberg*. Permanent injunctive relief is appropriate given that plaintiffs have demonstrated that the Act violates their constitutional rights on the above three bases. *See Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *see also Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir.1997).

Accordingly, defendant John Ashcroft, in his official capacity as Attorney General of the United States, and his employees, officers, agents, attorneys, and successors in office are PERMANENTLY ENJOINED from enforcing the Partial–Birth Abortion Ban Act of 2003 against plaintiffs Planned Parenthood Federation of America and Planned Parenthood Golden Gate, intervenors City and County of San Francisco, their members, officers, agents, servants, employees, contractors, and those persons in active concert or participation with those persons listed above. This order applies to those persons set forth above as they render services in any facility, including facilities that are not owned or operated by plaintiffs and/or intervenors.[67]

The clerk shall close the file.

**IT IS SO ORDERED.**

---

**67.** While recognizing that a nationwide injunction may be appropriate, in deference to the New York and Nebraska courts, this court declines plaintiffs' request to issue a nationwide injunction at this time. *See Bresgal v.* *Brock*, 843 F.2d 1163, 1170–71 (9th Cir.1987) (nationwide injunction not necessarily overbroad where "such breadth is necessary to give prevailing parties the relief to which they are entitled").